**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF UTAH, CENTRAL DIVISION**

| | | |
|---|---|---|
| **RALPH LEROY MENZIES,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  03-CV-0902-CVE-FHM** |
| | ) | |
| **SCOTT CROWTHER, Warden of** | ) | |
| **the Utah State Prison,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION AND ORDER

This matter comes before the Court on a second amended petition for writ of habeas corpus

(Dkt. # 109) filed by Utah death row inmate, Ralph Leroy Menzies, pursuant to 28 U.S.C. § 2254.

Petitioner, who appears through counsel, challenges his conviction and sentence in the Third District

Court of Salt Lake County, State of Utah, Criminal Case No. 86-887.  Respondent filed a response

(Dkt. # 123) to the second amended petition, and petitioner filed a reply (Dkt. # 127). The state court

record has been produced.[1]  The Court considered all of these materials in reaching its decision.  For

the reasons discussed below, the Court concludes the petition should be denied.

# I.
# BACKGROUND

## A.  Factual Background

Historical facts found by the state court are presumed correct, unless the petitioner rebuts the

same by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Since petitioner has failed to rebut

the facts, as set forth by the Utah Supreme Court, this Court hereby adopts the factual findings which

the Utah Supreme Court found were "largely undisputed."[2]

> At approximately 9:50 p.m. on Sunday, February 23, 1986, Salt Lake County
> Sheriff's deputies were dispatched to the Gas-A-Mat station located at 3995 West
> 4700 South.  The deputies found customers waiting to pay, but the cashier's booth

---

[1]     This Court received nine boxes of documents, along with five CDs ("disks") that contain
copies of all of the state court records.  Notice of submittal of the disks was filed as Dkt. #
110.  Due to the extensive number of files on those disks, the disks were placed in permanent
storage in the office of the Clerk of Court.  Subsequently, a supplement to the state court
record was filed containing a sixth disk.  Since this disk contained only one pleading, the
Appellant's Opening Brief Re: Denial of Habeas Relief in the Utah Supreme Court filed on
February 14, 2013, the pleading was attached in CM/ECF to the supplemental pleading.  See
Dkt. # 136-1.  Where available, references to documents and pleadings from the  state trial
court proceedings are contained in the trial record on appeal (ROA) and shall be referred to
as Trial ROA at ____.  Where available, references to documents and pleadings from the
state postconviction proceedings are contained in the postconviction ROA and shall be
referred to as PC ROA at ____.  Where any  document is contained on a disk filed in this
case, the Court will give a second citation as Dkt. # 110, Disk # ___, Vol. # ___ at ___ (this
page number will refer to the .pdf page number of the document on the disk) or Dkt. # 136-1,
at ___.  References to the trial transcript shall be referred to as "J.T. Tr. [Date], at ___";
references to other hearings held by the trial court shall be referred to as "Tr. [Date] at ___."
In addition to the hard copies of transcripts, all trial transcripts are contained on Disk # 1;
transcripts of later proceedings are contained on Disk # 5.

[2]     State v. Menzies (Menzies II), 889 P.2d 393, 396 (Utah 1994).

2

empty and the door locked. The station attendant, Maurine[3] Hunsaker, was missing, although her coat was still in the booth and a radio was playing. A preliminary accounting indicated that approximately $70 in cash was missing from the register.[4]

At approximately 11:05 that same night, Maurine telephoned her husband, Jim, at their home. Deputy Scott Gamble was with Jim at the time. Maurine told her husband that she had been robbed and kidnapped, but that her abductor(s) intended to release her sometime that night. Deputy Gamble also spoke with Maurine, and she again indicated that a robbery had occurred. However, Deputy Gamble was unable to get a clear answer regarding the kidnapping. Maurine also refused, or was unable, to answer Gamble's question regarding her location. When Jim again spoke with his wife, she asked him what she should do. The line then went dead.

At approximately 5 p.m. on Tuesday, February 25, 1986, a hiker discovered Maurine Hunsaker's body at the Storm Mountain picnic area in Big Cottonwood Canyon. She had been strangled and her throat cut. Her purse, which had not been found at the gas station, was not with the body or in the immediate area. That same evening, a jailer at the Salt Lake County Jail found several identification cards belonging to Maurine Hunsaker in a desk drawer in one of the jail's changing rooms. He recognized the picture on the driver's license as a woman reported missing the night before on television news.

Detectives later determined how the cards got into the drawer. [Petitioner] had been booked into the jail on unrelated charges at approximately 6:40 p.m. on Monday, February 24, 1986. He left the booking area for a short time without supervision and was found in a changing room. Shortly thereafter, Maurine Hunsaker's identification cards were found in a clothing hamper in that room. Unaware of the kidnapping, the officer who found the cards placed them in the desk drawer where the jailer found them Tuesday night.

Also on Tuesday evening, a high school student named Tim Larrabee was watching the news and learned that a hiker had discovered a woman's body at Storm Mountain. On Wednesday, Larrabee notified deputies that he and his girlfriend, Beth Brown, had skipped school on Monday, February 24th, and were at Storm Mountain. Larrabee had noticed a full-sized, two-door, late-1960s model, cream-colored automobile in the parking lot. He said that the vehicle was similar in appearance to a 1968 Buick Riviera. Larrabee and Brown also saw a man and woman at the site but saw nothing unusual happening between the two. They later heard a short scream, but Larrabee thought that the woman had slipped or had been frightened by an

---

[3]     Although the victim is referred to as "Maureen" in the charging document and certain trial court documents, the Utah Supreme Court correctly referred to her as "Maurine," as that is her legal name on her social security card. See State's Exhibit # 42 (Dkt. # 110, Disk # 1, Trial/Exhibits/1988.02.10 Trial).

[4]     An area manager for Gas-A-Mat later conducted a more thorough accounting and determined that approximately $116 in cash was missing.

animal. Approximately fifteen minutes later, Larrabee saw the man walking alone. Neither Larrabee nor Brown saw the woman again.

Larrabee described the suspect as a white male, 25-30 years of age, 6'1" tall, with a medium build (approximately 170 pounds), black, curly hair, prominent sideburns and a mustache, and wearing wire-rimmed glasses. A detective created a composite drawing of a possible suspect based on the description. After learning that Maurine's identification cards had been found at the jail, sheriff's detectives compared the composite drawing with the photographs of more than two hundred inmates who had been booked into the facility from February 23rd through the 25th. Three photographs were chosen as possible matches, including that of [petitioner].

Detective Jerry Thompson questioned [petitioner] regarding the Hunsaker homicide. [Petitioner] said that on Sunday, February 23rd, he borrowed a car from Troy Denter and picked up a young woman on State Street that evening. He told the detective that while with this woman, he picked up his girlfriend, Nicole Arnold, and drove around until the two women began to argue. [Petitioner] reportedly dropped Nicole and then left the unidentified woman somewhere around 7200 West and 2400 South. According to [petitioner], he then went home, where he talked with Nicole.

On February 28th, the detectives questioned Denter. He told them he loaned his cream-colored 1974 Chevrolet to [petitioner] on Sunday, February 23rd, sometime in the afternoon. He said that [petitioner] did not return the car until the afternoon of Monday, February 24th. Detectives then took Larrabee and Brown to the jail parking lot, where they identified Denter's car as the one they saw at Storm Mountain. They were also shown a photospread consisting of six photographs. Larrabee indicated that [petitioner] appeared to be the man he saw at Storm Mountain. Several months later, however, Larrabee did not correctly identify [petitioner] in a lineup.

Detectives found Maurine Hunsaker's fingerprint in Denter's car and located her purse in [petitioner's] apartment. [Petitioner] was charged with first degree murder, a capital offense. After the charges were filed, Walter Britton, [petitioner's] cell mate, contacted detectives about the homicide. Britton said that on February 27th, [petitioner] told him that he killed Hunsaker to prevent her from testifying against him.

Menzies II, 889 P.2d at 396-97 (second footnote in original) (citation omitted).

## B. Procedural History

On March 8, 1988, a jury convicted petitioner of criminal homicide, murder in the first degree, a capital offense, and aggravated kidnapping. Trial ROA at 898-99. The jury found petitioner not guilty of aggravated robbery. Id. at 900. The jury specifically found that the homicide

was committed while petitioner was engaged in the commission of, and attempt to commit, or flight after committing, or attempting to commit robbery and aggravated kidnapping. Id. at 898. Petitioner waived his right to a jury trial for the penalty phase of the proceedings, and on March 23, 1998, he was sentenced to death. Id. at 1104-07. On May 26, 1988, petitioner filed a docketing statement in the Utah Supreme Court raising twenty-nine issues on appeal. State v. Menzies (Menzies I), 845 P.2d 220, 223 (Utah 1992). On September 5, 1988, the trial transcript was certified. Id. Prior to filing his brief, petitioner "observed that the record contained numerous transcription errors." Id. As a result,

> [o]n November 15, 1989, prior to submitting his brief, [petitioner] filed a "motion to set aside judgment and/or for a new trial" on the ground that the transcription errors rendered the record inadequate for appeal. The trial court referred the matter to [the Utah Supreme Court], and [petitioner] modified his motion to include claims concerning the qualifications of the court reporter.

Id. The matter was remanded "to the trial court to conduct proceedings to correct the record, pursuant to rule 11(h) of the Rules of the Utah Supreme Court." Id. Additionally, the trial court was directed to rule on petitioner's "motion for a new trial and to resolve all issues relating to the qualifications of the court reporter and the adequacy of the transcript." Id. After several hearings, the trial court denied the motion, and the Utah Supreme Court affirmed, ordering petitioner to proceed with the appeal on the merits. Id. at 242.

Thereafter, petitioner raised forty-four issues on appeal. See Brief of Appellant filed on September 14, 1992 (Dkt. # 110, Disk # 1, Related Appeals/Direct Appeal, Dkt. # 100). The Utah Supreme Court's majority opinion addressed only the following claims of error on appeal: (1) failure to remove five jurors for cause; (2) failure to grant a mistrial following "surprise" testimony by Tim Larrabee; (3) admission of preliminary hearing testimony of a jailhouse informant; (4) consideration

of a heinousness aggravating circumstance during the penalty phase; (5) admission of victim impact evidence during the penalty phase; and (6) use of the incorrect standard in sentencing petitioner to death. The remaining claims were all denied as being without merit. The Utah Supreme Court affirmed the sentence and conviction. Menzies II, 889 P.2d at 406-07.

On April 20, 1995, petitioner, who was represented by attorneys acting pro bono, initiated postconviction proceedings in the state district court. Petitioner amended his petition on May 2, 1995, asserting seventy-three separate claims for relief, including claims that his trial counsel provided ineffective assistance. Menzies v. Galetka (Menzies III), 150 P.3d 480, 489-90 (2006).

On March 3, 1998, Edward K. Brass was appointed by the state court to represent petitioner in all proceedings before the court. Unfortunately, Brass defaulted petitioner's entire postconviction proceeding, resulting in the dismissal of his case. Id. at 489. Following the dismissal, Brass withdrew and new counsel was appointed in state court on November 6, 2003.

On August 12, 2003, petitioner attempted to set aside the dismissal under rule 60(b), Utah Rules of Civil Procedure.[5] On February 26, 2004, the state district court denied the rule 60(b) motion.[6] On December 15, 2006, the Utah Supreme Court found that petitioner was entitled to rule 60(b)(6) relief "due to the extraordinary circumstances of Brass' ineffective assistance of counsel

---

[5]    Petitioner's new state postconviction counsel filed this federal habeas action on December 17, 2003. Dkt. # 15.

[6]    On September 14, 2004, counsel filed a motion to stay this action pending exhaustion of petitioner's postconviction remedies (Dkt. # 34), and on October 27, 2004, this action was stayed. Dkt. # 41.

and grossly negligent representation" and, therefore, it reversed and remanded the postconviction

proceeding. <u>Menzies III</u>, 150 P.3d at 520.[7]

On remand, the trial court granted the state summary judgment, denied petitioner's cross-

motion for summary judgment, and on March 23, 2012, dismissed the fifth amended petition for

postconviction relief. This was affirmed by the Utah Supreme Court in <u>Menzies v. State</u> (<u>Menzies</u>

<u>IV</u>), 344 P.3d 581 (Utah 2014).

On February 25, 2015, petitioner informed this Court that the state court proceedings had

concluded. Dkt. # 100. On February 26, 2015, an order (Dkt. # 102) was entered lifting the stay and

petitioner was given permission to file an amended petition, which was subsequently filed on March

18, 2015. Dkt. # 103. Thereafter, pursuant to a stipulation and motion of the parties (Dkt. # 105),

the Court adopted a new schedule (Dkt. # 106) giving petitioner until August 31, 2015 to file a

second amended petition, which was subsequently filed on August 31, 2015. Dkt. # 109. In the

second amended petition, petitioner lists forty-three (43) claims for relief in the table of contents.

Dkt. # 109.[8] Respondent filed a response (Dkt. # 123) to the second amended petition by and

through the Attorney General of the State of Utah, and petitioner filed a reply (Dkt. # 127).

Petitioner asserts the following errors entitle him to release from custody: (1) the state court failed

---

[7]     While the postconviction proceedings were pending, Utah enacted legislation governing the
appointment and payment of counsel in postconviction death penalty proceedings. <u>See</u> Utah
Code Ann. § 78-35a-202 (West 2008).

[8]     In the body of the second amended petition, petitioner has withdrawn claims 21, 22, and 32.
Additionally, petitioner has incorporated claim 27 into claim 25 and claim 30 into claim 26.
For ease of reference, this court will refer to each claim as it was originally numbered within
the table of contents to the second amended petition. <u>See</u> Dkt. # 109, at 2-7. Additionally,
page numbers to specific federal court docket entries refer to the page number assigned at
the top of the pleading by this Court's CM/ECF system.

to provide him with an adequate transcript of his trial thereby violating his rights to due process and equal protection under the Fourteenth Amendment of the United States Constitution, his right to effective assistance of counsel on appeal under the Sixth and Fourteenth Amendments to the United States Constitution, and his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution; (2) the trial court's refusal to excuse unqualified jurors for cause deprived him of his right to a fair trial by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution; (3) the state's failure to disclose exculpatory evidence deprived him of his Fourteenth Amendment right to due process of law; (4) the trial court's refusal to declare a mistrial following a hearing regarding the withholding of exculpatory evidence violated his right to due process under the Fourteenth Amendment; (5) the trial court deprived petitioner of his Sixth Amendment right to confront a witness by admitting preliminary hearing testimony of Walter Britton, a jailhouse informant; (6) the trial court denied petitioner's Sixth and Fourteenth Amendment rights when it quashed the subpoena for the prosecutor who testified on behalf of Walter Britton at a hearing to modify his sentence; (7) the trial court's refusal to grant a mistrial after a law enforcement official violated a court order prohibiting testimony about his parole status denied him of his rights to due process as guaranteed by the Sixth and Fourteenth Amendments; (8) the state court's failure to declare a mistrial following alleged prejudicial incidents during the trial violated petitioner's right to an impartial jury as guaranteed by the Sixth and Fourteenth Amendments; (9) petitioner's Fourteenth Amendment right to due process was violated when he was briefly shackled in front of the jury following the fainting of one of the jurors; (10) the state's illegal search of petitioner's home violated his Fourth Amendment rights, and the admission of evidence seized during the illegal search violated his rights to due process and a fair

trial under the Sixth and Fourteenth Amendments; (11) petitioner was deprived of his right to due process under the Fourteenth Amendment when he was convicted and sentenced on the basis of inadmissible evidence; (12) petitioner was denied his Fourteenth Amendment right to due process when he was convicted and sentenced without having each and every element of the charges against him established beyond a reasonable doubt; (13) petitioner was denied his Fourteenth Amendment right to due process where a jury instruction allowed a jury to make a finding of guilt based on a degree of proof less than beyond a reasonable doubt; (14) petitioner was denied effective assistance of counsel during the guilt phase of his trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments; (15) the admission of petitioner's prison file during the penalty phase violated his rights to confrontation, to due process of law, and to a reliable capital sentencing hearing, under the Sixth, Eighth, and Fourteenth Amendments; (16) the admission of petitioner's rap sheets during the penalty phase violated petitioner's rights to confrontation, to due process of law, and to a reliable capital sentencing hearing, under the Sixth, Eighth, and Fourteenth Amendments; (17) the state's failure to disclose the contents of petitioner's prison file violated his rights to due process under the Fourteenth Amendment and to a reliable capital sentencing proceeding under the Eighth Amendment; (18) the admission of petitioner's prison file violated his rights to be free from self-incrimination under the Fifth Amendment and to due process of law under the Fourteenth Amendment; (19) the admission of three psychiatric evaluations during the penalty phase violated petitioner's right to be free from self-incrimination under the Fifth Amendment, his right of confrontation under the Sixth Amendment, his rights to a fair and reliable capital sentencing proceeding under the Sixth and Fourteenth Amendments, and his right to due process of law under the Fourteenth Amendment; (20) the admission of the testimony of Dr. Patricia Smith violated

petitioner's rights to due process under the Fourteenth Amendment and to a reliable capital sentencing proceeding under the Eighth Amendment; (21) withdrawn;[9] (22) withdrawn;[10] (23) the admission of photographs of the corpse violated petitioner's rights to due process under the Fourteenth Amendment and to be free from cruel and unusual punishment under the Eighth Amendment; (24) the admission of victim impact evidence during the penalty phase of his trial deprived petitioner of his Eighth Amendment right to a reliable sentencing; (25) prosecutorial misconduct, by improperly referring to items not in evidence and arguing improper factors in aggravation, deprived petitioner of his rights to due process and to a fair and reliable sentencing hearing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments; (26) the state court's reliance on uncharged aggravating circumstances denied petitioner of his rights to due process under the Fourteenth Amendment and to a reliable and fair capital sentencing proceeding under the Eighth Amendment; (27) incorporated into 25; (28) the state court's reliance on speculation that petitioner might escape or be paroled violated petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment; (29) petitioner's death sentence violated his right to due process under the Fourteenth Amendment and his right under the Eighth Amendment to a reliable capital sentencing proceeding because the sentencer relied on unconstitutional aggravating factors; (30) incorporated into 26; (31) petitioner was denied effective assistance of counsel during the penalty phase of his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments; (32)

---

[9] <u>See</u> Dkt. # 109, at 186.

[10] <u>Id.</u>

withdrawn;[11] (33) the state court's failure to record all proceedings violated petitioner's right to a public trial and his right to appeal and seek collateral review of his conviction under the Sixth and Fourteenth Amendments; (34) the state denied petitioner's right to due process of law guaranteed by the Fourteenth Amendment by failing to give him the benefit of well-established state law in his direct appeal; (35) a change in state law to include the possibility of a life sentence without parole renders petitioner's sentence cruel and unusual under the Eighth Amendment; (36) the state court erred in its application of the <u>Wood</u> factors in violation of petitioner's rights to due process under the Fourteenth Amendment and to a reliable sentence under the Eighth Amendment; (37) appellate counsel's failure to raise meritorious claims on direct appeal violated petitioner's rights to effective assistance of counsel and due process under the Sixth and Fourteenth Amendments; (38) ineffective assistance of counsel during state postconviction proceedings deprived petitioner of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (39) petitioner was sentenced to death under a death penalty scheme which failed to adequately channel the application of the death penalty in violation of the Eighth Amendment; (40) the Utah death penalty statute violates the Fifth and Fourteenth Amendments by creating a presumption of death in sentencing and placing the burden of overcoming the evidence of conviction upon the defendant; (41) it is cruel and unusual punishment to execute petitioner after he has spent twenty-seven years on death row; (42) the death penalty violates the Eighth Amendment's ban on cruel and unusual punishment; and (43) the cumulative effect of all errors during trial, appeal, and postconviction proceedings entitles petitioner to relief.

## II.
## GENERAL CONSIDERATIONS

---

[11]      <u>See</u> Dkt. # 109, at 265.

## A. Standard of Review

Title 28 U.S.C. § 2254(a) provides:

. . . a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

On April 25, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA made significant changes to federal habeas corpus law, specifically delineating the circumstances under which a federal court may grant habeas relief. Title 28, section 2254(d) now provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court **shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless** the adjudication of the claim—
    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

The Supreme Court recognizes this is a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011). Moreover, review is limited to the record that was before the state court that adjudicated the claim on the merits. Id. A habeas petitioner has the burden to establish that the state court applied the clearly established federal law in an objectively unreasonable manner. Woodford v. Visciotti, 537 U.S. 19, 25 (2002). Further, "an

*unreasonable* application of federal law is different from an *incorrect* application of federal law."

Williams v. Taylor, 529 U.S. 362, 366 (2000) (italics in original).

AEDPA's standard of review applies to habeas petitions filed after the effective date of AEDPA (as this case was), regardless of whether the crime or state trial occurred prior to the effective date.  Gardner v. Galetka, 568 F.3d 862 , 879 (10th Cir. 2009) (citing Eze v. Senkowski, 321 F.3d 110, 121 (2d  Cir. 2003)); see also Rogers v. Gibson, 173 F.3d 1278 (10th Cir. 1999) (applying AEDPA to a crime that occurred prior to effective date of AEDPA).

The standard of review applicable to each claim will depend on how the claim was resolved by the state courts.  Alverson v. Workman, 595 F.3d 1142, 1146 (10th Cir. 2010) (citing Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007)).  Review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits, Cullen, 563 U.S. at 181, and the state-court decision is measured against Supreme Court holdings, as opposed to the dicta, as of the time of the relevant state-court decision.  Williams, 529 U.S. at 412.  Thus, the first step in applying AEDPA is to determine whether there was clearly established federal law at the time the conviction became final.  § 2254(d)(1).  The state court is not required to cite to controlling Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts such precedent.  Early v. Packer, 537 U.S. 3, 8 (2002).  The Supreme Court recognizes that "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 571 U.S. 12, 19 (2013).  AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

This Court must also review any factual findings of the state court to ascertain whether they are unreasonable in light of the evidence presented at trial. Determinations of factual issues made by state courts are presumed correct and a habeas petitioner must rebut the presumption by clear and convincing evidence. § 2254(e)(1).

Petitioner initially filed a request for appointment of counsel on October 14, 2003, and filed his original petition herein on December 17, 2003. Therefore, this Court finds the provisions of Chapter 153 of AEDPA[12] are applicable to this case. See Lindh v. Murphy, 521 U.S. 320 (1997).

## B. Exhaustion

A threshold question this Court must decide is: Has petitioner exhausted the remedies available in state court or is there either an absence of available state corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the applicant? § 2254(b)(1). As a general rule, federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. § 2254(b)(1)(A); Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977) (reviewing history of the exhaustion requirement). "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991) (explaining that the exhaustion requirement is "grounded in principles of comity").

The exhaustion doctrine is designed to protect the state court's role in the enforcement of federal law while preventing the disruption of state judicial proceedings. Rose v. Lundy, 455 U.S. 509, 518 (1982). Since it would be "unseemly" for a federal court to upset a state court conviction

---

[12]     28 U.S.C. §§ 2241-54.

without first according the state court an opportunity to correct a constitutional violation, federal courts apply the doctrine of comity and allow the state court the opportunity to correct the constitutional violation.  Davila v. Davis, 137 S. Ct. 2058, 2064 (2017).  In order for exhaustion to have occurred, a habeas petitioner must have "fairly presented" to the state courts the "substance" of his federal habeas corpus claim.  Picard v. Connor, 404 U.S. 270, 275-76 (1971).  The exhaustion requirement will not have been met if the prisoner presents new legal theories or factual claims in his federal habeas petition.  Anderson v. Harless, 459 U.S. 4, 6-7 (1982).  Rather, a federal habeas petitioner must

> provide the state court's [sic] with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.  It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.

Id. (citations omitted).  A state prisoner must "present the state courts with the same claim he urges upon the federal courts."  Picard, 404 U.S. at 276; see also Smallwood v. Gibson, 191 F.3d 1257, 1267 (10th Cir. 1999) (finding ineffective assistance of counsel claims unexhausted when petitioner asserted a different basis for his claims in state court than presented in federal habeas petition).  Put another way, a federal habeas petitioner must present his claim as a federal constitutional claim in the state court proceedings in order for the claim to be exhausted.  See Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam).

A habeas petition containing both exhausted and unexhausted claims will, in most cases, be deemed a mixed petition requiring dismissal.    See Rose v. Lundy, 455 U.S. 590 (1982).[13]  Where it is clear, however, that a procedural bar would be applied by the state court if the claim were now presented, the reviewing habeas court may examine the claim under a procedural bar analysis instead of requiring exhaustion.  Coleman, 501 U.S. at 735 n.1.    Furthermore, a court has the discretion to ignore the exhaustion requirement altogether and deny the petition on the merits if the claims lack merit.  28 U.S.C. § 2254(b)(2); Moore v. Schoeman, 288 F.3d 1231 (10th Cir. 2002).  Respondent contends, and petitioner has admitted, that some of his claims are unexhausted.  As a result, the Court will address the threshold question of exhaustion as it arises in each claim.

## C.  Procedural Bar

As a general rule, a federal court should dismiss unexhausted claims without prejudice so the petitioner can pursue available state-court remedies.  Demarest v. Price, 130 F.3d 922, 939 (10th Cir. 1997).  Dismissal without prejudice for failure to exhaust state remedies, however, is not appropriate if the state would now find those claims procedurally barred on independent and adequate state procedural grounds.  Smallwood, 191 F.3d at 1267 (citing Coleman, 501 U.S. at 735 n.1).

"When a petitioner fails to properly raise his federal claims in state court, he deprives the state of 'an opportunity to address those claims in the first instance' and frustrates the state's ability to honor his constitutional rights."  Cone v. Bell, 556 U.S. 449, 465 (2009) (citing Coleman, 501 U.S. at 748).  Thus, consistent with the exhaustion requirement, when a petitioner fails to raise his

---

[13]    In Rhines v. Weber, 544 U.S. 269 (2005), the Supreme Court, recognizing the interplay between the one-year statute of limitations imposed by AEDPA and Lundy's dismissal requirement, authorized use of a "stay and abeyance" procedure similar to what was done in this case in 2004.

federal claims in compliance with relevant state procedural rules, a state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review. Id.

Where a state court's finding is separate and distinct from federal law, it will be considered "independent." See Ake v. Oklahoma, 470 U.S. 68, 75 (1985); Duvall v. Reynolds, 139 F.3d 768 (10th Cir. 1998). If the finding is applied "evenhandedly to all similar claims," it will be considered "adequate." Maes v. Thomas, 46 F.3d 979 (10th Cir. 1995) (citing Hathorn v. Lovorn, 457 U.S. 255, 263 (1982)). In cases where the state-law default prevented the state court from reaching the merits of the federal claim, the claim ordinarily cannot be reviewed in the federal courts. Ylst v. Nunnemaker, 501 U.S. 797 (1991). However, it is up to the reviewing federal habeas court to ascertain whether the state court's judgment rests on independent and adequate state grounds. Cone, 556 U.S. at 465.

Under Sykes and its progeny, an adequate and independent finding of procedural default will bar federal habeas review, unless the habeas petitioner can show "cause" for the default and "prejudice attributable thereto" or demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice." Harris v. Reed, 489 U.S. 255, 262 (1989) (citing Murray v. Carrier, 477 U.S. 478, 485 (1986)); see also Breechen v. Reynolds, 41 F.3d 1343, 1353 (10th Cir. 1994), and cases cited therein. "'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." Moore, 288 F.3d at 1233 n.3 (citing Hain v. Gibson, 287 F.3d 1224, 1240 (10th Cir. 2002)).

In Martinez v. Ryan, 566 U.S. 1 (2012), however, the Supreme Court qualified Coleman "by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Id. at 9. This narrow exception "applies only to claims of 'ineffective assistance of counsel at trial' and only when, 'under state law,' those claims 'must be raised in an initial-review collateral proceeding.'" Davila, 137 S. Ct. at 2065-66 (quoting Martinez, 566 U.S. at 9). A federal habeas court is not allowed to hear substantial, but procedurally defaulted, claims of ineffective assistance of appellate counsel based on the fact that a prisoner's state postconviction counsel provided ineffective assistance by failing to raise those claims. Id. The procedural default rule is not a jurisdiction rule; rather it is based upon the principles of comity and federalism. Jackson v. Shanks, 143 F.3d 1313, 1317 (10th Cir. 1998).

### III.
### CLAIMS FOR RELIEF

**Claims 1 and 33: Inadequate Transcript of Trial**

In his first claim for relief, petitioner argues he was denied his right to due process and equal protection under the Fourteenth Amendment, his right to the effective assistance of counsel on appeal under the Sixth and Fourteenth Amendments, and his right to be free from cruel and unusual punishment under the Eighth Amendment because the state court failed to provide him with an adequate transcript of his trial. This claim was raised in petitioner's direct appeal and, therefore, it has been exhausted. Respondent asserts that petitioner has failed to establish that the Utah Supreme Court's decision was based on an unreasonable determination of the facts. Dkt. # 123, at 76.

In claim 33, petitioner further argues the state court failed to record all proceedings in violation of his right to a public trial and his right to appeal and seek collateral review of his conviction under the Sixth and Fourteenth Amendments. Petitioner admits that claim 33 has not been properly presented to the state court. Dkt. # 109, at 265. Respondent argues that petitioner has procedurally defaulted this claim. Dkt. # 123, at 194.

Petitioner first attacks the competency of the court reporter, arguing that she lacked the requisite skills to perform her duties. Petitioner, however, cites no Supreme Court cases and this court is not aware of any that suggest there is a constitutional right to a court reporter who meets some undefined "minimum qualifications." Rather, in Griffin v. Illinois, 351 U.S. 12 (1956), the Supreme Court refused to hold that the state had to purchase a stenographer's transcript in every case where a defendant could not afford to purchase it. So long as the state affords indigent defendants adequate and effective appellate review based upon the state's rules of procedure and appellate practice in the same manner as defendants who have money to buy a transcript, the system will pass constitutional muster. Id.; see also Eskridge v. Washington State Bd. of Prison Terms and Paroles, 357 U.S. 214 (1958) ("We do not hold that a State must furnish a transcript in every case involving an indigent defendant. But here, as in the Griffin case, we do hold that, '(d)estitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts.'" (citation omitted)).[14]

Petitioner continues his attack on the record made in his case arguing a

prejudicial defect in appellate proceedings violates the Eighth Amendment guarantee that any punishment imposed must be proportionate and not arbitrary. The use of an

---

[14]    It should be pointed out that no allegations have been made that this court reporter was used solely to record trials where indigent defendants were involved.

unreliable record violates an appellant's Sixth Amendment rights to due process and equal protection, given that other capital appellants have their cases reviewed on the basis of an accurate and complete trial record.

Dkt. # 109, at 63. Again, petitioner cites no Supreme Court cases directly supporting these conclusory allegations.

Finally, petitioner argues in claim 33 that failure to record all proceedings, including multiple bench conferences, arguments in chambers, and other legal proceedings, violated his right to a public trial and his right to appeal and to seek collateral review of his conviction and sentence under the Sixth and Fourteenth Amendments. Respondent argues this claim is procedurally barred. Petitioner asserts his failure to raise this claim can be excused by demonstrating cause and prejudice, and then he argues ineffective assistance of state appellate and postconviction counsel constitutes cause for the default.

The Supreme Court has never held that a verbatim transcript of every court proceeding is required to satisfy due process. To the contrary, the record must only be of "sufficient completeness" to permit proper consideration of a defendant's claims. Draper v. State of Wash., 372 U.S. 487, 499 (1963).

In rejecting petitioner's claim, the Utah Supreme Court made the following findings of fact:

. . . . . the court reporter, Ms. Tauni Lee, was not licensed in the state of Utah. However, evidence was presented that Lee attended Empire Business College in Santa Rosa, California, where she completed a twenty-month course in court reporting. In 1985, Lee passed the California certified shorthand reporter examination and received an overall score of 97 percent. From August 1985 through July 1987, she worked as a certified court reporter in municipal court in Sonoma County and in municipal and superior court in Marin County. During her tenure in California, Lee completed several transcripts that were used for appeals.

In July 1987, Lee moved to Utah. She stopped paying her California dues because she believed it was no longer necessary to retain her California certification. By reason of nonpayment of dues, her California certification lapsed. Lee, thinking

that a national certification was all that was needed to work in Utah, applied for certification from the National Shorthand Reporters Association ("NSRA"). On the basis of her California test scores, Lee obtained a national certification and began paying dues to the NSRA.

In January 1988, Lee was appointed court reporter in the Third Judicial District Court. The administrative office of the courts was aware that Lee was not licensed in Utah. However, on the basis of her qualifications and because she was the only applicant, the office determined that Lee could hold the position until June 1988, when the next Utah examination for certified reporters was scheduled. This determination was based on Utah Code Ann. § 78-56-17, which provides for appointment of unlicensed court reporters on a temporary basis. Lee reported [petitioner's] trial in February and March 1988.

In preparing the transcript of [petitioner's] trial, Lee used a note reader and a proofreader. The note reader would transcribe Lee's shorthand notes and mark any portions of the transcript where she had difficulty reading the notes. Lee would then proofread the portions of the transcript that were marked. The proofreader read over the rest of the transcripts, looking for misspellings and similar errors. It was established in the hearings that certified reporters use note readers in preparing transcripts, and Lee's note reader was considered "excellent." However, it was common practice for the court reporter to proofread all the work prepared by a note reader.

In November 1990, the trial court denied [petitioner's] motion for a new trial based on Lee's licensure status. The court ruled that Lee was "de facto" qualified because of her "training, testing, and experience." The court also ruled that for a new trial to be granted on the basis of transcription errors, [petitioner] must show that the errors are uncorrectable and prejudicial. After this ruling, the parties continued in their attempts to correct the record.

As part of the procedures to correct the record, Lee read from her shorthand notes while representatives of both parties read from a copy of the original transcript. Discrepancies between the original version and Lee's notes were noted on this copy of the transcript. Because the process was conducted in California, this copy of the transcript is referred to as the "California version." In addition to the proofreading of the original transcript, several motions and stipulations were filed in an attempt to correct the record. However, in many instances, the parties were unable to agree on what had occurred at trial, and therefore, the record could not be corrected through the procedures of rule 11(h).

Proceedings were also conducted to determine if the errors that existed in the record warrant a new trial. It was established that the trial judge, a member of the prosecutor's staff, and two lawyers representing [petitioner] had read the transcript from cover to cover. After this extensive review, the trial court concluded that none of the transcription errors were prejudicial. On February 20, 1991, the trial court issued its final ruling, denying [petitioner's] motion for a new trial on the ground that "the transcript is sufficiently accurate to afford defendant a full and fair review of his

issues on appeal." The court also designated the California version of the transcript, as well as the original version of the transcript, as part of the record on appeal.

Menzies I, 845 P.2d at 223-24.

The Utah Supreme Court went into great detail explaining the requirements of Utah law regarding the court reporter's qualifications and found, under Utah law, that the court reporter was qualified to report the proceedings. After reviewing the transcripts of petitioner's trial, this Court finds a sufficient record was made to allow appellate review of petitioner's trial. Moreover, petitioner has not, after extensive and thorough reviews of the transcript and the reporter's notes, shown that the findings of the Utah Supreme Court were unreasonable in light of the evidence presented on this issue. As a result, this Court holds that petitioner has not established any basis for federal habeas relief under the Sixth Amendment, Eighth Amendment, or the Due Process or Equal Protection Clauses of the Fourteenth Amendment, simply because there were some errors which were identified in subsequent reviews of the transcript.

As to claim 33, because there is no federal constitutional right to have all proceedings recorded, this Court finds that appellate counsel was not ineffective in failing to raise this issue on direct appeal. Further, the record reveals that the trial court allowed counsel to make a record, after off-the-record conferences, where counsel felt it was warranted. See J.T. Tr. of February 18, 1988, at 1069-73 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) at 175-79). Since this Court does not find this claim potentially meritorious, this Court finds that petitioner has failed to establish "good cause" to overcome the procedural default of appellate counsel. As a result, this Court denies claims 1 and 33.

**Claim 2: Impartiality of Jury**

In his second claim for relief, petitioner argues that he was denied the right to a fair trial by an impartial jury in violation of the Sixth and Fourteenth Amendments when the trial court refused to excuse four unqualified jurors for cause. Petitioner raised this claim in his direct appeal and, therefore, it has been exhausted. Since the claim was adjudicated on the merits, respondent asserts that petitioner has failed to establish that the decision of the Utah Supreme Court was based upon an unreasonable determination of the facts.

In Irwin v. Dowd, 366 U.S. 717 (1961), the Supreme Court held that "the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," and the "failure to accord an accused a fair hearing violates even the minimal standards of due process." Id. at 722 (citations omitted). In Witherspoon v. Illinois, 391 U.S. 510 (1968), the Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id. at 522. In a footnote, the Supreme Court stated:

> We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

Id. at n.21 (emphasis in original). The main objective of voir dire in this area is to obtain jurors who will follow the law. The Supreme Court again emphasized the need to obtain jurors who are able to follow the law in Boulden v. Holman, 394 U.S. 478 (1969), stating:

> [I]t is entirely possible that a person who has a 'fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law-to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case.

Id. at 483-84. Thereafter, in Adams v. Texas, 448 U.S. 38 (1980), the Court summarized its cases stating as a general proposition:

> [A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.

Id. at 45.

Further, in Patton v. Yount, 467 U.S. 1025 (1984), the Supreme Court held that the impartiality of a juror is a question of fact. Id. at 1036. A trial judge's factual determination as to a potential juror's bias is accorded a presumption of correctness pursuant to 28 U.S.C. § 2254(d). Wainwright v. Witt, 469 U.S. 412 (1985). Because issues of credibility and demeanor are critical to a trial judge's decision regarding removal of a juror, review of such decisions is extremely deferential. Castro v. Ward, 138 F.3d 810, 825 (10th Cir. 1998). Thus, "[a] federal habeas court may reverse a state trial court's findings of juror impartiality only upon a showing of 'manifest error'." Lucero v. Kirby, 133 F.3d 1299, 1308 (10th Cir. 1998) (citations omitted). To establish such a showing, a petitioner "must demonstrate either that the trial resulted in actual prejudice or that it gave rise to a presumption of prejudice because it involved such a probability that prejudice will result that it is deemed inherently lacking in due process." Id. (citations and internal quotation marks omitted).

Moreover, in Ross v. Oklahoma, 487 U.S. 81 (1988), the Supreme Court rejected "the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an

impartial jury." Id. at 88. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." Id. (citing Hopt v. Utah, 120 U.S. 430, 436 (1887), and Spies v. Illinois, 123 U.S. 131 (1887)).

In considering this issue, the Utah Supreme Court, recognizing the holding in Ross, held:

> . . . even if the trial court erred in failing to remove those prospective jurors whom [petitioner] found objectionable, that error was harmless. *See* Utah R.Crim.P. 30(a). [Petitioner] has not asserted that he faced a partial or biased jury during the guilt phase of his trial or that the jury was made more likely to convict as a result of "death qualifying" the jury. *Cf. State v. Young*, 853 P.2d 327, 342, 386-95, 414-17 (Utah 1993). Furthermore, while the bulk of [petitioner's] objections to potential jurors revolved around those individuals' views on the death penalty, the penalty phase was tried to the court rather than to the jury.

Menzies II, 889 P.2d at 400.

While petitioner did not argue on direct appeal that he faced a partial or biased jury during the guilt phase of his trial, he did argue, during postconviction proceedings, that trial and appellate counsel were ineffective for failing to strike Juror Rosenkrantz. He claimed that the answers given by her in voir dire show bias as to the penalty phase which, according to petitioner, equates to bias

in the guilt phase.[15]   The state district court denied the claim and petitioner did not appeal the decision.

In this proceeding, petitioner not only argues that he was forced to use four peremptory challenges on jurors who should have been excused for cause, but also argues, in claim 38, that postconviction counsel was ineffective by not buttressing the failure to strike unqualified jurors with a claim that Rosenkrantz was biased.[16]   No Supreme Court case has ever held that a juror who may possibly be in favor of the death penalty is necessarily more inclined to convict.   A review of the questions asked and the answers given during her individual voir dire does not convince this court that Rosenkrantz was biased during the guilt phase of trial.    Rather than showing bias, the questioning reveals that the juror had "never really formed a firm opinion about the death penalty;" was not "irrevocably committed to what penalty a person convicted of first degree murder should receive;" and would follow the court's instructions and vote for the death penalty only if the state

---

[15]   The individual questioning of Juror Rosenkrantz is contained in the J.T. Tr. of February 17, 1988, at 860-73 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1154) at 344-57).   The trial court's ruling was made on the totality of the juror's responses and begins on the bottom of page 872 (356).   The first seven lines on the top of page 873 (357) are not legible on either the original transcript (which is contained in Addendum 8 of the trial court records) or on the copy of the original transcript.   One of the copies of the transcript, however, is legible and reveals that the trial court judge found:

> Based on her responses to the various questions, the court is of the opinion that she would consider all of the evidence and try the case proved [sic] beyond a reasonable doubt aggravating circumstances and only if appropriate that she would impose -- bring back a verdict of death.   Otherwise, she would consider mitigating circumstances and bring back a verdict of life in prison.
> So deny the motion for cause.

J.T. Tr. of February 17, 1988, at 860-73 (Add. 23), also contained on Disk # 1.

[16]   Claim 38 is addressed separately below.

proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances and that the death penalty was the only appropriate penalty. She also indicated that she could consider a sentence less than death. See J.T. Tr. of February 17, 1988, at 860-73 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1154) at 344-357). Without any evidence to support a claim of juror bias, this Court finds petitioner has failed to establish that the Utah Supreme Court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, this Court denies claim 2.

**Claims 3 and 4: Failure to Disclose Exculpatory Material**

Petitioner asserts in his third claim that the state violated his right to due process of law under the Fourteenth Amendment by failing to disclose certain irregularities with an eyewitness's identification. Similarly, in his fourth claim, petitioner argues that the failure of the state trial court to grant a mistrial after learning of the state's conduct also violated his right to due process. Petitioner raised both of these claims in his direct appeal and, therefore, the claims have been exhausted. Respondent argues these claims should be denied based upon 28 U.S.C. §§ 2254(d)(1) and (2).

Petitioner alleges that the prosecution failed to disclose a conversation that occurred between the prosecutor and Tim Larrabee following Larrabee's misidentification during a lineup. Specifically, Tim Larrabee, the high school student who saw a man and woman at Storm Mountain on the day of the homicide, participated in a lineup conducted by the sheriff's office approximately three months after describing the suspect to detectives with the sheriff's office. During that lineup,

Larrabee identified someone other than petitioner as the person he saw at Storm Mountain. During Larrabee's direct examination, the prosecutor did not ask any questions about the lineup. On cross-examination, however, defense counsel brought up the misidentification. As a result, during re-direct, the prosecutor asked Larrabee about a conversation the two had on the way back to the prosecutor's office following the lineup. According to Larrabee, he asked the prosecutor whether "number 6" was the correct person. "Number 6" was the petitioner. <u>Menzies II</u>, 889 P.2d at 400.

Since the prosecution had not disclosed this post-lineup conversation to defense counsel, defense counsel moved to strike "all testimony of Mr. Larrabee made concerning his equivocation of the lineup selection"[17] and requested that the court admonish the jury not to consider any of that testimony. The trial court granted the motion, and ordered: "The testimony in regards to what [Mr. Larrabee] talked about later with the people after the lineup. He indicated that there is some equivocation. That part there should be disregarded and stricken from your notes."[18] Additional witnesses were called before the court took a noon recess. Following this recess, defense counsel moved for a mistrial arguing that ". . . striking of [Larrabee's equivocation] testimony and admonishment to the jury . . ." was not sufficient to cure the harm that resulted from the prosecutor's failure to disclose the conversation to defense counsel. The court denied the motion.[19] On appeal, petitioner argued the trial court erred in denying his motion for mistrial because the failure to

---

[17]    J.T. Tr. February 23, 1988, at 1297 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) at 61).

[18]    <u>Id.</u> at 1299, 1304 (63 and 68).

[19]    <u>Id.</u> at 1314 (78).

disclose the conversation after the lineup with the witness violated rule 16 of the Utah Rules of Criminal Procedure[20] and his right to due process under the U.S. Constitution.

In considering the issue on appeal, the Utah Supreme Court found that its disposition of the state rule 16 question obviated the need for a separate due process analysis. Menzies II, 889 P.2d at 400. In this proceeding, petitioner argues that the trial court's finding that the state had failed to disclose this conversation made his trial fundamentally unfair because "Larrabee's post-lineup query was critical to the State's case since it was the only 'identification' of [petitioner] being in the company of Ms. Hunsaker." Dkt. # 109, at 80.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. This disclosure duty "encompasses impeachment evidence as well as exculpatory evidence." Strickler v. Greene, 527 U.S. 263, 280 (1999) (citing United States v. Bagley, 473 U.S. 667 (1985)). Furthermore, in Giglio v. United States, 405 U.S. 150 (1972), the Supreme Court, in discussing the importance of ensuring that juries are not presented with deliberate deceptions stated: "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility fall within" the perimeters of Brady. Id. at 766.

In order to establish a Brady violation sufficient to obtain federal habeas relief, a habeas petitioner must demonstrate: (1) the prosecutor suppressed evidence; (2) that the suppressed

---

[20] This Court will not consider violations of state criminal rules. See Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("federal habeas corpus relief does not lie for errors of state law").

evidence was favorable to him, either because it was exculpatory or impeaching; and (3) the suppressed evidence was material. <u>Smith v. Roberts</u>, 115 F.3d 818, 820 (10th Cir. 1997) (citing <u>Fero v. Kerby</u>, 39 F.3d 1462, 1472 (10th Cir. 1994)).

> The <u>Brady</u> rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial[.]

<u>Bagley</u>, 473 U.S. at 675. Evidence will, however, be material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 682.

Further, as a general rule, the effect of improper evidence may be remedied by admonishing the jury to disregard the evidence. <u>United States v. Laymon</u>, 621 F.2d 1051, 1053 (10th Cir. 1980). How to handle procedural trial problems are uniquely within the discretion of the trial judge. While errors in the admission of evidence can usually be cured by an admonition, there are circumstances where testimony may create such a strong impression in the minds of the jurors that they will be unable to disregard it. <u>Mares v. United States</u>, 409 F.2d 1083, 1084-85 (10th Cir. 1968) (citing <u>Brown v. United States</u>, 380 F.2d 477, 479 (10th Cir. 1967)).

Petitioner claims the discrepancies in the descriptions by Larrabee were so significant that the testimony that was ordered stricken was the only "identification" of petitioner being in the company of the victim. Thus, petitioner says the predominant means of tying petitioner to the body "was accomplished, primarily, by means of information withheld from defense counsel." Dkt. # 109,

at 80.  After reviewing the entire trial transcript, this Court finds that petitioner has not shown that the testimony was so critical to the state's case that the jury was likely to consider it despite the court's instructions to disregard it.  Larrabee's description of petitioner, within two (2) days of seeing petitioner at Storm Mountain,

> . . . was within "one inch in height and ten pounds in weight of [petitioner].  He accurately described [petitioner's] hair, facial hair, and glasses and helped create a composite drawing that was so accurate that detectives were able to select [petitioner's] photograph from among those of 200 inmates.  Larrabee also accurately described and identified Denter's car.[21]  There was other substantial evidence linking [petitioner] to the homicide,[22] including the victim's fingerprint in Denter's car.

Menzies II, 889 P.2d at 401 (footnotes added).  Moreover, Larrabee viewed a photographic lineup a few days after helping to create the composite and picked out a photograph of petitioner as the man who "appeared to be most like the man [he saw] at Storm Mountain."  J.T. Tr. February 19, 1986 at 1213 (Dkt. # 110, Trial/Transcripts (ROA 1155) (Add.11) at 312).  Trial counsel did an excellent job of pointing out to the jury the discrepancies in Larrabee's descriptions of both the petitioner and the car driven by petitioner.  Therefore, this Court finds there is not a reasonable probability that the result of the proceeding would have been different if the conversation had been disclosed to the defense.  Accordingly, claims 3 and 4 are denied.

**Claim 5:  Right of Confrontation**

In his fifth claim for relief, petitioner argues the state court deprived him of his right to confrontation, as guaranteed by the Sixth Amendment, by admitting the preliminary hearing

---

[21]     Larrabee further identified the clothes that the victim was wearing as appearing "to be the clothes that I saw the woman wearing."  J.T. Tr. February 19, 1986 at 1207 (Dkt. # 110, Trial/Transcripts (Add.11) at 306).

[22]     The victim's purse was found in petitioner's apartment and carpet fiber similar to the carpet in petitioner's apartment was found on the victim.

testimony of Walter Britton, a jailhouse informant and petitioner's cellmate.  Petitioner raised this claim in his direct appeal and the Utah Supreme Court made a ruling on the merits.  Thus, this claim has been exhausted.  Petitioner argues the state court decision was based upon an unreasonable determination of fact and an unreasonable application of clearly established federal law.  Respondent disputes this argument.

In rejecting petitioner's claim on direct appeal, the Utah Supreme Court considered "whether admission of Britton's testimony has impinged on the values embodied in the Confrontation Clause to such a degree as to rise to the level of a constitutional violation."  <u>Menzies II</u>, 889 P.2d at 402 (citations omitted).  Relying on <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980),[23] the Utah Supreme Court applied the two-pronged test for ascertaining admissibility of hearsay when a hearsay declarant is not present for cross-examination at trial, <u>i.e.</u>, (1) is declarant unavailable, and (2) if so, does the statement bear sufficient "indicia of reliability."  <u>Id.</u> at 67.  In applying that test, the state court said:

> . . . the record indicates that Britton was physically present at trial, pursuant to a court order, and repeatedly refused to testify despite the judge's order to do so.  We conclude that every reasonable effort was made to produce Britton at trial, and the trial court correctly concluded that Britton was unavailable.

<u>Menzies II</u>, 889 P.2d at 402.  These findings are subject to a presumption of correctness.  <u>See</u> 28 U.S.C. § 2254(e)(1).

Petitioner does not contest these factual findings.  Rather, he acknowledges that "[t]he trial court ordered Britton to testify and he stated that he would refuse."  Dkt. # 109, at 85.  Additionally, defense counsel admitted, after Britton advised the court he would not testify, that Britton was "technically unavailable" for purposes of the exception to the hearsay rule.  J.T. Tr. February 18,

---

[23]     This Court recognizes that <u>Roberts</u> was abrogated in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), but that has no effect on this Court's decision herein for the reasons discussed below.

1986, at 961 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) (Add. 11) at 68). Petitioner

argues, however, that the court erred in making a finding of unavailability without putting Britton

on the stand, in front of the jury, and allowing the jury to actually observe his refusal to testify.

Additionally, petitioner cites Barber v. Page, 390 U.S. 719 (1968), for his argument that "preliminary

hearing testimony could not be a substitute for properly cross-examined testimony in front of the

jury." Dkt. # 109, at 86.

The Sixth Amendment to the United States Constitution, made applicable to the states by the

Fourteenth Amendment, guarantees the right of an accused to confront the witnesses against him.

There has traditionally been an exception to the confrontation requirement where a witness is

unavailable but has given testimony at previous judicial proceedings against the same defendant

which was subject to cross-examination by that defendant. Barber, 390 U.S. at 722. While it is true

that the Supreme Court overturned the use of the preliminary hearing testimony at trial in Barber,

the reason for that decision was the "fact that the State made absolutely no effort to obtain the

presence of [the witness] at trial other than to ascertain that he was in a federal prison outside

Oklahoma." Id. at 723. Under those facts, the Supreme Court held the state had failed to establish

that the witness was "unavailable." No Supreme Court case has, however, held that a witness can

only be found "unavailable" after that witness takes the stand and refuses to testify in front of a jury.

Where, as in this case, the state secured the presence of the witness at trial, only to have the witness

refuse at an in camera hearing to testify after being held in contempt of court,[24] this Court finds the

---

[24]     The Tenth Circuit has upheld a finding of "unavailability" where the witness stated at an in
        camera hearing that he would not testify if called at trial. Jennings v. Maynard, 946 F.2d
        1502 (10th Cir. 1991).

state court decision regarding "unavailability" of the witness was not an unreasonable determination of the facts.

Thereafter, the Utah Supreme Court considered "whether Britton's preliminary hearing testimony bore sufficient indicia of reliability to warrant its admission at trial." <u>Menzies II</u>, 889 P.2d at 402. In finding that the testimony contained sufficient indicia of reliability to warrant its admission at trial and, therefore, met the requirements of the Confrontation Clause, the state court found:

> . . . the transcript of the preliminary hearing shows that the defense had the opportunity for an effective cross-examination of Britton. While we agree that new evidence obtained after the hearing may have aided an attack on Britton's credibility on cross-examination, the preliminary hearing transcript indicates that the issue was well-explored. Defense counsel brought out Britton's criminal history, including pending charges against him, as well as the fact that Britton might receive more favorable treatment by the courts because of his cooperation with law enforcement officials. Furthermore, the defense introduced extrinsic evidence related to Britton's credibility at trial and might have introduced other credibility-related evidence as well. For example, the trial transcript indicates that Britton had been incarcerated in a mental health section of the county jail before the preliminary hearing was held.

<u>Id.</u> at 403. The fact that petitioner had the opportunity for cross-examination of Britton at his preliminary hearing satisfies the demands of the confrontation clause. <u>See</u> <u>California v. Green</u>, 399 U.S. 149 (1970) (witness's preliminary hearing statements held admissible at trial since the statements were given under circumstances closely approximating those surrounding a typical trial). Therefore, this Court finds the state court decision did not result in a decision that was contrary to clearly established Supreme Court precedent. Accordingly, claim 5 is denied.

**Claim 6: Compulsory Process**

Petitioner's sixth claim asserts the state court denied his right to compulsory process in violation of the Sixth and Fourteenth Amendments by quashing a subpoena issued to one of the state

court prosecutors. Although this claim was raised on direct appeal, the Utah Supreme Court did not specifically address it, but denied it with the statement: "We find [petitioner's] other claims to be without merit." <u>Menzies II</u>, 889 P.2d at 406. Accordingly, the claim has been exhausted. Petitioner now argues the state court's determination of this claim was an unreasonable application of clearly established federal law.

To establish a violation of the right to compulsory process, a defendant must show "more than a mere absence of testimony." <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 867 (1982). Rather, a defendant must "make some plausible showing of how [the] testimony would have been both material and favorable to his defense." <u>Id.</u> The omission of the testimony must be evaluated in the context of the entire record and the absence of the testimony must have rendered the trial fundamentally unfair such that the result of the proceeding would have been different if such evidence had been heard by the jury. <u>See</u> <u>Young v. Workman</u>, 383 F.3d 1233, 1238 (10th Cir. 2004).

On May 19, 1986, Britton, the jailhouse informant, testified at the preliminary hearing regarding statements petitioner made to him while they were both incarcerated in the Salt Lake County Jail. <u>See</u> Tr. of Preliminary Hearing on May, 19, 1986, at 150-87. During cross-examination, Britton implied that his testimony in petitioner's case would not be of any benefit to him.[25] In an effort to prevent admission of Britton's preliminary hearing testimony, the defense

---

[25] Both parties state in their pleadings that Britton denied in the preliminary hearing that his testimony in petitioner's case would be of any benefit to him. Dkt. # 109, at 88; Dkt. # 123, at 88. Britton was never asked specifically if he was going to receive some benefit for testifying on behalf of the state. Rather, he was asked: (1) if he would serve about a third of his ten-year sentence before he would be eligible for any kind of release; (2) whether his release date was dependent on his performance while in the federal institution; and (3) if recommendations from other sources, such as a law enforcement agency, affected his sentence. Britton responded that recommendations did not have any reflection upon one's

(continued...)

asserted a Sixth Amendment right to call one of the prosecutors regarding a supposed "deal" that had been cut with Britton for his testimony. If that motion had been granted, the prosecutor would have been required to withdraw from the case. According to the prosecutor, he made it clear to Britton's attorney that he was not appearing as an advocate because throughout the dealing with Britton, the prosecutor had represented to him

> . . . that we would do nothing on his behalf in the sense of initiating anything or talking with any federal prosecutors about reducing his sentence or talking to anybody about giving him a better plea bargain, and [Britton] had a clear understanding of that.

J.T. Tr. on February 26, 1988, at 1819 (Dkt. # 110, Trial/Transcripts (ROA 1157) (Add.13) at 227).

Outside the presence of the jury, Britton's attorney, J. Bruce Savage, outlined the factual background of this dispute. See J.T. Tr. of March 2, 1998, at 2034-59 (Dkt. # 110, Trial/Transcripts (ROA 1158) (Add. 14) at 136-161). Savage testified that he spoke with one of the prosecutors on May 2, 1986, after learning, from an out of state attorney who represented Britton in another federal case, that Britton was going to testify at petitioner's preliminary hearing. Id. at 2045-48 (147-150). Savage made a note in his file that Britton had, on his own, contacted the Salt Lake County prosecutor's office and volunteered information regarding petitioner's case. Savage's notes reflected that "no deal was demanded" and "no attorney was demanded." Id. at 2038 (140). Additionally, the

---

25    (...continued)
     conduct while in the prison system. See Tr. of Preliminary Hearing on May 19, 1986, at 158, lines 10-24.   Britton also indicated that he had been sentenced in his federal case about a week after speaking with detectives regarding petitioner's case and that he was surprised he had received ten (10) years instead of twenty (20) years. Id. at 169-70. There was also some discussion that his sentence could be reviewed at a Rule 35 hearing; but Britton stated he had not asked for such a review. Id. at 157-59, 170-71.

notes reflected that the prosecutor with whom Savage spoke advised that he would "sign [a] favorable affidavit after test."[26]

On June 12, 1986, Savage filed a Rule 35 motion in federal court. Id. at 2036 (138). Thereafter, on July 3, 1986, a few days prior to the Rule 35 hearing, Savage testified that he contacted the state prosecutor and, after speaking with him, his notes reflected that the prosecutor "will appear voluntarily to testify on [Britton's] behalf." Id. at 2040 (142). Savage further testified that there were no deals made with him on either May 2, 1986 or as late as August 4, 1986, other than the promise to appear and make the federal judge aware of Britton's cooperation.[27] Id. at 2046 (148). According to Savage, the prosecutor represented to him that he would come to federal court and tell the judge that Britton had testified and that, in the prosecutor's opinion, his testimony was truthful. Id. at 2047 (149). At the Rule 35 hearing, the prosecutor appeared and advised the federal court that Britton had

> appeared at the preliminary hearing, that he had testified, and that to [the prosecutor's] knowledge he had testified truthfully based on what we knew, what we thought his testimony would be based on interviews and what we knew about the case.

J.T. Tr. of February 26, 1988, at 1821 (Dkt. # 110, Trial/Transcripts (ROA 1157) (Add. 13) at 229). The prosecutor never represented to Savage that he would urge the federal court to make a reduction in his federal sentence, id., and, in fact, Britton did not receive any reduction in his sentence following the hearing. J.T. Tr. of March 3, 1998, at 2331 (Dkt. # 110, Trial/Transcripts (ROA 1158)

---

[26]     Savage testified that "test" was his shorthand for "testimony." Id. at 2039 (141).

[27]     Britton entered his guilty plea and was originally sentenced in federal court on approximately February 26, 1986, with the judgment being filed on March 26, 1986. Id. at 2049 (151).

at 18).  The prosecutor's only role was that he appeared at the Rule 35 hearing and informed the federal judge of the substance of what had occurred at the preliminary hearing.

After hearing this testimony and reviewing the Rule 35 proceedings, the trial court found that Britton had voluntarily contacted jail personnel and/or the Salt Lake County Attorney's office and given testimony at petitioner's preliminary hearing.  Id. at 2030 (132).  According to the trial court, this information was then related to the federal court by Savage representing to that court that there were no negotiations for Britton's testimony and, upon request of Savage, the prosecutor appeared and related to the federal court that Britton's testimony is "significant testimony.  It is certainly helpful to the state's case against [petitioner].  Mr. Britton appears to be truthful, does not appear to have withheld any information, and he has testified adequately."  Id.  Later, the trial court stated:

> The court is of the opinion that in this situation here based on Mr. Savage's testimony, that he was the one that initiated the contact.  Further, that Mr. Britton was the one who initially initiated the contact, and that his testimony apparently would have been no different whether they agreed to do it or not because he indicated he was going to testify and apparently he did testify.
> And at the time that the county attorney's office was asked to testify at the Rule 35 hearing, [the prosecutor] testified that [Britton] testified truthfully, helpfully. It was significant, and that is exactly what it was based on, you know, what I can understand of his testimony.

Id. at 2063 (165).

It is clear that the prosecutor's testimony would have mirrored that of Britton, i.e., no deal was made to secure Britton's testimony.  If the prosecutor had told the jury this, it would have bolstered Britton's testimony as opposed to contradicting it.  Moreover, petitioner cannot establish that he lacked the ability to present the facts from another source, since the prosecution agreed to stipulate to the admission of the Rule 35 hearing transcript.  See J.T. Tr. of February 26, 1998, at 1830 (Dkt. # 110, Trial/Transcripts (ROA 1157) (Add. 13) at 238).  To the extent petitioner has

failed to establish how the prosecutor's testimony would have been relevant or material to his defense, or shown that the result of the proceeding would have been different if the jury had heard from the prosecutor, this Court finds he has failed to establish a violation of his right to compulsory process. As a result, this Court finds petitioner has failed to establish that the Utah Supreme Court's decision, that this claim lacked merit, was an unreasonable application of clearly established federal law. Accordingly, claim 6 is denied.

**Claim 7: Failure to Declare Mistrial after Witness Mentions Parole Office**

The seventh claim for relief is that the mention of petitioner's statement to law enforcement that he had gone to the parole office around 9:00 o'clock was a violation of his rights to due process and to a fair trial as guaranteed by the Sixth and Fourteenth Amendments. This issue was raised on direct appeal. Again, the Utah Supreme Court did not specifically address the issue, but found it to be without merit. Menzies II, 889 P.2d at 406. Petitioner now argues that the state court's determination of this claim was an unreasonable application of clearly established federal law. As stated previously, however, a state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of that decision. Richter, 562 U.S. at 101 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

On November 18, 1986, defendant filed a motion in limine requesting that the court prohibit introduction at trial of any evidence of or mention of defendant's "status as a prison parolee" and "[t]he circumstances surrounding the existence of an outstanding warrant of a charge of Theft or Defendant's subsequent arrest on February 24, 1986 on a charge of Theft." Trial ROA at 463-64 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 507-08). On February 5, 1988, the trial court entered the following minute order:

The court, wanting to make the record clear to respective counsel, now further orders that all of the previously argued motions in limine on defendant's prior criminal history and record on burglary, theft and past convictions is hereby granted in favor of the defendant.

Id. at 780 (848) (capitalization removed).

During the trial, the prosecutor asked Detective Jerry Thompson if he had talked to the petitioner about his whereabouts on Sunday evening, February 23, 1986. When the detective answered "yes," the following colloquy occurred:

Q: What did he tell you?

A: He claims that that evening or afternoon that [sic] he went and borrowed a car from a friend of his by the name of Troy Denter somewhere around 6:00 p.m. that evening. While driving down state street somewhere in the area of 2700 South State Street or 38th, he picked up a young female, described her as early 20's, long hair.
    Claims the only thing he can remember was she was wearing some levis, doesn't know what kind of shoes, and a purple coat. Claims he had conversations with the girl. They basically talked, drove around. He states about what she was talking about here he states she said how rotten men were, et cetera.
    He than [sic] took her to his house somewhere from around 2:00 to 2:30 a.m. While he was there. [sic] He had only been there a few minutes when his girlfriend, Nicole, called him, wanted him to come and pick her up, stating that she had been at a girlfriend's house in a trailer court behind Mark's Lounge.
    He claims he then went there with this girl, picked up Nicole, the three of them drove around in the car for some time. The two girls had an argument or a fight between them, and she got mad at him for having the other girl with him. In fact, he stated that he wanted to go down to Fairview to his folk's place to take the girl there, really got in an argument over that.
    He claims he then went back to his house the three of them, somewhere around 3:30 in the morning. Claims then he left there.

    [Defense counsel]: I will object to the officer designating the manner or describing without being asked what the demeanor is in terms of "claims." I think he can state what the interview was and what the defendant said, but it's the characterization that is objectionable.

    The Court: If you can just stick to what was said.

The Witness: He stated that he had been left with the girl and went somewhere around 7200 West 2400 South. They got stuck in the mud in his car. She got out, in fact, walked in the mud. He then left her there. He then went back home, talked to Nicole a couple of hours, somewhere between 6:30 and 8:30. Then left, went down to the patrol [sic] office about 9:00 o'clock.

J.T. Tr. of February 26, 1988, at 1876-77 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) at 284-85).

Defense counsel immediately objected, id. at 1877 (285), and a hearing was held outside the presence of the jury in which counsel moved for a mistrial. Id. at 1878-79 (286-87) . The court took the defendant's motion under advisement and the witness was admonished that "no reference should ever be made in regards to the status of the defendant." Id. at 1880 (288). The jury was returned to the courtroom and testimony from the witness continued. Thereafter, stipulations were made regarding what additional witnesses would testify to if they were called to the stand. Id. at 1886-89 (294-97). One additional witness was called, on an entirely different subject matter, before the court recessed for a long weekend. Id. at 1890-98 (299-306).

Following the long recess, the court allowed the parties to argue the motion for a mistrial. J.T. Tr. of March 1, 1988, at 1904-58 (Dkt. # 110, Trial/Transcripts (ROA 1158) at 6-60).[28] The court discussed, in chambers, with counsel,

---

[28] Based upon the arguments in the motion for mistrial hearing, it appears that the officer actually said "parole office." While petitioner asserts that "[d]uring proceedings to attempt to correct the transcript, the parties stipulated that Detective Thompson actually said "parole office," Dkt. # 109, at 91 n.20, no citation is made to that stipulation in the record, and the response brief does not admit that there was such a stipulation. See Dkt. # 123, at 93. Notes written on the J.T. Tr. of February 25-26, 1988 at 1877, however, indicate the court reporter had keyed "Parol" and she "can't understand how got patrol." See Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 85) at 283. Additionally, Add. 27 at 283 shows the correction as "parole office." Id.

. . . the matter of curing the statement by the court making an admonition before further testimony was to be made, and the discussion I think ended in that if the admonition were made, it would be more prejudicial because it would recall more forcibly the statement than if it were left alone.

Id. at 1945 (47);[29] see also id. at 1950-51, 1956 (52-53, 58). The court indicated there was no dispute that an error had been made, but denied the motion for mistrial. In denying the motion, the court recognized that any errors had to be considered in light of the entire proceedings and indicated the matter could be reurged at the conclusion of trial. Id. at 1947 (49). The court also made it clear that (1) there was no misconduct by the prosecutor because he had warned the witnesses not to mention the defendant's criminal record; and (2) no evidentiary harpoon was involved, as this was inadvertent because the detective was simply relaying what the defendant had said when he was questioned by the police. Id. at 1947-48 (49-50). At the conclusion of all the evidence, defense counsel again moved for a mistrial. J.T. Tr. of March 7, 1988, at 2586 (Disk # 1, Trial/Transcripts (ROA 1160) (Add. 16) at 69). The court again denied the motion for mistrial. Id. at 2600 (83).

This Court's responsibility is to ensure that petitioner was afforded the protections of due process, not to exercise supervisory powers over the Utah state courts. Nichols v. Sullivan, 867 F.2d 1250, 1253 (10th Cir. 1989) (citing Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). In Donnelly, the Supreme Court was clear in stating ". . . not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" Id. at 642 (quoting Lisenba v. California, 314 U.S.

---

[29]     It appears from the transcript that the court first made the suggestion to admonish the jury before the long recess and defense counsel opposed an immediate admonition. Id. at 1950 (52). After the recess, the court said: ". . . the court can cure by giving the instruction. You know you'll have to take the consequences. We don't know what the jury will do. The court can advise the jury that 'you are to disregard it. That is not to be any part of your considerations or deliberations' . . . ." Id. at 1956 (58).

219, 236 (1941)).  Thus, evidentiary and procedural rulings regarding a witness may not be questioned in this action unless the remark by the witness was so prejudicial in the context of the proceedings as a whole that petitioner was deprived of the fundamental fairness essential to the concept of due process.  Nichols, 867 F.2d at 1253; see also  Brinlee v. Crisp, 608 F.2d 839, 850 (10th Cir. 1979); Batten v. Scurr, 649 F.2d 564, 569 (10th Cir. 1981).  In this case, there is no question that the jury knew the defendant was in jail on an unrelated charge; the matter of parole had been brought up in voir dire; and the witness did not state that the defendant was going to see his parole officer, but only that he was going to the parole office.  While the jury was not admonished to disregard the testimony, defense counsel adamantly objected to such admonishment.  Based on the facts  and a thorough review of the entire record, this Court finds that petitioner has failed to establish that the decision of the state court, to deny the motion for mistrial based upon one witness saying petitioner told him he "went down to the parole office," was an unreasonable application of clearly established federal law.  Accordingly, claim 7 is denied.

**Claim 8:  Prejudicial Incidents during Trial**

In his eighth claim for relief, petitioner complains that the state court violated his right to a fair trial by an impartial jury guaranteed by the Sixth and Fourteenth Amendments by failing to declare a mistrial after the jury was exposed to what he terms a "pattern of prejudicial incidents" during his trial.  Specifically, petitioner identifies four instances that he argues, both individually and cumulatively, denied him a fair trial.  These include:  (1) Juror Eaton fainted during the medical examiner's testimony; (2) the court reporter became distraught and could not continue reporting; (3) Juror Adams  advised the court that he had received an anonymous phone call from a person stating that petitioner had robbed and killed a cabdriver; and (4) Juror Gass suffered an emotional

43

breakdown during the trial and had to be excused. The trial court denied a mistrial based on the cumulative effect of these four incidents. This claim was raised during petitioner's direct appeal, but was denied because the Utah Supreme Court found no merit to the claim. Menzies II, 889 P.2d at 406.

On February 25, 1988, Juror Eaton fainted during the testimony of the medical examiner.[30] The jury was immediately removed from the courtroom and a recess was taken. According to petitioner, he was "abruptly shackled and forcibly removed from the courtroom in view of the jurors." Dkt. # 109, at 94.[31] Following the incident and a lunch break, the judge called the juror into the courtroom, outside the presence of the other jurors, and asked her how she felt. The juror relayed that her fainting spell had been caused by a combination of hearing the medical examiner's testimony and skipping breakfast. After eating lunch, however, the juror felt well enough to continue and no objection was made by defense counsel. J.T. Tr. of February 25, 1988, at 1634-36 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 42-44).

Also, during the medical examiner's testimony, petitioner asserts "the court reporter became distraught in the presence of the jury and was unable to continue transcribing." Dkt. # 109, at 94. The transcript of trial reveals that the following colloquy with the court reporter occurred, outside the presence of the jury, following the fainting of Juror Eaton:

The Court: Okay. If there is nothing else, we should call the jury in.

---

[30]    J.T. Tr. of February 25, 1988, at 1621-22 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 29-30).

[31]    While most cases of "shackling" involve use of leg irons, handcuffs, and a belly chain, petitioner was handcuffed during the pandemonium that ensued as deputies scrambled to provide the juror with aid. See PC ROA at 0012208, ¶ 8, Exhibit A to Petitioner's Fifth Amended [Postconviction] Petition (Dkt. # 110, Disk # 3, Vol. 33 at 53).

[Defense counsel]: Also, perhaps before we do that, would could take up the other matter and Tauni, this is in regards to your state of mind. I know that you were quite upset over the testimony that took place right before the trial, [sic] and I – what I guess we need to know is whether or not you think any of the emotion would have shown while you were making your report.

(Discussion held off the record.)

The Court: You had some question as to whether she might have started crying before she went to her room.

[Defense counsel]: And perhaps we can just ask you that, did you?

The reporter: No, I didn't.

[Defense counsel]: The only reason for bringing that up, of course, is to -- if something should happen and that would become something that the jurors could observe, then that could present a problem as court personnel.

The suggestion I would have on that is if -- should that happen again, just let's ask or anyone involved ask for a recess.

J.T. Tr. of February 25, 1988, at 1633-34 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 41-42).

In an attempt to attach more significance to this incident, petitioner now says:

[t]he jurors had to assume that the medical examiner's testimony was extraordinary to cause an emotional response in a member of the court's staff. Though the court reporter denied that it happened in the courtroom, the fact that defense counsel was aware of it and asked about it shows otherwise.

Dkt. # 109, at 94. Conclusory allegations, however, are insufficient to establish constitutional violations without supporting facts from the record. See Phillips v. Murphy, 796 F.2d 1303, 1304 (10th Cir. 1986). Here, petitioner has failed to establish that the jury was aware of anything regarding the court reporter's state of mind during the medical examiner's testimony.

Thereafter, on March 4, 1988, Juror Adams sent a note to the court which stated "Last night an anonymous caller telephoned me about [defendant's] prior criminal record." J.T. Tr. of March

4, 1988, at 2367 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1159) at 153).  The court held a

hearing outside the presence of the jury and the following colloquy occurred:

> . . . what we need to know is exactly what happened, what time it was, and what the circumstances were and so forth.

> A Juror: Shortly after 7:30, my wife took a call for me.  She said the caller asked for Nathan.  I came to the phone.  He said, 'Nathan Adams, you're a juror.  You're serving jury duty,' something like that.  I said, 'What?'  I was surprised that anyone would ask me about that.  And he said, 'Ralph Menzies was convicted of, I think, robbing and murdering a taxi driver' or something like that, and then I think he hung up.

> The Court: It was a male voice?

> A Juror: Yes.

> The Court: Any questions?

> Mr. Jones: Did you discuss this phone call with any of the other jurors?

> A Juror: No.

> Mr. MacDougall: Do you have any recollection of the voice at all?  Was it a familiar voice?

> A Juror: Young male, that's all I can say.

> The Court: Do you have any questions?

> Ms. Wells: I don't have any questions.

> Ms. Palacios: No.

> The Court: Anyone else?

> Don't disclose anything that has taken place here.  The fact that you received a phone call, we will have to discuss this further.

> A Juror: Sure.

> The Court: Thank you.

Id. at 2367-68 (153-54).

Following a discussion regarding the best course of action, the court ruled that the juror had

been tainted and should be excused.  Id. at 2374 (160).  The judge then advised the juror as follows:

> The Court: Now, you have got a feeling why we take so long considering these things.  We have gone over this very carefully.  We've discussed all pros and cons, and at this time, because of this telephone call, it's the opinion of everybody here that you should be excused.
> And so we want to just admonish you, and then we want to request that you not talk about anything you've heard up to this point in the jury trial, and we don't think anyone will contact you again, but if they do, will you just let us know.
> And we probably will have an investigator who will contact you to follow through on this and to make an investigation, so if you can cooperate and help them out, we will see what is happening.
> You've not discussed this with anyone else?
>
> A Juror: No.

Id. at 2386 (172).  Thereafter, the court decided to immediately sequester the jury.  Id. at 2394 (180).

While sequestration arrangements were being made, it was brought to the attention of the court that

another juror, Juror Gass, was having some emotional problems in the jury room in the presence of

all of the other jurors.  Both sides agreed Ms. Gass should be excused and the court excused her.

Id. at 2395-402 (181-88).  Defense counsel moved for a mistrial based upon the cumulative effect

of these incidents.  Id. at 2409-15 (195-201).  In denying counsel's request for a mistrial, the court

found that these events had not tainted the jury such that they could not reach a fair and impartial

verdict.  Id. at 2415-19 (201-05).

Thereafter, the court conducted extensive individual voir dire of each remaining juror.  The

court discussed four things with each juror:  (1) whether the incident with Juror Gass would prevent

them from trying the case in a fair and impartial manner and reaching a verdict based on the merits

of the case; (2) whether anyone had contacted them about the case or if they had been exposed to

publicity about the case; (3) they were advised they would be sequestered for the remainder of the trial because a juror had been contacted about the case and what that meant; and (4) if they would be satisfied to have their own case tried by a person in their present frame of mind. During the discussion, the jurors were told that the fact some contact had been made should not be attributed to either the prosecution or the defendant. Finally, each juror was advised not to discuss what had occurred in chambers. Id. at 2428-73 (214-59). Based upon the responses of the jurors, the court again denied the motion for mistrial. Id. at 2473 (259).

While each of these events took place within a short time frame, the record reveals that the court invoked a myriad of safeguards to assure the defendant received a fair trial. If anything, these events highlight "the reality of the human fallibility of the participants." United States v. Hastings, 461 U.S. 499, 508 (1983). There is, however, simply "no such thing as an error-free, perfect trial," id., and the Constitution does not guarantee such a trial. Id. at 508-09. It is nothing more than a conclusory allegation that these events had any impact whatsoever upon the actual verdict in this case. As a result, this Court finds that petitioner has failed to establish that he is entitled to relief on claim 8.

**Claim 9: Shackling in Front of Jury**

Petitioner's ninth claim for relief is that he was "shackled" in front of the jury, which violated his due process rights under the Fourteenth Amendment. Petitioner concedes this claim was not raised in state court either on direct appeal or in his state postconviction proceedings. It is clear that postconviction counsel was aware of this claim as early as October 5, 2010, when trial counsel signed her affidavit that was submitted as Exhibit A to the postconviction petition. Postconviction counsel did not, however, raise this issue in his fifth amended postconviction petition, filed on March

14, 2011.  Rather, counsel first attempted to raise this issue in his memorandum in opposition to respondent's motion for summary judgment/and cross motion for summary judgment, filed on August 1, 2011.  See PC ROA at 0013270 (Dkt. # 110, Disk # 3, Vol. 35, at 29).  In denying relief, the state postconviction court found that the issue was not raised in the postconviction application, but rather in a cross motion which was improper and, thus, the issue was procedurally barred as it could have been raised on appeal and was not.  Id. at 0015492 (id. at Vol. 40 at 474).  Thereafter, in his appeal of the postconviction decision, petitioner again tried to raise this issue and the Utah Supreme Court found the issue had not been properly preserved and, therefore, it refused to hear the claim.  Menzies IV, 344 P.3d at 603 n.69.

Petitioner states that his failure to raise this claim in earlier state court proceedings was a result of ineffective assistance of both direct appeal and postconviction counsel.  It was, however, the failure of postconviction counsel to raise this claim during petitioner's state postconviction proceeding that ultimately resulted in the claim being unpreserved.  In Davila, 137 S. Ct. 2058 (2017), the Supreme Court held that ineffective assistance of postconviction counsel does not provide cause to excuse procedural default of ineffective assistance of appellate counsel claims.  See also 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.")

Even if this claim were not procedurally barred, this Court finds that petitioner would still not be entitled to habeas relief on this issue.  In Deck v. Missouri, 544 U.S. 622 (2005), abrogated on other grounds by Fry v. Pliler, 551 U.S. 112 (2007), the Supreme Court concluded that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial

court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Id. at 629. The Supreme Court recognized, however, that there will be instances where shackling at trial is unavoidable, and noted that "[w]e do not underestimate the need to restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude in making individualized security determinations." Id. at 632.

According to petitioner, he was "handcuffed in front of the jury" when Juror Eaton passed out. See PC ROA at 0013301, ¶ 40, Exhibit XXX to Petitioner's Memorandum in Opposition to Respondent's Motion for Summary Judgment/and Cross Motion for Summary Judgment (Dkt. # 110, Disk # 3, Vol. 35 at 60). There is no indication in the record that this exposure was either aggravated or continuous. Rather, the action was taken because of an emergency medical situation that arose during the trial, and no contemporaneous objection was made by defense counsel. The Tenth Circuit has held that "a juror's brief view of a defendant in shackles does not qualify as a due process violation worthy of a new trial." United States v. Jones, 468 F.3d 704, 709 (10th Cir. 2006) (citations omitted). In order to violate due process, the defendant must establish prejudice. Id. Since the focus of the jury would have been on Juror Eaton, this Court will not presume prejudice. Where the defendant does not make a contemporaneous objection, courts have refused to find prejudice. United States v. Simpson, 950 F.2d 1519, 1522 (10th Cir. 1991), and cases cited therein. Accordingly, this Court finds no merit to claim 9.

**Claim 10: Search of Petitioner's Apartment**

In his tenth claim, petitioner argues that the state violated his Fourth Amendment rights by conducting an illegal search of his home, and that he was denied due process and a fair trial under the Sixth Amendment and Fourteenth Amendment by admission of evidence seized during the illegal

search. Relying upon Stone v. Powell, 428 U.S. 465 (1976), respondent argues that this claim should be denied since petitioner had a full and fair opportunity to litigate this issue in state court. In his reply, petitioner claims he did not get a "full and fair opportunity" to litigate this issue in state court because a "fair hearing" would have precluded the admissibility of the evidence. According to petitioner, since the state did not rebut in this federal proceeding his claims that the search was illegal and the evidence was inadmissible, this Court must accept as true his arguments of law and fact contained within his second amended petition.

The Supreme Court, however, held in Stone that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494. The Tenth Circuit has consistently refused to overturn a state conviction because of a violation of the Fourth Amendment where the petitioner had a full and fair opportunity to litigate the claim. Matthews v. Workman, 577 F.3d 1175, 1194 (10th Cir. 2009); Brown v. Sirmons, 515 F.3d 1072, 1082 (10th Cir. 2008); Miranda v. Cooper, 967 F.2d 392, 401 (10th Cir. 1992); Gamble v. Oklahoma, 583 F.2d 1161, 1165 (10th Cir. 1978).

A review of the state court record reveals that petitioner filed a motion to suppress and a memorandum in support in the trial court on October 24, 1986. Trial ROA at 000335-59 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 372-97). The trial court held a hearing on the motion to suppress. See Pre-Trial Motion to Suppress Transcript dated November 7, 1986. At the beginning of the hearing, defense counsel advised the court that there were additional issues to be explored through the evidence and, after presentation of the evidence, they were given an opportunity to supplement their motion. The amended motion to suppress and a memorandum in support was

filed on November 18, 1986. Trial ROA at 000465-508 (id. at 509-52). The trial court heard arguments on the motion on November 21, 1986. See Arguments on Motion to Suppress and Motion to Continue Transcript dated November 20-21, 1986. During the oral arguments, the trial court judge asked questions of counsel. Thereafter, on November 28, 1986, the state filed a memorandum in opposition to the motion to suppress. Trial ROA at 000515-23 (id. at 559-67). On February 12, 1987, the trial court denied the motion to suppress. Id. at 000538. Petitioner raised this issue in his direct appeal. See Brief of Appellant filed on September 14, 1992 at 85-97 (Dkt. # 110, Disk # 1, Related Appeals/Direct Appeal Dkt. # 100, at 110-22). Although the Utah Supreme Court did not specifically address this issue, it denied the claim when it said, "[w]e find [petitioner's] other claims to be without merit." Menzies II, 889 P.2d at 406.

Despite the litigation of this claim in a motion to suppress hearing, at trial, and on direct appeal to the Utah Supreme Court, petitioner argues that the evidence seized from his apartment was illegally seized and the state court's admission of the evidence deprived him of due process and a fair trial. Petitioner argues facts based upon his interpretation of the testimony at the suppression hearing. Petitioner claims, based upon that interpretation, that the state court's determination of this claim was an unreasonable application of clearly established federal law. Petitioner does not, however, recognize that the officers obtained not only his girlfriend's consent to enter and search the apartment, but also consent directly from petitioner, as well as a search warrant **before** actually conducting any search of the premises. See Transcript of Pre-Trial Motion to Suppress dated November 7, 1986, at 42, 81-83, 85-87. Further, none of the items that were seized from the home were observed by the affiant who signed the affidavit for a search warrant before a search was conducted pursuant to that warrant. Id. at 45-46. Petitioner's girlfriend had lived in the apartment

for four months at the time she gave consent to the officers.  Id. at 20.  Because petitioner's girlfriend did not pay the bills for the apartment, however, the officers chose to get consent from petitioner. While petitioner orally consented to the search, he attempted to place limitations upon the officers when he was presented with a consent to search form.  As a result, the officers obtained a search warrant before searching the apartment.  Based upon the record at the suppression hearing, this Court finds petitioner had a full and fair opportunity to litigate this issue.  Accordingly, petitioner is not entitled to relief on claim 10.

**Claims 11 and 23:  Admissibility of Evidence**

 A.  Guilt phase of trial

  In his eleventh claim for relief, petitioner asserts that he was denied his right to due process of law under the Fourteenth Amendment because he was convicted and sentenced on the basis of inadmissible evidence.  This issue was raised on direct appeal and, therefore, has been exhausted. Menzies II, 889 P.2d at 406.  Respondent asserts petitioner is not entitled to relief on this issue because he has failed to establish that the state court's adjudication resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.

  According to petitioner, the trial court admitted a number of items that had no relevance to any fact in this case.  These items included a gun belonging to witness Troy Denter, three knives, tennis shoes, and a "ten-code" card.  Defense counsel, however, raised a specific objection on relevancy grounds only prior to the admission of the gun, see J.T. Tr. of February 23, 1988, at 1412-13 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) (Add. 12) at 176-77), and a "chain of

custody" objection to only one of the knives.  J.T. Tr. of March 1, 1988, at 2001 (id. at (ROA 1158) (Add. 14) at 103).

These claims are nothing more than claims of error under state law.  As such, they are not cognizable in this federal habeas court action.  Federal courts do not have the authority to decide questions concerning the admissibility of evidence under state law.  Estelle v. McGuire, 502 U.S. 62, 67 (1991).  This Court's role is to decide "whether a conviction violated the Constitution, laws, or treaties of the United States."  Id. at 68.  Due process challenges to state evidentiary rulings are reviewed only for fundamental fairness.  Matthews v. Price, 83 F.3d 328, 331 (10th Cir. 1996); see Donnelly, 416 U.S. at 642.  In Crane v. Kentucky, 476 U.S. 683 (1986), the Supreme Court acknowledged a "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."  Id. at 689.  The Constitution gives state court judges "wide latitude" to make these decisions.  Id.  Federal courts simply may not interfere with state evidentiary rulings unless those rulings rendered "the trial so fundamentally unfair as to constitute a denial of federal constitutional rights."  Moore v. Marr, 254 F.3d 1235, 1246 (10th Cir. 2001) (citation omitted); see Hatch v. Oklahoma, 58 F.3d 1447, 1468 (10th Cir. 1995) ("[I]n federal habeas proceedings, we do not question a state court's evidentiary rulings unless the petitioner can show that, as a whole, the court's rulings rendered his trial fundamentally unfair.").

Under Utah law, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action."  Utah R. Evid. 401.  Trial counsel objected to the admission of any testimony regarding a firearm because "there was no firearm utilized in the injuries sustained by Miss Hunsaker."  J.T. Tr. of February 23, 1988, at 1412-13 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) (Add. 12) at

176-77).  According to the testimony, however, Troy Denter purchased the gun at petitioner's request approximately three weeks to a month before this crime occurred and petitioner knew the gun was in the car at the time of the robbery/kidnapping of the victim.    Id. at 1417-18 (181-82).  Over the objection of defense counsel, the court found "some relevancy in terms of what Denter did in regards to the purchase of the gun and the reason the gun was in the car."  Id. at 1416 (180).  The court further found that the prejudicial effect of the gun would not outweigh the probative effect of the knowledge of petitioner.  Id.

Petitioner now argues admission of the gun prejudiced him "by misleading the jury into making a probable and erroneous inference about his dangerousness and violent nature." Dkt. # 109, at 106.  Simply because the defendant had access to a gun would not necessarily have led the jury to infer that the defendant was dangerous or had a violent nature.  The fact that petitioner did not kill the victim with the gun, however, does not make the gun's presence totally irrelevant to the facts of this case.  This is particularly true where, as here, the testimony was that the gun was purchased at petitioner's request about three weeks to a month before this crime occurred.  J.T. Tr. of February 23, 1988, at 1417-18 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) (Add. 12) at 181-82).  The facts that the gun was purchased by Denter, at petitioner's request, and that petitioner was aware that the gun was in the vehicle, tend to show how petitioner could have taken the victim from the Gas-O-Mat and held her against her will for twelve hours.

Petitioner argues the knives should not have been admitted because they "were not used in the offense and were only admitted to create the prejudicial inference that [petitioner] was a dangerous person."  Dkt. # 109, at 106.  With the exception of a chain of custody objection to one

of the knives,[32] petitioner did not object at trial to the introduction of the knives. See J.T. Tr. of February 23, 1988, at 1408, 1410 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) (Add. 12) at 172, 174). While petitioner now focuses on the fact that the medical examiner[33] testified that two of the knives "could possibly have created the victim's wounds, as could any other knife of similar size," petitioner now claims it was error to admit the knives since they were not used to commit the crime. Dkt. # 109, at 106. What petitioner fails to acknowledge, however, is that defense counsel used the fact that there was no hair or blood on the knives in an attempt to exculpate petitioner. See J.T. Tr. of March 1, 1988, at 1978 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1158) (Add. 14) at 80); J.T. Tr. of March 7, 1988, at 2665-66 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1160) (Add. 16) at 148-49). Additionally, the fact petitioner had access to these knives could have explained how he was able to kidnap and hold the victim against her will.

Next, petitioner argues that the tennis shoes (Exhibit 75) had no evidentiary value and, therefore, should not have been admitted. The homicide investigator who conducted a search of petitioner's apartment was asked to look at what had been marked as Exhibit 75 and identify that object if he could. J.T. Tr. of February 26, 1988, at 1745 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 153). The witness testified, "This is a pair of blue and white gym shoes, and these were located in the child's bedroom in a box in the southeast corner of the residence." Id. The witness also stated the shoes had a "lot of mud" on them. Id. at 1768 (176). Thereafter, the parties entered into the following stipulation:

---

[32]    See J.T. Tr. of March 1, 1988, at 2001-02 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1158) (Add. 14) at 103-04).

[33]    The medical examiner testified that "the cause of death was strangulation with stab wounds to the neck contributing to the death." (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 47).

Stipulation that if Robert Greenman from the state crime lab were called, he would indicate he had a chance to examine the shoes of Maureen Hunsaker and also the tennis shoes that were found at the apartment belonging to [defendant]. His conclusion was that the soil from the shoes of Maureen Hunsaker examined found to be dissimilar in color to the soil from the shoes marked "suspect shoes" which were [defendant's].

Id. at 1889-90 (297-98).

Defense counsel asked Martha Kerr, a serologist, how many pairs of shoes she received for testing for blood and the witness said she had "received a pair of men's tennis shoes, a pair of women's tennis shoes, and then the victim's shoes and the boots." J.T. Tr. of March 1, 1988, at 1981 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1158) (Add. 14) at 83). Defense counsel then asked numerous questions about the tests that were conducted on the shoes, eliciting from the witness that no blood was identified on the men's tennis shoes and that the witness had not tested for the presence of any hair or fiber. Id. at 1991-93 (93-95). Exhibit 74 was admitted by the court immediately prior to the state's request to admit Exhibit 75 and, at that time, defense counsel advised there was no objection. At the time the state moved for admission of the tennis shoes, Exhibit 75, defense counsel stated:

Your honor, no objection to that. I would point out that Exhibits 74 and 75 have been the subject of previous argument for which the court gave us a continuing objection. So given the court's ruling, that would be the basis for no objection, but we would ask for the continuing objection based upon the earlier argument.

Id. March 2, 1988, at 2129 (231).[34] Based upon this evidence, this Court finds the tennis shoes had enough relevance to justify their admission at trial.

---

[34] Despite petitioner's assertion that defense counsel entered a "continuing objection" to admission of these shoes, this Court searched the trial transcript in an attempt to ascertain what "earlier argument" counsel was referencing. This Court was unable to find any such objection other than the above quotation, and petitioner has not pointed the Court to any such objection.

Finally, petitioner complains about the admission of a ten-code card (State's Trial Exhibit No. 96) that was seized from his apartment. At the time the state moved for admission of this exhibit, defense counsel simply said: "Subject, again, to the previous objection." Id. To the extent that the police officer who spoke with the victim on the telephone following her kidnapping testified that he heard a police radio in the background,[35] this Court finds that possession of a ten-code card, which would assist in deciphering police jargon, suggested that petitioner had access to a police radio. Therefore, this Court finds that the ten-code card was probative of facts that the jury heard.

Based upon a careful review of petitioner's arguments, this Court finds that he has failed to establish that admission of these items, either individually or cumulatively, deprived him of a fundamentally fair trial. Accordingly, claim 11 is denied.

B. Penalty phase of trial

Petitioner argues, in claim 23, that his right to due process under the Fourteenth Amendment to be free from cruel and unusual punishment under the Eighth Amendment was violated when, during the penalty phase of trial, two photographs of the deceased victim were admitted into evidence. Petitioner claims these two photographs were cumulative of the medical examiner's testimony and, therefore, had no probative value.

---

[35] See J.T. Tr. of February 18, 1988, at 1048 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) (Add. 11) at 155).

Petitioner argues that the reason the trial judge gave for admitting the photographs, i.e., those pictures would be helpful in observing what the scene was, was an erroneous finding of fact[36] because the photographs were closeup postmortem photographs of the victim. Additionally, petitioner states that the photographs did not accurately depict the wounds as they had been inflicted.[37] This Court's review, however, is limited to deciding "whether the admission of the photographs rendered the proceedings fundamentally unfair." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999).

Once again, the medical examiner testified that "the cause of death was strangulation with stab wounds to the neck contributing to the death." J.T. Tr. of February 25, 1988, at 1639 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 47). The photographs, depicting the slashes on the victim's neck and ligature marks, were highly probative of the manner in which the homicide was committed. Moreover, the penalty phase of the case was tried to the judge, the same judge who would have viewed the photographs in determining whether to admit them into evidence. As a result, this Court finds petitioner has not shown that the admission of these two photographs, during the penalty phase of trial, had such an impact in this case that petitioner's trial was fundamentally unfair. Moreover, petitioner has completely failed to establish that the Utah Supreme

---

[36]   It should be pointed out that neither party corrected the judge when the judge misidentified what was depicted in these two photographs. J.T. Tr. of March 16, 1988, at 2882-83 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 96-97). The judge then indicated that the pictures did not appear to be gruesome, id. at 2883 (97), and this Court agrees with that finding.

[37]   Based upon the testimony of the medical examiner regarding the elasticity of skin and the ligature marks on the neck of the victim, the photographs were not misleading. See J.T. Tr. of February 25, 1988, at 1644-48, 1673-74 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 52-56, 81-82).

Court's decision regarding this issue involved an unreasonable application of federal law. Accordingly, claim 23 is denied.

**Claim 12: Sufficiency of the Evidence**

Petitioner argues, in his twelfth claim for relief, that he was deprived of due process of law under the Fourteenth Amendment when he was convicted without the state having to prove each and every element of the charges against him beyond a reasonable doubt. This claim has been exhausted as it was raised on direct appeal and summarily dismissed. Menzies II, 889 P.2d at 406.[38]

Petitioner first complains that there was insufficient evidence to connect him with the homicide because the evidence placing him at the site of the homicide was weak and circumstantial. Dkt. # 109, at 109. The Tenth Circuit has made it abundantly clear that "evidence supporting guilt may be entirely circumstantial." United States v. Henry, 468 F.2d 892, 894 (10th Cir. 1972). "The evidence supporting a conviction must be substantial, raising more than a mere suspicion of guilt, although the evidence can be wholly circumstantial." United States v. Williams, 923 F.2d 1397, 1402 (10th Cir. 1990) (citation omitted). This Court is not asked to decide "whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (citations omitted, italics in original). Rather, this Court must view all the evidence, direct and circumstantial, and all reasonable inferences to be drawn therefrom, in the light most favorable to the prosecution, and must sustain the jury's verdict if *"any* rational trier of fact could

---

[38] In order to establish that this claim is the same as that raised on appeal, petitioner cites to page 113 of his appeal brief. Other than citing Jackson v. Virginia, 443 U.S. 307, 315-18 (1979), in the first paragraph of his insufficiency of evidence proposition, nowhere within the proposition does petitioner specifically argue that he was deprived of due process of law under the Fourteenth Amendment. Because respondent states this claim has been exhausted, however, this Court finds the claim is substantially similar to the claim raised in petitioner's direct appeal and, thus, is exhausted.

have found the essential elements of the crime beyond a reasonable doubt." Id. (italics in original).[39]

Reiterating this principle in <u>Cavazos v. Smith</u>, 565 U.S. 1 (2011), the Supreme Court stated

> . . . it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court may do so only if the state court decision was "objectively unreasonable."

Id. at 2 (citing <u>Renico v. Lett</u>, 559 U.S. 773 (2010)).

Based upon the totality of the evidence presented in petitioner's trial, this Court finds that sufficient evidence was presented at trial to prove that petitioner was guilty of criminal homicide beyond a reasonable doubt. The jury instructions advised the jury that there were three elements which had to be proven beyond a reasonable doubt:

> 1. That on or about the 24th day of February, 1986, in Salt Lake County, State of Utah, Ralph Leroy Menzies, unlawfully caused the death of Maureen [sic] Hunsaker; and
>
> 2. That Ralph Leroy Menzies cause [sic] said death either intentionally or knowingly; and
>
> 3. That Ralph Leroy Menzies caused said death under the following circumstances:
>
> > 1) The homicide was committed while the defendant was engaged in the commission of or an attempt to commit, or flight after committing, or attempting to commit: Aggravated Robbery and/or Robbery and/or Aggravated Kidnapping and/or Kidnapping[.]

---

[39]    A reviewing court considers only this "legal" question. Such a limited review does not intrude on the jury's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." <u>Musacchio v. United States,</u>136 S. Ct. 709, 715 (2016) (citations omitted).

Instruction No. 31, Trial ROA at 000879 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 964). Petitioner does not identify any element of homicide that was not proven beyond a reasonable doubt. Rather, petitioner simply attacks the inconsistencies in eyewitness identification, the line-up, the photo array and the identification of Troy Denter's car, which his trial counsel did an excellent job of pointing out to the jury. The jury, as the trier of fact, was responsible for resolving the issues of fact, including the credibility of the witnesses. The evidence at trial established the facts as found by the Utah Supreme Court and set out verbatim above in this opinion and order. Petitioner's suggestion that the evidence presented at trial was insufficient to support the jury's convictions is nothing more than wishful thinking. Even if some of the evidence that petitioner now argues should have been excluded had not been admitted, this Court finds, in the light most favorable to the prosecution, that the evidence overwhelmingly supported the jury's verdict of criminal homicide, murder in the first degree, beyond a reasonable doubt. Since the facts underlying the Utah Supreme Court's decision are presumed correct, 28 U.S.C. § 2254(e)(1), and petitioner has not rebutted this presumption by clear and convincing evidence, id., this Court finds that petitioner has failed to establish that he is entitled to relief on this issue.

Next, petitioner complains there was insufficient evidence to support the charge of robbery. Dkt. # 109, at 114-17. Petitioner was not, however, charged with robbery. Rather, petitioner was charged with aggravated robbery and aggravated kidnapping, and was acquitted of aggravated robbery. The jury did, however, find that "[t]he Homicide was committed while the defendant was engaged in the commission of, an attempt to commit, or flight after committing, or attempting to commit:" robbery and aggravated kidnapping. Verdict, Trial ROA at 000898 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 983). The following testimony supports the jury's

findings. First, the victim was allowed to make a telephone call to her husband in which she said: "They told me to tell you they robbed me and got me and that I am fine and they are going to let me go sometime tonight." J.T. Tr. of February 18, 1988, at 986 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) (Add. 11) at 93). The victim's husband described her voice as "very scared, upset, very nervous." Id. Money was missing from the Gas-A-Mat where the victim worked, J.T. Tr. of February 19, 1988, at 1178 (276), and cash within one dollar of the amount stolen was traced to petitioner. J.T. Tr. of February 23, 1988, at 1423-24, 1484-85 ((ROA 1156) (Add. 12) at 187-88, 248-49); J.T. Tr. of February 25, 1988, at 1746-47 ((ROA 1157) (Add. 13) at 154-155). The victim's purse was found in petitioner's apartment (J.T. Tr. of February 18, 1988, at 989 ((ROA 1155) (Add. 11 at 96)), and petitioner was connected to the victim's missing identification (J.T. Tr. of February 24, 1988, at 1551-52, 1561-63, 1572-74 ((ROA 1156) (Add. 12) at 313-14, 323-25, (Add. 26) at 331-33); J.T. Tr. of February 25, 1988, at 1731-32 ((ROA 1157) (Add. 13) at 139-40)). In fact, petitioner was arrested on unrelated charges and, when asked for his belongings, he ran down the hall and ducked into a changing room in which a jail clothing officer later found the victim's identification cards. J.T. Tr. of February 24, 1988, at 1519-22, 1548-50 ((ROA 1156) (Add. 12) at 282-84, 310-12). Additionally, the victim's social security card was found in belongings that were removed from petitioner's apartment. Id. at 1482-83, 1498, 1506-10, 1512-17 (246-47, 262, 268-72, 274-79). The victim's husband testified she normally kept this card in her wallet in the purse that was found in petitioner's apartment. J.T. Tr. of February 18, 1988, at 989 ((ROA 1155) (Add. 11) at 96). Trial counsel cross-examined this testimony extensively. The jury also heard who found each of these items, including the circumstances surrounding when and where they were found.

Petitioner argues that the evidence, however, was inconclusive and failed to establish that he personally took the money. Dkt. # 109, at 115. As pointed out by respondent, the evidence need not be viewed in a vacuum. The victim's statements, along with the other direct and circumstantial evidence, viewed in the light most favorable to the prosecution, clearly were sufficient to support the jury's verdict. Petitioner has simply not shown that the state court decision was objectively unreasonable.

Finally, petitioner argues that there was insufficient evidence to support the charge of kidnapping, because the victim's statements over the telephone to her husband and the police were inadmissible hearsay and were unreliable; the victim's absence from the Gas-A-Mat established only that the victim had, in fact, left the Gas-A-Mat; and the handcuff testimony was speculative and therefore of questionable veracity. Dkt. # 109, at 118-19.

Looking at the totality of the evidence at the trial in the light most favorable to the jury's verdict, this Court finds that there was sufficient evidence to support the verdict of aggravated kidnapping beyond a reasonable doubt. The jury was given a number of instructions regarding kidnapping. First, the jury was instructed as follows:

> Under the law of the State of Utah a person commits the crime of kidnapping when he intentionally or knowingly and without authority of law and against the will of the victim:
>
> (a) detains or restrains another for any substantial period; or
>
> (b) detains or restrains another in circumstances exposing him or her to risk of serious bodily injury.
>
> A person commits Aggravated Kidnapping if the person intentionally or knowingly, without authority of law and against the will of the victim, by any means and in any manner seizes, confines, detains, or transports the victim with intent:

(a) to facilitate the commission, attempted commission, or flight after commission or attempted commission of a felony; or

(b) to inflict bodily injury on or to terrorize the victim.

In order to find that the crime of kidnapping has occurred, the State must prove beyond a reasonable doubt that the victim was detained for a substantial period of time and that the victim was forcibly removed a substantial distance from the normal surrounding and naturel sources of aid for the purpose of committing a criminal act.

The term "substantial period" requires a period of detention longer than the minimum inherent in the commission of another crime.

A kidnapping begins when the detention begins to be against the will of the victim.

In order to constitute the crime of kidnapping, detention of the victim requires some circumstances of risk in addition to those inherent in the commission of the homicide.

Instruction Nos. 35-39, Trial ROA at 000883-87 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal

(ROA) at 968-72).

Additionally, the jury instructions advised the jury that:

Before you can convict the defendant, Ralph LeRoy Menzies, of the crime of Aggravated Kidnapping, as charged in Count II of the Information, you must find from the evidence beyond a reasonable doubt, all of the following elements of that crime:

1. That on or about the 23rd day of February, 1986, in Salt Lake County, State of Utah, Ralph Leroy Menzies, a party to the offense, did intentionally or knowingly by any means and in any manner, restrain, seize, confine, detain, or transport Maureen [sic] Hunsaker.

2. That said seizure, confinement, detention, or transportation was without authority of law and against the will of Maureen [sic] Hunsaker.

3. That said seizure, confinement, detention, or transportation was with the intent to facilitate the commission of, or the attempted

65

commission of a felony; or flight from a felony, and/or to inflict bodily injury on or to terrorize the victim, Maureen [sic] Hunsaker.

If you believe that the evidence establishes each and all of the essential elements of the offense beyond a reasonable doubt, you must find the defendant guilty of Aggravated Kidnapping. On the other hand, if the evidence has failed to so establish one or more of said elements, then you must find the defendant not guilty of Aggravated Kidnapping.

Instruction No. 41, Trial ROA at 000888 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 973).

As discussed above, the victim was allowed to make a telephone call to her husband, and her statements to him in that call were admissible as hearsay exceptions. The victim sounded very scared and upset when telling her husband that "they told me to tell you that they robbed me and got me and that I am fine and they are going to let me go sometime tonight." J.T. Tr. of February 18, 1988, at 986 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) (Add. 11) at 93). This statement could have meant only that she had been kidnapped. Second, the fact that the victim was missing from the Gas-a-Mat was clearly relevant and admissible to help establish that the victim had been kidnapped. It was not, however, the only fact that was used to prove the crime. For example, the testimony of Britton (the jailhouse informant and petitioner's cellmate) about petitioner's alleged confession was relevant and admissible evidence used by the state to prove the charges against the petitioner. Finally, while petitioner argues that the handcuff testimony was questionable, evidence from the medical examiner established that the victim had ligature marks around her wrists and that handcuffs could have made the marks on the victim's wrists. J.T. Tr. of February 25, 1988, at 1609, 1615-18 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 17, 23-4). Additionally, a demonstration was utilized at trial to show the marks that handcuffs make on human wrists, the purpose of which was to allow the jury to compare the handcuff marks on the subject's wrists with

66

photographs showing marks on the victim's wrists. J.T. Tr. of February 23, 1988, at 1387-89 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) (Add. 12) at 151-53).

Petitioner does not identify any element of aggravating kidnapping that was not proven beyond a reasonable doubt. It was the jury's responsibility to decide what conclusions to draw from the evidence admitted at trial, and this Court cannot set aside that verdict unless the state court decision regarding the sufficiency of evidence was "objectively unreasonable." Cavazos, 565 U.S. at 2. Based upon the totality of evidence in this case, this Court finds the state court decision was not objectively unreasonable. As a result, this Court denies claim 12.

## Claim 13: Jury Instructions

The thirteenth claim for relief asserts that petitioner was deprived of his Fourteenth Amendment right to due process of law by a jury instruction that allowed the jury to make a finding of guilt based upon a degree of proof less than beyond a reasonable doubt. Again, petitioner raised this issue on direct appeal and the Utah Supreme Court summarily dismissed it. Menzies II, 889 P.2d at 406. Thereafter, on appeal from denial of his postconviction petition, petitioner asserted that appellate counsel was ineffective for not raising a challenge to the reasonable doubt jury instruction. In denying petitioner's claim, the Utah Supreme Court held that counsel was not ineffective because the instruction conformed with instructions upheld by the United States Supreme Court. Menzies IV, 344 P.3d at 632-33.

As a general rule, improper jury instructions do not form the basis for federal habeas corpus relief. Cupp v. Naughten, 414 U.S. 141, 146 (1973). The conviction will be set aside only if the "errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial." Maes v. Thomas, 46 F.3d 979, 983 (10th Cir. 1995). "The burden of demonstrating that an

erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (footnote omitted). The question in this habeas proceeding is not whether the instruction is "undesirable, erroneous, or even 'universally condemned,'" but whether the instruction so infected the trial that the resulting conviction violates due process. Cupp, 414 U.S. at 146. While the Due Process Clause protects an accused against conviction except upon proof beyond a reasonable doubt,[40] the United States Supreme Court has never held that any particular language must be used to define reasonable doubt. Rather,

> so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.

Victor v. Nebraska, 511 U.S. 1, 5 (1994) (citations omitted). Moreover, the Tenth Circuit has held that the trial court has considerable latitude in instructing juries on reasonable doubt. United States v. Petty, 856 F.3d 1306, 1309 (10th Cir. 2017) (citing United States v. Conway, 73 F.3d 975, 980 (10th Cir. 1995)).

In this proceeding, petitioner argues Instruction No. 12 allowed the jury to find him guilty on a degree of proof less than beyond a reasonable doubt and that the state court's determination of this claim was an unreasonable application of clearly established federal law. The challenged instruction provided, as follows:

> All presumptions of law, independent of evidence, are in favor of innocence, and a defendant is presumed innocent until he is proved guilty beyond a reasonable

---

[40]    In re Winship, 397 U.S. 358, 364 (1970).

doubt. And in case of a reasonable doubt as to whether his guilt is satisfactorily shown, he is entitled to an acquittal.

I have heretofore told you that the burden is upon the State to prove the defendant guilty beyond a reasonable doubt. Now by reasonable doubt is meant a doubt that is based on reason and one which is reasonable in view of all the evidence. Proof beyond a reasonable doubt is that degree of proof which satisfies the mind and convinces the understanding of those who are bound to act conscientiously upon it. A reasonable doubt is a doubt which reasonable men and women would entertain, and it must arise from the evidence or the lack of the evidence in this case.

If after an impartial consideration and comparison of all the evidence in the case you can candidly say that you are not satisfied of the defendant's guilt, you have a reasonable doubt. But if after such impartial consideration and comparison of all the evidence you can truthfully say that you have an abiding conviction of the defendant's guilt such as you will be willing to act upon in the more weighty and important matters relating to your own affairs, you have no reasonable doubt. A reasonable doubt must be a real, substantial doubt and not one that is merely possible or imaginary.

Instruction No. 12, Trial ROA at 000857 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 942).[41]

After reviewing the instructions as a whole and this instruction in particular, this Court finds nothing within the instructions that in any way altered the state's burden to prove the defendant guilty beyond a reasonable doubt. But see Menzies II, 889 P.2d at 407 (dissenting opinion). As a result, this Court finds that petitioner has failed to establish that the state court's determination of this claim was an unreasonable application of clearly established federal law. Therefore, claim 13 is denied.

**Claim 14: Ineffective Assistance of Counsel during the Guilt Phase**

---

[41]     The language utilized in this instruction is identical in all material respects to the instruction that was proposed by defense counsel. See Defendant's Requested Instructions to the Jury, Instructions No. 10-11, Trial ROA at 000960-61 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 1048-49).

Petitioner asserts, in his fourteenth claim for relief, that he was denied effective assistance of counsel during the guilt phase of his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. First, petitioner claims all of the issues raised have been exhausted in his state postconviction petition and in his subsequent appeal from the denial of the postconviction petition. Dkt. # 109, at 121. A few sentences later petitioner states, "[t]o the extent any aspect of this claim was not exhausted, that failure is attributable to the ineffective assistance of [his] post-conviction counsel."[42] Id. at 121-22. Petitioner then argues that the state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

In a motion to stay this case, petitioner characterized this claim as "partially unexhausted." Dkt. # 139, at 15-24. In his response, respondent asserts that some of petitioner's ineffective assistance of counsel claims "are exhausted because they were raised in his state postconviction petition and in the subsequent appeal. See Menzies IV, 344 P.3d 581 (Utah 2014)." Dkt. # 123, at 122. However, according to respondent, most of the ineffective assistance of counsel claims have been procedurally defaulted either because they were raised in his state postconviction petition, but were not appealed; or they were never raised or addressed at any level of state court. Id.

A. Legal principles applicable

---

[42]    This Court will address only the ineffective assistance of counsel claims that were exhausted in state court. See Davila, 137 S. Ct. 2058 (2017). Therefore, this Court will not address claims 14(C), (D), (G), (H), or (I). Claims 14(C) and (D) were raised in petitioner's postconviction petition, but they were not raised on appeal from that proceeding. Therefore, petitioner is barred from raising those claims. Petitioner did not raise claim 14(G) in his state petition, but he attempted to raise it in his cross-motion for summary judgment. The postconviction court and the Utah Supreme Court declined to hear the claim because it was not properly before them. Therefore, claim 14(G) is procedurally barred. Similarly, claims 14(H) and (I) are procedurally barred because petitioner did not raise them in state court.

Ineffective assistance of counsel claims are governed by the now familiar two-part test adopted in Strickland v. Washington, 466 U.S. 668 (1984), by the United States Supreme Court.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687. Failure to establish either prong of the Strickland standard will result in a denial of petitioner's Sixth Amendment claims. Id. at 696.

In order to demonstrate deficient performance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. Id. at 688. The focus is on whether counsel's assistance was reasonable considering all of the circumstances in this particular case. Id. at 689. While counsel's representation must be assessed against the standards prevailing in the state or the city where the attorney practiced at the time of the defendant's trial,[43] in determining reasonableness, it is important to remember that it is "not what is prudent or appropriate, but only what is constitutionally compelled." Breechen v. Reynolds, 41 F.3d 1343, 1365 (10th Cir. 1994). The petitioner is required to establish that counsel made errors so serious that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. Counsel's performance will be not be deemed constitutionally ineffective where it is merely wrong; rather, it must have been completely

---

[43]     See Pinholster, 563 U.S. 170 (2011), wherein the majority, in addressing the dissent's questions regarding counsel's penalty phase strategy, points out that no evidence existed to establish that counsel's chosen defense "would have been inconsistent with the standard of professional competence in capital cases that prevailed in Los Angeles in 1984" or "contest that, at that time, the defense bar in California had been using that strategy." Id. at 196.

unreasonable such that it bears no relationship to a possible defense strategy. <u>Le v. Mullin</u>, 311 F.3d 1002, 1025 (10th Cir. 2002). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." <u>Premo v. Moore</u>, 562 U.S. 115, 122 (2011).

In order to establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 689. Where the alleged ineffective assistance occurred during the guilt stage, the question becomes whether "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." <u>Id.</u> at 694. If the alleged ineffectiveness occurred during the sentencing phase, the Court must decide whether "there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>Id.</u> In assessing prejudice, this Court must examine the totality of the evidence, not just the evidence helpful to the petitioner. <u>Boyd v. Ward</u>, 179 F.3d 904 (10th Cir. 1999). Finally, petitioner will be entitled to relief only if the state court's rejection of his claim of ineffective assistance of counsel was "contrary to, or involved an unreasonable application of" <u>Strickland</u>, or it rested "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Surmounting <u>Strickland's</u> high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). Because ineffective assistance claims "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial," the <u>Strickland</u> standard must scrupulously be applied. <u>Premo</u>, 562 U.S. at 122. Otherwise, "'intrusive post-trial inquiry' may

threaten the integrity of the very adversary process the right to counsel is meant to serve." Id. (citing Strickland, 466 U.S. at 689-90).

Counsel must be given wide latitude in making tactical decisions and will be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. While ensuring that criminal defendants receive a fair trial, reviewing courts must exercise considerable judicial restraint. As the Supreme Court cautioned in Strickland,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

Id. at 689. Moreover, every effort must be made to eliminate the distorting effects of hindsight and evaluate the challenged conduct from counsel's perspective at the time. Due to the inherent difficulties of recreating an attorney's thought processes, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. Finally, the benchmark for judging ineffective assistance of counsel claims is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 687.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Premo, 562 U.S. at 122-23 (internal citations omitted). "The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (citing Yarborough, 541 U.S. at 654).

B. Ineffective assistance of trial counsel during guilt stage

    1. Conflict of interest

    Petitioner first claims his attorneys created and performed under a conflict of interest because counsel had him "sign a blank waiver of liability form after informing him that it would only pertain to [his] demand not to call Nicole Arnold [(petitioner's girlfriend)] as a witness." Dkt. # 109, at 125. This claim was raised in petitioner's state postconviction proceeding. See Fifth Amended [Postconviction] Petition , filed on March 14, 2011, PC ROA at 0011984-2210, (Dkt. # 110, Disk # 3, Vol. 32 at 355-Vol. 33 at 57). The Utah Supreme Court rejected petitioner's claim that the execution of a liability waiver created an actual conflict of interest. Respondent urges this Court to find that the Utah court's adjudication of this claim was not based upon an unreasonable determination of the facts and it did not involve an unreasonable application of clearly established Supreme Court law.

    In Cuyler v. Sullivan, 446 U.S. 335 (1980), the Supreme Court held that "the possibility of a conflict of interest is insufficient to impugn a criminal conviction." Id. at 350. To demonstrate a violation of the Sixth Amendment, a defendant must establish that an actual conflict of interest adversely affected his attorney's performance. Id.

The liability waiver at issue here was signed before a notary public prior to trial and provided:

> I, RALPH LEROY MENZIES, defendant in Criminal Case No. CR86-887 assigned to the Third District Court of the Third Judicial District, Judge Raymond S. Uno presiding, hereby acknowledge that I have refused to provide my counsel, Brooke C. Wells and Frances M. Palacios, with the name of witnesses who may have evidence pertinent to the defense of the above-referenced case.
>
> I hereby waive any and all claims which I might have against Brooke C. Wells and Frances M. Palacios or the Salt Lake Legal Defender Association as a result of the failure of such witnesses to be interviewed or presented as witnesses in any proceeding pertaining to this case, including trial.

See Exhibit II to the Fifth Amended [Postconviction] Petition, PC ROA at 0012308 (Dkt. # 110, Disk # 3, Vol. 33 at 254). Petitioner's major argument is that the waiver violated the Utah Rules of Professional Conduct. Specifically, petitioner challenges the finding by the Utah Supreme Court that the waiver does not violate those rules, arguing that this finding was an "objectively unreasonable determination of the facts." Dkt. # 109, at 126. It is not, however, the province of this Court to reexamine state-court determinations of state-law questions. Estelle v. McGuire, 502 U.S. 62, 68 (1991). Rather, this Court is limited to deciding whether petitioner's conviction violated the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a).

In deciding that the waiver did not create an actual conflict of interest, the Utah Supreme Court found that the waiver "explicitly memorializes the fact that the decision not to interview or present certain witnesses was [petitioner's], not counsel's . . . ." Menzies IV, 344 P.3d at 620. One of the bedrock principles of Strickland is that

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

75

Strickland, 466 U.S. at 691.  Simply memorializing the fact that the defendant refused to provide counsel with the names of witnesses who might have evidence pertinent to his defense does not create a conflict of interest.  Accordingly, this Court finds that petitioner has failed to establish that the state court decision was based upon an unreasonable application of clearly established federal law.

## 2. Failure to investigate

Petitioner next argues that his counsel did not conduct a reasonable and independent investigation of the facts of the crime and present the same to the jury.  Specifically, petitioner claims trial counsel:  (1) failed to investigate and present information provided by prospective witness Nicole Arnold (petitioner's girlfriend);  (2) failed to investigate and present two witnesses who allegedly saw the victim at a Denny's Restaurant;[44] (3) failed to "properly" investigate and present

---

[44]    On March 1, 1986, detectives obtained some information that led them to interview employees at a Denny's Restaurant.  The employees were shown a picture of Hunsaker, and a regular customer, Mary Beth Hodges, stated she was positive that the victim was at Denny's on February 23, 1986 between 11:30 p.m. and midnight.  She then pointed to a booth at which, she stated, Hunsaker and a man were sitting, described the man as male, white, five-ten to six feet, medium build, sandy brown hair with a shaggy "pork chop" beard and mustache.  Hodges stated that Hunsaker and the man sat and drank coffee for approximately 30 minutes and left.  During the time they were in Denny's, Hodges observed that they were having a normal conversation.  When asked, Hodges stated she was sure she could identify the male who was with the victim.  On March 3, 1986, Hodges was shown a photo spread containing six photos, including a photo of petitioner.  She was not able to identify petitioner.  On March 7, 1986, detectives spoke with Nicole Arnold (petitioner's girlfriend) and she stated that she had spoken to a Denny's waitress a few nights earlier, and the waitress had identified petitioner and Hunsaker from a newspaper article.  Arnold claimed to have shown the "night waitress" a copy of a newspaper clipping of her "husband" (petitioner), and that the waitress told her that she had seen petitioner and "that girl" in the restaurant drinking coffee for two hours.  See Exhibit I to the Fifth Amended [Postconviction] Petition, PC ROA at 0012226-27 (Dkt. # 110, Disk # 3, Vol. 33 at 89-91).

While petitioner argues that his trial counsel did not investigate the potential witnesses at (continued...)

additional evidence from witness Randy Butters (an ex-boyfriend of the victim and the father of one

of her children);[45] and (4) failed to investigate and present evidence from George Benitez (an inmate

---

44      (...continued)
Denny's, trial counsel for petitioner introduced a death certificate for Mary Beth Hodges (the regular customer at Denny's), showing that she died on August 28, 1986. See Defendant's Trial Exhibit ## 103, 104 (Dkt. # 110, Disk # 1, Trial/Exhibits/1988.02.10 Trial, Ex 103 Def and 104 Def). Thereafter, Hammer (a detective with the Salt Lake County sheriff's office) was called as a witness for petitioner, over the hearsay objection of the prosecutor. See J.T. Tr. of March 3, 1988, at 2244-50 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1159) (Add. 15) at 31-37). Hammer testified that he went to Denny's and took a verbal statement from Mary Beth Hodges, a regular customer of Denny's; that he showed Hodges a photograph of Hunsaker; that she identified the photograph as being the woman she had seen; and that she had seen Hunsaker on the night of February 23, sometime between 11:30 and midnight. Id. at 2246-47 (33-34). Hammer further testified that Hodges stated that the two people were having a "normal conversation" but she didn't remember anything they said. According to Hammer, Hodges was asked to give a description of the male party and she described that person as "male, white, five-foot ten to six-foot, medium build, sandy brown hair with a shaggy 'pork chop' type beard and mustache." Id. at 2248 (35). Hammer testified that Hodges said she would be able to identify the male that Hunsaker was with, and that Hunsaker and the male were in Denny's for approximately thirty minutes. Id. During cross-examination by the prosecutor, Hammer testified that Hodges was a customer, that he showed the photograph of the victim to the manager and three employees of Denny's, and that none of those employees was able to identify Hunsaker.

An affidavit by petitioner's co-counsel at trial, Frances M. Palacios, states that the "waitress at the Denny's Restaurant" to whom Arnold spoke was "referred to as Mrs. Hodges." See Exhibit A to Fifth Amended [Postconviction] Petition, PC ROA at 0012209, ¶ 16 (Dkt. # 110, Disk # 3, Vol. 33 at 55). Nothing but petitioner's conclusory allegations supports his statements that there were "two" witnesses who could establish that the victim was with someone else on the evening of her disappearance. Petitioner did not present to the state court, and has not presented in this Court, any affidavits to substantiate that the person to whom Arnold claimed to have spoken, and Hodges, were in fact two different people. Moreover, most importantly, petitioner refused to consent to calling Arnold as a witness at trial. See Menzies IV, 344 P.3d at 619.

45      The evidence petitioner claims should have been presented was contained within a police report of an interview with Butters.

at the Salt Lake County Jail in February and March, 1986).[46]  In the second amended petition in this federal habeas proceeding, petitioner states that this claim was partially raised in his state postconviction petition and, to the extent any portion of the claim was not exhausted, that failure is attributable to ineffective assistance of postconviction counsel.  According to respondent, the only parts of this claim that are exhausted are that counsel did not investigate the accounts of Tim Larrabee and Beth Brown (the couple who saw petitioner and Hunsaker at Storm Mountain) and present inconsistencies at trial, and did not investigate and present evidence undermining the account of Walter Britton (the jailhouse informant and petitioner's cellmate).  Dkt. # 123, at 129.

A review of petitioner's fifth amended petition for postconviction relief reveals that petitioner argued that counsel was ineffective because they failed "to conduct an effective investigation."  See Fifth Amended [Postconviction] Petition, filed March 14, 2011, PC ROA at 0011991-98 (Dkt. # 110, Disk # 3,  Vol. 32, at 362-69).  In particular, petitioner argued that counsel failed to call Nicole Arnold (petitioner's girlfriend) and Mary Beth Hodges (the Denny's customer), as witnesses at trial. Id. at 0011992-93.

As to Tim Larrabee, petitioner initially claimed only that "[t]rial counsel failed to competently interview" said witness,  but later stated he was "prejudiced by trial counsel's failure to[47] interview Larrabee. . . ."  Id. at  0011993-94, ¶¶ 41, 43, respectively (id. at 364-65).  Thereafter, with regard to Britton (the jailhouse informant and petitioner's cellmate), petitioner argued that

_____

[46]    Nowhere within the fifth amended petition for postconviction relief is George Benitez mentioned.  Benitez told law enforcement officers that the defendant confessed that he had killed a woman.  Benitez was not, however, called as a witness at trial.  On August 8, 2014, Benitez recanted his story.  See Dkt. # 109-12, at 35-37.  This declaration was never presented to the state court.

[47]    Petitioner repeats his claim that trial counsel failed to "competently interview Mr. Larrabee" in ¶ 44 of his fifth amended postconviction petition.  Id. at 0011994-95 (id. at 366-67).

counsel "failed to check the public federal court file for Walter Britton prior to the preliminary hearing," failed to use a report in the federal court file "to impeach Mr. Britton at the preliminary hearing," and "failed to contact Mr. Britton's attorney in the federal matter . . . prior to the preliminary hearing." Id. at 0011995, ¶¶ 45, 48, 49, respectively (id. at 366-67). Additionally, petitioner argued that counsel failed to elicit information from Butters (the victim's ex-boyfriend) regarding an earlier three-day disappearance of the victim with some military men when Butters and the victim were dating. Finally, petitioner claimed that counsel failed to call Craig Nichols[48] as a witness even though, based upon defense counsel's investigator, Nichols' testimony would not have been helpful to petitioner. See Exhibit RRR to the Fifth Amended [Postconviction] Petition, PC ROA at 0012439 (Dkt. # 110, Disk # 3, Vol. 33, at 515). According to petitioner, all of these failings show that counsel had failed to conduct a proper investigation and, therefore, had provided ineffective assistance of trial counsel.

a. Procedural bar

On appeal from the postconviction proceeding, petitioner challenged the effectiveness of both his trial and appellate counsel. According to the Utah Supreme Court, in his postconviction petition, petitioner "raised approximately twenty ineffective assistance of counsel claims, some of which contained numerous subparts." Menzies IV, 344 P.3d. at 603-04. Petitioner, however, appealed only ten of those claims. At issue here are the failure to investigate claims that were stated by the Utah Supreme Court as: (1) inadequate investigation of the eyewitness testimony of Larrabee and

---

[48]    Craig Nichols called police on February 23, 1986, and said that he had picked up Hunsaker as a hitchhiker and that she wanted sex; however, when defense counsel's investigator interviewed Nichols, he changed his story and said that the woman who he had picked up was not Hunsaker and, if called as a witness, he would testify that the woman he had picked up and Hunsaker are not the same person.

Brown (the couple who saw petitioner and Hunsaker at Storm Mountain) and (2) failure to adequately impeach Britton (the jailhouse informant).  Id. at 604.

Other than the two specific failures to investigate the facts of the crime relating to the eyewitness testimony of Larrabee and  Brown and the impeachment of Britton, petitioner did not, during the appeal of his postconviction proceeding, directly attack trial counsel's failure to investigate during the guilt phase of his trial.  Dkt. # 136-1, Appellant's Opening Brief re: Denial of Habeas Relief, at 85-88, 88-91.

As previously stated, for exhaustion to have occurred, a habeas petitioner must have "fairly presented" to the state courts the "substance" of his federal habeas corpus claim.  Picard, 404 U.S. at 275-76.  In this particular case, while petitioner included information in his fifth amended petition for postconviction relief to which Nicole Arnold (petitioner's girlfriend) could have testified under a heading of "failure to investigate," no allegation is found within the information relating specifically to Arnold that indicates counsel failed to investigate said information.  Rather, all of the facts recited by petitioner indicate trial counsel's error was in failing to call Arnold as a witness at trial to corroborate other information.  Nevertheless, petitioner does not challenge the Utah Supreme Court's finding that he "did not want Ms. Arnold to testify and refused to consent to calling her as a witness."  See Menzies IV, 344 P.3d at 619; see also Deposition of Brooke Wells, Vol. 2 at 35, lines 12-16 (Dkt. # 110, Disk # 5, Transcripts 2010.07.30 Deposition of Brooke Wells, at  9).  Moreover, in his appeal from the denial of his postconviction petition, petitioner did not raise a separate claim that counsel was ineffective for failing to properly investigate and/or introduce additional evidence.  In challenging the flaws in the trial court's reasoning concerning the alleged conflict of interest, petitioner did state that the Salt Lake Legal Defender Association:

(1) failed to interview Larrabee and Brown; (2) failed to carefully read their statements to the police; (3) failed to interview a second witness at Denny's (who could have confirmed that Hunsaker was with the man with the Levi jacket when [petitioner] was with Franks); (4) failed to interview the Denny's customer who saw that man with Hunsaker, i.e., Mary Beth Hodges; (5) failed to introduce evidence that Hunsaker had run off with friends from the military a few years earlier; and, (6) failed to hire expert witnesses to prepare for the fingerprint and carpet fiber evidence.

Dkt. # 136-1, Appellant's Opening Brief Re: Denial of Habeas Relief, at 76 (footnotes omitted).[49]

This is not the same, however, as bringing a stand-alone claim of ineffective assistance of counsel for failure to investigate. As a result, this Court finds that petitioner has not exhausted his claim as it relates to potential witnesses Nicole Arnold (petitioner's girlfriend), Mary Beth Hodges (the Denny's customer), Randy Butters (the victim's ex-boyfriend), or George Benitz (the inmate at the Salt Lake County Jail).

Because Utah law requires ineffective assistance of counsel claims to be raised in an initial postconviction proceeding, petitioner argues that ineffective assistance of postconviction counsel excuses his procedural default. As stated above, in Martinez v. Ryan, 566 U.S. 1 (2012), the Supreme Court created a narrow exception to the procedural default rule to allow review of defaulted claims of ineffective assistance of trial counsel where the state collateral proceeding was the initial review proceeding of the defaulted ineffective assistance of counsel claim. Thereafter, in Davila, 137 S. Ct. 2058 (2017), the Supreme Court made clear that Martinez will not be extended to claims

---

[49]  It should be noted that in one of the omitted footnotes, petitioner states that the Legal Defender Association "also failed to call an optometrist to challenge Brown's ability to identify the jacket without her glasses and with 20-40 vision. . . ." An affidavit submitted in this proceeding by Elizabeth (Brown) Babinchak, however, indicates while she was not paying close attention, she did recognize the jacket the man had. Dkt. # 109-12, at 20, ¶ 16. Additionally, Babinchak indicates surprise that there were references in the transcript to the fact she was not wearing her glasses or contact lenses that day at Storm Mountain, because "at the time the only glasses I had were reading glasses. I did not need glasses when I wasn't reading. I've never had contacts." Id. at 21, ¶ 21.

of ineffective assistance of postconviction counsel for failing to raise the ineffective assistance of appellate counsel claims. Thus, petitioner is procedurally barred from raising anything to do with the failure to investigate Arnold, Hodges, Butters, and Benitez.[50] The Court will address the merits of petitioner's claims of ineffective investigation as it relates to Larrabee and Brown (the couple who saw petitioner and Hunsaker at Storm Mountain), and impeachment of Britton (the jailhouse informant) at his preliminary hearing.

b. Merits of claim

In assessing counsel's investigation, this court must conduct "an objective review of their performance, measured for 'reasonableness under prevailing professional norms.'" Wiggins v. Smith, 539 U.S. 510, 523 (2003) (citing Strickland, 466 U.S. at 688). This "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" Id. As stated previously, this Court must review trial counsel's performance without the "distorting effects of hindsight" and counsel's conduct must be evaluated "from counsel's perspective at the time." Strickland, 466 U.S. at 689.

---

[50]    Petitioner also argues that counsel was ineffective for failing to investigate and present facts showing that someone else committed the offense. Dkt. # 109, at 144-46. Respondent argues that this claim is procedurally defaulted. Dkt. # 123, at 124. Instead of addressing whether or not the claim is procedurally defaulted in his reply, petitioner argues that this Court must accept his "merits arguments" (which, in actuality, are factual statements as opposed to arguments) as uncontroverted because respondent did not respond to the merits of the subclaim. As previously stated, petitioner did not bring a standalone claim of ineffective assistance of counsel for failure to investigate. As a result, this Court finds that this argument is procedurally barred. Even if it were not barred, however, petitioner's arguments are based on his assertion that two potential witnesses reported observing the victim at Denny's on the night of her disappearance. Petitioner has not, however, presented any evidence that establishes that there were, in fact, two separate witnesses who could establish that the victim was with someone else on the evening of her disappearance or that someone else committed the offense.

Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, . . . keeping in mind that there are countless ways to provide effective assistance in any given case.

Id.

### 1. Larrabee and Brown

In this case, petitioner claims he was

prejudiced by trial counsel's failure to interview Larrabee and Brown because, on cross-examination, Wells failed to elicit information that Larrabee was distracted at the time he observed the hikers because he was engaging in sexual activity with his girlfriend. This additional evidence would have provided information to the jury that Larrabee was unable to accurately determine what the male hiker looked like. Even more troubling, counsel's failure to conduct a pre-trial interview of this key State witness prevented counsel from learning that Larrabee questioned his in-person lineup identification and asked whether he should have identified Number 6, [petitioner]. Counsel's failure to discover this fact led counsel to open the door to this testimony at trial and prevented counsel from being adequately prepared to confront the witness and prepare a defense strategy. Failure to properly interview and cross-examine Larrabee was objectively unreasonable, uninformed, and prejudicial.

Dkt. # 109, at 136 (citation to transcript omitted).

At trial, defense counsel got Larrabee to admit that he did not see the hikers faces because his "purpose for being [at Storm Mountain] was to spend time with his girlfriend, that [his] attention was turned more towards her." J.T. Tr. of February 19, 1988, at 1222-23 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) (Add. 11) at 321). During postconviction proceedings, petitioner first submitted an affidavit from Larrabee, executed on October 12, 2010, that he and Brown were "kissing on a picnic table" and Brown "was worried that people might see what we were doing." PC ROA at 0011403 at ¶¶ 3, 4, respectively (Dkt. # 110, Disk # 4, PCR Sealed Pleadings/Sealed Vol. 3 at 177). In his effort to prevent summary judgment, petitioner proffered an affidavit, executed on September 7, 2011, from postconviction counsel, which indicated that Larrabee had told him that

"at the time he was observing the male hiker, Beth Brown was fondling his penis." Id. at 0013764, ¶ 4 (Dkt. # 110, Disk # 3, Vol. 36 at 74). Postconviction counsel then states that, for "tactical purposes," he "decided to state that Mr. Larrabee was simply kissing Ms. Brown during his observations of the male hiker." Id. ¶ 6 (id.).

Petitioner argued on appeal in his state postconviction proceeding that "trial counsel performed unreasonably in failing to interview Larrabee and Brown, learn about the nature of their distraction, and then use that knowledge at trial to impeach their testimony." Id. at 617. In denying this claim, the Utah Supreme Court said:

> We reject this claim because trial counsel cross-examined Mr. Larrabee and Ms. Brown at trial and highlighted for the jury the weaknesses of their testimony. Mr. Larrabee admitted to the jury that his attention was turned towards Ms. Brown during the time he saw the man and woman walking at Storm Mountain. [Petitioner] concedes that 'Larrabee admitted his inconsistent statements at trial.' [Petitioner] does not explain how the jury knowing that Mr. Larrabee's attention was directed at Ms. Brown *for the purpose of having sexual relations* would have changed the outcome in the case. Further, eliciting the specific reason Ms. Brown and Mr. Larrabee were distracted might have hurt [petitioner's] case more than it helped it. The jury might have concluded that Mr. Larrabee was so concerned about being caught with Ms. Brown that he was more focused on the man at Storm Mountain than he might otherwise have been.
>
> * * * * *
>
> In short, trial counsel's failure to elicit the specific reason that Mr. Larrabee and Ms. Brown were distracted was neither unreasonable nor prejudicial, and [petitioner] has therefore failed to raise a genuine issue of material fact. Accordingly, we affirm the PCC's grant of summary judgment.

Id. (italics in original).

According to petitioner, since Larrabee admitted in the October 12, 2010 affidavit that he was "focused" on his girlfriend (Brown), the Utah Supreme Court's factual conclusion "that eliciting the nature of Larrabee and Brown's distraction might have hurt [petitioner's] case more than helped

because Larrabee may have 'focused more on the man at Storm Mountain' out of a fear of getting caught," Dkt. # 109, at 136, is "not supported by the record and is objectively unreasonable." <u>Id.</u> In <u>Wood v. Carpenter</u>, 907 F.3d 1279 (10th Cir. 2018), the Tenth Circuit stated that "the prejudice inquiry is a 'mixed question of law and fact.'" <u>Id.</u> at 1291. The Circuit explained that the "factual part of the mixed question" is whether the evidence had, in fact, been "presented at trial," while the "legal part" is related to the "strength of the . . . evidence." <u>Id.</u> The Utah Supreme Court would have made a factual error if it had concluded Larrabee's focus was not on Brown. But, as can be seen from the state court's decision, that is not what the state court found. Rather, the state court's comment regarding what the jury might have concluded had they known the specific reason for the couple's distraction, relates to the "legal part" of the prejudice analysis — the strength of the missing reason, and whether it would have affected the proceeding's outcome. Since, however, the factual determination petitioner claims is unreasonable is not a factual determination, § 2254(d)(2) is inapplicable. <u>Id.</u> Accordingly, this Court finds "fairminded jurists could disagree" on the correctness of the state court's decision and, therefore, federal habeas relief is not appropriate.

Additionally, petitioner argues that counsel rendered ineffective assistance of counsel because trial counsel did not object on due process grounds to the identifications made by Larrabee. Dkt. # 109, at 158. In considering this claim, the Utah Supreme Court found that trial counsel's decision to impeach Larrabee's and Brown's eyewitness testimony rather than to seek suppression was reasonable. <u>Menzies IV</u>, 344 P.3d at 617. Petitioner claims that the state court's rejection of this claim involved an unreasonable application of clearly established federal law and constituted an unreasonable determination of facts in light of the evidence presented.

In Perry v. New Hampshire, 565 U.S. 228 (2012), the Supreme Court held that the introduction of eyewitness testimony, without preliminary judicial assessment of its reliability, did not render a defendant's trial fundamentally unfair and that the Due Process Clause did not require preliminary judicial inquiry into the reliability of eyewitness identification that was not procured under unnecessarily suggestive circumstances arranged by law enforcement. In reaching its holding, the Supreme Court acknowledged that its decisions in this area were aimed at deterring police from rigging identification procedures at lineups, showups, or photograph arrays. Id. at 233. Furthermore, the Supreme Court recognized that:

> The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit. Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel; compulsory process; and confrontation plus cross-examination of witnesses. Apart from these guarantees, we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial. Only when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice," . . . have we imposed a constraint tied to the Due Process Clause.

Id. at 237 (citations omitted) (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)).

In rejecting petitioner's claim, the state court, citing to Perry, stated the following:

> As a general rule regarding the validity of identification procedures, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." Courts must "assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" In determining whether a photo array is impermissibly suggestive, we have stated that "the main question is whether the photo array emphasized the defendant's photo over others." Factors that we consider in answering that question include: (1) "whether the words and body language of the police officers who presented the array conveyed an attitude of disinterest," (2) "whether the officers manipulated the photos to indicate their belief that one of the photos portrayed the perpetrator," and (3) "whether the photos themselves were selected so that the defendant's photo stood out from the rest."

As an initial matter, we note that neither Mr. Larrabee nor Ms. Brown ever made a firm identification of Mr. Menzies. Rather, Mr. Larrabee identified Mr. Menzies's photo as looking the most like the man he saw at Storm Mountain. And later Mr. Larrabee could not identify the man he saw during a lineup. Mr. Larrabee did ask the prosecutor after the lineup whether number six was in fact Mr. Menzies. But the trial court struck this part of Mr. Larrabee's testimony. Ms. Brown also never made a firm positive identification of Mr. Menzies.

Even if we assume that Mr. Larrabee's and Ms. Brown's testimony is identification testimony, Mr. Menzies offers no evidence that is relevant to any of the three factors we use to determine whether identification procedures are suggestive. Instead, he offers conclusory assertions. For instance, he states that Mr. Larrabee's identification was unreliable because of "suggestive comments made by the police to Larrabee." But Mr. Menzies does not provide specifics regarding what comments the police made. He merely refers to "the suggestiveness of the mug shots."

Mr. Menzies's other assertions do not support the conclusion that the identification procedures were unduly suggestive, but simply undermine the weight of the identification testimony. For example, Mr. Menzies states that "[Detective] Judd admitted that if Larrabee only saw a profile the composite was inaccurate." He further states that "Larrabee and Brown were grossly distracted, and had no meaningful opportunity to observe or pay attention to the hiker." Even if true, these facts affect only the weight of Mr. Larrabee's identification testimony. They are irrelevant to the question of whether the identification procedures employed by the police were unnecessary and suggestive.

Finally, other indicia of suggestiveness cited by Mr. Menzies simply have no basis in the record. For instance, Mr. Menzies alleges that "[Officer] Couch used the composite to select [Mr. Menzies's] mug shot to presumably frame [Mr. Menzies]." Mr. Menzies provides no record citation to support this allegation. Further, Mr. Menzies states that during the photo array procedure the "police told Larrabee that he had picked the right man, and that they had [Mr. Menzies] in custody. Then after Mr. Larrabee picked the wrong man because he had a pot belly, the police told him that [Mr. Menzies] had lost 20 pounds." Mr. Menzies provides no citation to the record on this point, either. Our review of the record, indicates, as the State suggests, that Mr. Larrabee selected Mr. Menzies's photo as looking most like the man he saw at Storm Mountain *before* the police told him that Mr. Menzies was in custody and mentioned anything about a weight change. Mr. Larrabee stated that at the time he picked Mr. Menzies's picture out of the photo array he did not know that the police had Mr. Menzies in custody. In fact, Mr. Larrabee learned that Mr. Menzies was in custody approximately three months later. At the lineup, Mr. Larrabee identified someone other than Mr. Menzies. It was not until after the lineup that Mr. Larrabee learned about Mr. Menzies's weight change. This is not a case where the police told Mr. Larrabee that he picked the right man or ever implied as much.

Only one fact cited by Mr. Menzies is even potentially relevant to determining suggestiveness. Mr. Menzies claims that "[Detective] Judd did not instruct Larrabee that the hiker may or may not be in the photo array." Mr. Menzies cites a federal

district court case where the court recognized that "[s]uch an admonition is extremely important to avoid suggestiveness in the presentation of a photographic lineup to an adult witness . . . [and] is even more critical to avoid suggestiveness in the presentation . . . to a six-year-old child." But the facts of that case differ in several important ways from the situation here. First, the witness in that case was a six-year-old child, whereas Mr. Larrabee was a high-school student. Second, there the police made suggestive statements such as telling the witness that she did an "awesome" and "fantastic" job after identifying the defendant. In contrast, here the police made no such statements. The lone fact that Detective Judd did not tell Mr. Larrabee that the hiker may or may not be in the photo array is not enough for us to conclude that trial counsel acted unreasonably in not seeking to suppress the identification as unnecessarily suggestive.

Mr. Menzies has not raised a genuine issue of material fact regarding trial counsel's decision to impeach Mr. Larrabee's and Ms. Brown's testimony. Trial counsel acted reasonably in pointing out the flaws in the testimony rather than seeking to suppress it on the ground that the police used unnecessarily suggestive tactics.

Additionally, Mr. Menzies's ineffective assistance claim would fail in any case because he has not made a sufficient showing of prejudice. His only argument regarding prejudice on this claim is that "there is a good change that had LDA moved to strike the identifications, the motion would have been granted, and the result of the trial would have been different." This merely restates the basic prejudice standard and provides no analysis regarding why it would be the case. For these reasons we affirm the PCC and reject Mr. Menzies's claim that trial counsel was ineffective in dealing with Ms. Brown's and Mr. Larrabee's testimony.

Menzies IV, 344 P.3d at 617-19 (footnotes omitted).

In this proceeding, petitioner argues that trial counsel was ineffective because she failed to object to the use of the eyewitness identifications of Larrabee under a due process theory. Petitioner objects not only to the photo identifications that the Utah Supreme Court dealt with at length, but also to Larrabee's statements that Denter's car looked a lot like the car he saw at Storm Mountain and that petitioner's coat was the coat carried by the male hiker at Storm Mountain. All of the cases cited by petitioner deal with eyewitness identifications of a defendant either in photo arrays, lineups, or, as in Perry, a spontaneous identification of the defendant followed by an inability to pick the defendant out of a photo array. Petitioner does not cite to any Supreme Court cases dealing solely

with the identification by a witness of objects connected to a crime. The latter two statements of Larrabee were apparently admissible under state law and, therefore, this Court will review them only for fundamental fairness.[51]

While arguing that the state court's decision was an unreasonable determination of the facts, petitioner does not identify the specific facts to which he is referring. Rather, he cites facts that deal with Larrabee's statements regarding the car and the coat. Since the state court did not even discuss those facts, the state court's decision was not an unreasonable determination of those facts. Moreover, the facts cited by petitioner, in an attempt to overturn the state court's decision, rely upon a declaration that was never submitted to the state court. See Dkt. # 109-12, at 23-30. As previously stated, this Court's review is limited to the record that was before the state court. Pinholster, 563 U.S. at 181.

After reviewing the state court records herein, this Court finds that petitioner has failed to establish that the state court decision, finding that trial counsel had acted reasonably in pointing out the discrepancies in Larrabee's testimony rather than seeking to suppress the testimony, was based upon an unreasonable determination of the facts or that it involved an unreasonable application of clearly established federal law. Moreover, the introduction of Larrabee's statements that the car in the police parking lot "looked like the car [he] saw" at Storm Mountain and that the coat he was shown by police was "perhaps the coat that [he] had seen the male individual was wearing" did not render petitioner's trial fundamentally unfair. J.T. Tr. of February 23, 1988, at 1272, 1273,

---

[51]     As stated previously, due process challenges to state evidentiary rulings are reviewed only for fundamental fairness. Matthews, 83 F.3d at 331.

respectively (Dkt. # 110, Disk # 1, Trial/Transcripts, ROA 1156 (Add. 12) at 37). Accordingly, habeas relief is not appropriate.

## 2. Walter Britton

During his appeal, petitioner argued that trial counsel failed to impeach Britton (the jailhouse informant and petitioner's cellmate) during the preliminary hearing about his mental illness.[52] In considering petitioner's claim of deficient performance regarding counsel's failure to impeach Britton, the Utah Supreme Court said:

---

[52] The state trial court considering the postconviction petition made some important observations concerning testimony at a preliminary hearing which bear repeating here in light of the actual argument made, i.e., counsel was ineffective for failing to impeach Britton at the preliminary hearing:

> . . . impeachment at a trial in front of a fact finding jury is a completely different issue from impeachment at a preliminary hearing. The record contains nothing which indicates anyone knew, at the time of the preliminary hearing, that Britton would not be testifying at trial and would, in the face of a contempt finding, refuse to testify. The burden of proof at a preliminary hearing is so low that impeachment at that hearing as a practical matter is not effective nor worthwhile. The judge at a preliminary hearing, acting as a magistrate, is required to only find a reasonable belief that the offenses were committed by the accused and the evidence must be highly inconsistent and incredible before it is rejected by the magistrate. The magistrate makes only a very limited credibility determination to assure itself the testimony is not wholly incredible or unbelievable. Determinations of credibility are limited to determining that the evidence is not wholly lacking and incapable of reasonable inference. Acting as a magistrate, the judge at a preliminary hearing does not weigh credibility and leaves to the fact finder ultimate judgments of credibility.

PC ROA at 0015434 (citation omitted) (Dkt. # 110, Disk # 3, Vol. 40, at 416). Thus, any claimed failures to impeach at a preliminary hearing are "of a wholly different character from failures to effectively impeach at a trial." Id.

Even if [petitioner] could satisfy his burden of showing prejudice, his claim would fail because he has not shown that trial counsel had access to the evidence, or could have obtained access through reasonable diligence. [Petitioner's] claim instead relies on a variety of unsupported inferences to conclude that trial counsel knew about Mr. Britton's mental illness.

Counsel's duty to "adequately investigate the underlying facts of the case" is an important one because "investigation sets the foundation for counsel's strategic decisions about how to build the best defense." But counsel's duty is to conduct an "adequate investigation." [Petitioner] appears to argue this duty further obligates counsel to present evidence that was not obtained even after an adequate investigation.

Here, [petitioner] has failed to raise a genuine issue of material fact regarding trial counsel's investigation into whether Mr. Britton had a mental illness. Trial counsel's investigator testified that he served the federal court hearing Mr. Britton's case with a subpoena seeking Mr. Britton's psychological records, but received nothing back. Mr. Britton's attorney told trial counsel that the records were not public records and that he could not disclose confidential client information. Ms. Wells testified that the federal court hearing Mr. Britton's case had the only copy of the Springfield report, that she was unsuccessful in procuring the report, and that Mr. Britton's attorney did not have a copy.

Not only did trial counsel investigate Mr. Britton's background, but they also used their findings to impeach his testimony. In Ms. Wells's closing argument, she reminded the jury that Mr. Britton refused to testify after learning he would not get any benefit in his own case from doing so. [Petitioner] apparently misunderstands trial counsel's purpose for telling this to the jury and states that the jury couldn't infer bias because "Britton did not get a deal." This is precisely the point trial counsel made to the jury. Counsel highlighted the weakness of Mr. Britton's testimony by showing that he was eager to testify against [petitioner] when he thought he might benefit by doing so, but he stopped cooperating once he realized that benefit would not materialize.

[Petitioner] counters the State's assertion that trial counsel's investigation was reasonable by suggesting that the police reports available to trial counsel firmly established that Mr. Britton was mentally ill. But the portion of the report [petitioner] cites for this proposition states only that Mr. Britton was "sent out to Springfield, Missouri (inaudible) my attorney tried to get an irresistible impulse plea put on there." This report merely refers to the report that trial counsel did not have access to—it does not establish some other basis for finding that trial counsel should have searched elsewhere for evidence of Mr. Britton's alleged mental illness.

Additionally, [petitioner] makes the sweeping assertion that "Savage spoke to [trial counsel] about Britton prior to the preliminary hearing. Thus, it is reasonable to infer that [trial counsel] was aware of Britton's mental illness because of Savage's contact." [Petitioner's] citation to the record here merely indicates that Mr. Savage talked to counsel before Mr. Britton testified against [petitioner]. There is nothing

in the portion of the record cited by [petitioner] to support the inference that "[trial counsel] was aware of Britton's mental illness because of Savage's contact."

Finally, [petitioner] argues that it is reasonable to infer that trial counsel could have used a FOIA request to obtain the Springfield report because [petitioner's] post-conviction counsel was able to obtain a copy of the report in 2011 pursuant to FOIA from the Federal Bureau of Prisons. On this point [petitioner] does not explain why this is a reasonable inference or what effect amendments to FOIA during the last twenty years would have on the analysis. Further, [petitioner] has not provided any evidence showing that the Federal Bureau of Prisons actually had the Springfield report during the time of trial. Trial counsel and Mr. Britton's attorney both suggested that the federal court hearing Mr. Britton's case had the only copy of the report and therefore the Federal Bureau of Prisons may not have had the report at that time. Trial counsel's investigator served the federal court a subpoena seeking mental health records but received no response. [Petitioner] has failed to support his suggested inference that trial counsel could have used a FOIA request to obtain the Springfield report.

[Petitioner] has not proffered sufficient evidence to overcome our "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Accordingly, we hold that [petitioner] has not raised a genuine issue of material fact regarding the deficient performance prong of <u>Strickland</u>.

<u>Menzies IV</u>, 344 P.3d at 615-16.

In this case, petitioner claims

[p]rior to the preliminary hearing, trial counsel failed to check the public federal court file for Walter Britton. Contained in the federal court file was a November 1985 motion for determination of Britton's mental competency filed by the United States attorney prosecuting Britton in an unrelated federal case. The record also contained a letter written by Dr. Breck Lebegue in November of 1985, which indicated that Britton may have been suffering from a mental illness at the time of his preliminary hearing testimony. Trial counsel failed to use this information to impeach Britton at the preliminary hearing.

Dkt. # 109, at 137-38 (citations omitted).[53]

In order to impeach a witness based upon a mental disorder, the party offering the evidence must first show that "the witness's mental condition is such that it affects the witness's ability to accurately perceive, recall, and relate events." State v. Stewart, 925 P.2d 598, 600 (Utah App. 1996); see also United States v. Lopez, 611 F.2d 44, 45 (4th Cir. 1979) ("[M]any psychiatric problems or fixations which a witness may have had are without any relevancy to the witness'[s] credibility,

---

[53]      Petitioner makes two additional claims regarding trial counsel's failures. First, he claims that counsel failed to present to the jury the fact that Britton's testimony and statements to the police tracked media reports. Dkt. # 109, at 153. The record, however, establishes that during the preliminary hearing, counsel got Britton to admit that "he heard about Mrs. Hunsaker's abduction on the news approximately a week before he told the police about [petitioner's] statement"; that "he watched the news more frequently after his first conversation with [petitioner]"; and "that he did not report [petitioner's] statements to the police until about a month after [petitioner] made them." Menzies IV, 344 P.3d at 614. Additionally, counsel "pointed out to the jury during closing argument that Mr. Britton's testimony could have been derived from either the news or jail rumors." Id.; see also J.T. Tr. of March 8, 1988, at 2669-72 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1160) (Add. 16) at 152-55). Finally,

> [t]rial counsel also attempted to discredit Mr. Britton's testimony at trial. There, counsel called a jail officer who testified that the details of Ms. Hunsaker's death were discussed by jail employees and inmates. The officer further testified that she heard several rumors in the jail regarding the crime and repeated those rumors.

Menzies IV, 344 P.3d at 614. Therefore, this Court finds this allegation to be without merit.

     Second, petitioner argues that counsel failed to elicit testimony about petitioner's drug use at the time of the crime. Dkt. # 109, at 153. This allegation is based upon a police report and a supplementary police report of interviews with Britton in which Britton claims that, during petitioner's confession, petitioner told him he was on high on drugs, see PC ROA at 0012339, Exhibit NN to Fifth Amended Postconviction Petition (Dkt. # 110, Disk # 3, Vol. 33 at 315), and/or on heroin, see PC ROA at 0012391-92, Exhibit EEE to Fifth Amended Postconviction Petition at 4 (Dkt. # 110, Disk # 3, Vol. 33 at 419-20). Petitioner did not raise this argument on appeal from the denial of his postconviction application. Therefore, this allegation has been procedurally defaulted.

concerned as it is with whether the witness' mental impairment is related to 'his capacity to observe the event at the time of its occurrence, to communicate his observations accurately and truthfully at trial, or to maintain a clear recollection in the meantime.'" (citations omitted)). Additionally, the party must "demonstrate that the mental disorder existed either at the time of the event regarding which the witness has been called to testify, or at the time testimony is given." Id.

After reviewing the report written by Breck Lebegue, M.D., it is clear that no mental illness was identified that could have been used at the time of the preliminary hearing to impeach Britton. Rather, Dr. Lebegue indicated he was unable to "derive an opinion as to the defendant's mental state with reasonable medical certainty, because [Britton] refused to speak with me for more than a half hour." PC ROA Sealed Vol. 4, at 0012501-02 (Dkt. # 110, Disk # 4, PCR Sealed Pleadings/Sealed Vol. 4, at 194-95). Moreover, Dr. Lebegue indicated that he believed that Britton had "a rational understanding of the nature of the proceedings against him, and his relationship to those proceedings . . . ." Id. As a result, no public information existed at the time of the preliminary hearing to suggest Britton actually suffered from a mental illness that affected his ability to accurately perceive, recall, and relate the events about which he was testifying. Further, if trial counsel was unable to access the information at the time of trial with a subpoena, it is unlikely she could have obtained the information any easier prior to the preliminary hearing. Finally, in a Final Psychiatric Evaluation of Britton dated January 14, 1986, the evaluator believed Britton had "no mental disorder." PC ROA at 0013412 (Dkt. # 110, Disk # 3, Vol. #35 at 171). In fact, it was his opinion that Britton was

> not suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequence of proceedings against him. He is also able to assist properly in his own defense.
> . . . [Britton] is not suffering from a severe mental disease or defect that would substantially impair him to the extent that he was unable to appreciate the nature and quality or the wrongfulness of the alleged offense at the time of the alleged offense.

94

Id. at 0013413 (172).

Where "some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the habeas corpus writ should be denied." Frost v. Pryor, 749 F.3d 1212, 1125 (10th Cir. 2014). In light of the record herein, this Court finds petitioner has failed to establish the state court's decision was an unreasonable application of Strickland. Clearly, even if counsel's investigation of Britton was deficient, based upon this record, petitioner cannot establish any prejudice whatsoever. As a result, this Court finds petitioner is not entitled to relief on his claim that counsel conducted an ineffective investigation of Britton prior to petitioner's preliminary hearing.

Accordingly, this Court finds petitioner has failed to establish ineffective assistance of counsel during the guilt stage of his trial. Therefore, claim 14 is denied.

**Claims 15, 16, 17, 18 and 19: Admission of Evidence during Penalty Phase**

In claims 15 and 16, petitioner argues that admission of his prison file and his rap sheets during the penalty phase of trial violated his rights to confrontation, to due process of law, and to a reliable sentencing hearing, in violation of the Sixth, Eighth, and Fourteenth Amendments. In claim 17, petitioner argues that the state's failure to disclose the contents of his prison file violated his right to due process under the Fourteenth Amendment. Additionally, in claim 18, petitioner argues that admission of his prison file violated his rights against self-incrimination under the Fifth Amendment and to due process of law under the Fourteenth Amendment, and, in claim 19, petitioner argues that admission of three psychiatric evaluations at the penalty phase of his trial violated his rights to be free from self-incrimination under the Fifth Amendment, to confrontation under the Sixth Amendment, to a fair and reliable capital sentencing under the Sixth Amendment, to a fair and reliable capital sentencing proceeding under the Eighth Amendment, and to due process of law under

the Fourteenth Amendment.  Each of these claims was raised on direct appeal and, like many others, each was summarily denied by the Utah Supreme Court.  Menzies II, 889 P.2d at 406.  While petitioner claims that the state court's resolution of each of these claims was an unreasonable determination of the facts, he does not identify any facts that were actually decided in ruling on any of these claims.

A. Confrontation rights

In Williams v. New York, 337 U.S. 241 (1949), the United States Supreme Court made it clear that a sentencing judge, even in capital cases, may consider information about a convicted person's past life, health habits, conduct, and mental and moral propensities, even if such information is "obtained outside the courtroom from persons whom a defendant has not been permitted to confront or cross-examine."  Id. at 245.  In finding that the defendant in Williams had not been denied due process, the Supreme Court recognized that

> [t]ribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations.  But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.  Out-of-court affidavits have been used frequently, and of course in the smaller communities sentencing judges naturally have in mind their knowledge of the personalities and backgrounds of convicted offenders.

Id. at 246 (footnotes omitted).  In addressing the historical basis for different evidentiary rules governing trial and sentencing procedures, the Supreme Court stated that "there are sound practical reasons for the distinction."  Id.  Finally, the Supreme Court concluded: "It is urged, however, that we should draw a constitutional distinction as to the procedure for obtaining information where the death sentence is imposed.  We cannot accept the contention."  Id. at 251.  Thus, Williams makes

it clear that the Confrontation Clause does not apply to capital sentencing proceedings.[54] Rather, it "applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty." Szabo v. Walls, 313 F.3d 392, 398 (7th Cir. 2002).

Relying on Gregg v. Georgia, 428 U.S. 153 (1976), and Godfrey v. Georgia, 446 U.S. 420 (1980), petitioner seemingly argues that, since discretion in sentencing "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action,"[55] limits must be placed upon the information that a sentencer considers. Petitioner further relies on Gardner v. Florida, 430 U.S. 349 (1977), to argue that he was entitled to "due process of law" at sentencing; but, he concedes that "Gardner did not explicitly address whether the right to confrontation applies in capital sentencing hearings." Dkt. # 109, at 171. Since Gregg and Lockett v. Ohio, 438 U.S. 586 (1978), the law of capital sentencing has changed dramatically. Szabo, 313 F.3d at 398. However, the Supreme Court has never questioned the precise holding of Williams, and this Court is not at liberty to do so in this federal habeas proceeding. See also Green v. Georgia, 442 U.S. 95 (1979) (application of hearsay rule to preclude the defendant from introducing mitigating evidence at sentencing in a capital case violates due process).

> The Constitution allows the hearsay rules to be relaxed, quite simply, to expand the deposit of information available to the sentencing tribunal. The Supreme Court has summarized this principle: '[a] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'

---

[54]    In his reply, petitioner argues that, because the Confrontation Clause was not made applicable to the states until the Supreme Court decided Pointer v. Texas, 380 U.S. 400 (1965), Williams could not have addressed the Confrontation Clause. If petitioner's argument is correct, there is no Supreme Court precedent on this issue.

[55]    Gregg, 428 U.S. at 189.

Del Vecchio v. Illinois, 31 F.3d 1363 (7th Cir. 1994) (en banc) (citing Roberts v. United States, 445 U.S. 552, 556 (1980)). To the extent Utah statutes allow admission of hearsay evidence for purposes of sentencing,[56] this Court finds there is no Confrontation Clause violation. See Del Vecchio, 31 F.3d at 1388 (holding the penalty phase of a capital trial presents no exception to the general rule that defendants have no confrontation rights during sentencing); Chandler v. Moore, 240 F.3d 907, 918 (11th Cir. 2001) (no Confrontation Clause violation because hearsay evidence is admissible in capital sentencing hearing); Bassette v. Thompson, 915 F.2d 932, 935 (4th Cir. 1990); and United States v. Bustamante, 454 F.3d 1200, 1202-03 (10th Cir. 2006) (no Sixth Amendment Confrontation Clause right at sentencing). Contra United States v. Mills, 446 F.Supp.2d 1115, 1130-31 (C.D. Cal. 2006). Moreover, there is nothing in the record that shows the state did anything to prevent petitioner from rebutting this hearsay evidence. Therefore, petitioner has failed to establish how his sentencing proceeding was fundamentally unfair or unreliable. Since there is no United States Supreme Court precedent that holds that the Confrontation Clause applies in capital sentencing hearings, the state disposition is not contrary to, nor did it involve an unreasonable application of, clearly established federal law. Accordingly, claims 15 and 16 are denied. Additionally, the portion of claim 19 that alleges a violation of petitioner's confrontation rights is also denied.

B. Failure to disclose prison file

Petitioner argues in claim 17 that the state's failure to disclose the contents of his prison file, used during the penalty phase, violated his rights to due process under the Fourteenth Amendment and to a reliable capital sentencing proceeding under the Eighth Amendment. Again, this claim was

---

[56]    See State v. Sanwick, 713 P.2d 707, 709 (Utah 1986) ("The rules of evidence in general, and the rules on hearsay exclusions in particular, are inapplicable in sentencing proceedings. Utah R.Evid. 1101(b)(3).").

raised on direct appeal, but summarily denied by the Utah Supreme Court. <u>Menzies II</u>, 889 P.2d at

406. Petitioner claims the state court's decision was an unreasonable determination of fact and an

unreasonable application of clearly established federal law.

Even though the state court's decision is unaccompanied by an explanation, petitioner still

has the burden to show there was no reasonable basis for the state court to deny relief. <u>Richter</u>, 562

U.S. at 98. Moreover, under AEDPA, this Court is obligated to give the Utah Supreme Court's

decision the benefit of the doubt. <u>Burt v. Titlow</u>, 571 U.S. 12, 15 (2013) (citing <u>Pinholster</u>, 563 U.S.

at 188). Since the Utah Supreme Court did not explain its decision, this Court must "look through"

the state court's decision to the last related state decision that provides a relevant rationale and then

presume that the unexplained decision adopted the same reasoning. <u>Wilson v. Sellers</u>,138 S. Ct.

1188 (2018).

According to the trial transcript, the prosecution notified defense counsel of its intent to

introduce the prison file, but defense counsel never requested production of the file. <u>See</u> J.T. Tr.

March 16, 1988, at 2897-98 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 191-

92). Since defense counsel stated they had not seen the prison file, the trial court permitted them to

review the file overnight. The next morning, when counsel stated they had not completed their

review, the trial court recessed the proceeding in order to allow defense counsel additional time to

complete their review before ruling on the admissibility of the entire file. <u>Id.</u> at 3128. Additionally,

nothing in the record establishes that petitioner was prevented from challenging any of the

information contained in his prison file. To the extent counsel was permitted as much time as

needed to review the file before its introduction, this Court finds that petitioner has failed to establish

that his right to due process and/or to a reliable capital sentencing proceeding was violated. As a

result, this Court finds petitioner has failed to establish that the state court decision was based on an unreasonable determination of fact or an unreasonable application of clearly established federal law. Accordingly, claim 17 is denied.

C. Self-incrimination claims

As stated above, petitioner claims that admission of his prison file and his psychiatric evaluations during the penalty phase of his trial violated his right to be free from self-incrimination. According to respondent, petitioner did not raise any claims of self-incrimination during his trial. In his reply, petitioner suggests the failure to raise the issue at trial is not germane to the claim since the issue was raised on appeal.[57]

The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V.  In Miranda v. Arizona, 384 U.S. 436 (1966), the Court held:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required.  Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does

---

[57] Failure to raise an issue at trial will, as a general rule, prevent a claim, including constitutional claims, from being raised on appeal.  Winward v. State, 293 P.3d 259, 262 (Utah 2012) (citing State v. Holgate, 10 P.3d 346 (Utah 2000)).  Certainly failure to raise the issue on appeal would have impacted the way in which the Utah Supreme Court reviewed the issue.

make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed.

Id. at 445 (footnote omitted).

> The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.

Lefkowitz v. Turley, 414 U.S. 70, 77 (1973). The Fifth Amendment prohibits only "compelled testimony that is incriminating." Hibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty., 542 U.S. 177, 189 (2004).

There is no question that the Fifth Amendment right against self-incrimination is applicable to the penalty phase of a capital murder trial. Estelle v. Smith, 451 U.S. 454 (1981). In Rhode Island v. Innis, 446 U.S. 291 (1980), however, the Supreme Court made it clear that

> . . . the special procedural safeguards outlined in *Miranda* are required not where the suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

Id. at 300 (footnote omitted). The Court continued:

> . . . the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. But, since the police surely cannot be held accountable for the

> unforeseeable results of their own words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

Id. at 301-02 (italics in original, footnotes omitted).  Since it appears petitioner was in custody when each of the complained statements were made, the question becomes whether the statements complained of were compelled and/or were incriminating.

### 1.  Admission of prison file

In claim 18, petitioner argues that his

> prison file is replete with reports that were made while [he] was in custody, including reports of interviews and evaluations during which [he] was not advised of his right to remain silent or that the information would be used against him in deciding whether he should receive the death penalty.

Dkt. # 109, at 178.  Petitioner then identifies approximately 70 pages out of a 360- page exhibit that he is now claiming violated his right against self-incrimination under the Fifth Amendment and to due process of law under the Fourteenth Amendment.  These items include a twelve-page presentence report dated September 10, 1976;[58] an eight-page Social Investigation and Study for Hearing on the State's Motion to Certify dated February 26, 1976, which was submitted in accordance with a February 4, 1976 court order;[59] eight pages from petitioner's stays at the Utah state

---

[58]     Sentencing Exhibit 8, at 83 (82-93).  The page numbers contained on the actual exhibit are different from the page numbers of the exhibit on Disk # 1.  For ease of reference, when referring to this exhibit, this Court will refer to the page numbers on the hard copy of the exhibit followed in paranthesis with the page numbers of the exhibit as found on Disk # 1 under Trial/Exhibits/1988.03.15 Sentencing.

[59]     Id. at 88 (99-106).

hospital as a juvenile;[60] a four-page initial evaluation by a psychiatric social worker with the Murray-Jordan-Tooele Mental Hygiene Center in Murray, Utah dictated on February 26, 1976, which was completed to assist the court in deciding the state's motion for certification in criminal proceedings;[61] a one-page psychological evaluation dated September 16, 1976;[62] a one page psychological assessment dated July 20, 1979;[63] a one-page psychological assessment dated September 4, 1980;[64] three pages of chronological notes from June 12, 1986 to July 31, 1986;[65] twenty-six (26) pages of chronological notes that are in reverse order from October 17, 1984 to September 15, 1976;[66] and

---

[60]   Id. at 104 (122-29 - petitioner did not object to 129).  The first page is a Utah state hospital separation summary that indicates petitioner was involved in a serious AWOL plot on December 7, 1975, after which he discharged from the hospital back to court.  The next two pages are a Psychiatric Evaluation dated December 17, 1975.  The fourth, fifth, and sixth pages are an interval note dated March 7, 1973 and the seventh page is an assessment conducted on March 16, 1973 by a psychologist.  The final page is a letter dated October 1, 1976, from the Nevada Youth Training Center to a clinical psychologist indicating the center had forwarded all information relating to petitioner to the Utah state hospital and to the Parole and Probation Department of the sentencing court.

[61]   Id. at 108 (130-33).

[62]   Id. at 108 (136).

[63]   Id. at 109 (137).

[64]   Id. at 110 (138).

[65]   Id. at 160-62 (187-89).  Chronological notes are nothing more than periodic notes about the inmate and his behavior in prison including, among other things, disciplinary incidents, inmate attitudes, housing and classification issues, and/or work habits.

[66]   Id. at 168-93 (195-220).  During this approximately eight year span of incarceration, these notes show that petitioner was written up for violations of prison rules approximately eleven times.  Some of these violations were deemed minor violations, for things such as tampering with a locking device on October 13, 1976, id. at 193 (220), as well as major violations, such as being involved in gambling activities and being in possession of betting slips on September 18, 1979, id. at 185 (212).  At the same time, these notes reflect that petitioner had generally good work habits and at times indicated that he should be commended for the

(continued...)

one-page entitled chronological note dated February 7, 1979.[67]  It should be noted that several of the pages complained of contain portions that are not legible either due to poor copy quality or due to the way the page numbers were affixed to the individual pages of the exhibit.

Additionally, petitioner claims the prison file also contains numerous statements made by him to prison authorities during various disciplinary proceedings.  Petitioner does not, however, identify any specific statements made by him that he claims violated his Fifth Amendment rights. Rather, every citation petitioner provides in support of this claim is nothing more than the individual <u>Miranda</u> warnings that were given to petitioner prior to him offering any statements at these disciplinary hearings.[68]  Accordingly, this Court will not search the record to identify statements, if any, that petitioner made during his disciplinary hearings.

> a. <u>Presentence reports</u>

In the case of the presentence reports from one of petitioner's prior convictions, this Court finds that the interview would have been voluntary.  Petitioner was not under a court order to submit to the interview with the probation officer, and he could have refused altogether to be interviewed. <u>See</u> <u>United States v. Rogers</u>, 921 F.2d 975 (10th Cir. 1990).  Moreover, routine postconviction presentence interviews by a probation officer do not constitute the type of inherently coercive situation and interrogation by the government for which the <u>Miranda</u> rule was designed.  <u>Id.</u> at 979. The purpose of a presentence report is neither prosecutorial nor punitive.  Rather, it is essentially

---

[66]     (...continued)
work he had done.

[67]     <u>Id.</u> at 246 (273).

[68]     <u>Id.</u> at 221 (248); 230 (257); 231 (258); 238 (265); 245 (272); 251 (278).

neutral in those respects. A presentence interview simply cannot be compared to a custodial arrest that "thrusts an individual into 'an unfamiliar atmosphere' or 'an interrogation environment . . . created for no purpose other than to subjugate the individual to the will of his examiner.'" Minnesota v. Murphy, 465 U. S. 420, 433 (1984) (quoting Miranda, 384 U.S. at 457). As a result, this Court finds that admission of these reports did not violate petitioner's right against self-incrimination.

### b. Psychiatric evaluations

Unlike the in-custody, court-ordered psychiatric examination to determine competency to stand trial for murder that was the focus in Estelle v. Smith, 451 U.S. 454 (1981), the psychiatric evaluations that petitioner challenges in this proceeding were not compiled as a result of petitioner's custody on the charges arising out of this case. Rather, they were historical documents relating to earlier incarcerations of petitioner in 1973, 1975, 1976, 1979, and 1980. To the extent that the evaluations were conducted years before the murder in this case was committed, this Court finds that petitioner has failed to establish any constitutional error in the admission of these evaluations. Therefore, this Court finds that petitioner has failed to establish that the Utah Supreme Court's decision was an unreasonable application of clearly established federal law. Further, to the extent the defendant's expert witnesses reviewed and referenced previous Utah state hospital evaluations,[69] this Court finds that admission of these evaluations did not violate petitioner's right against self-incrimination.

---

[69] See J.T. Tr. dated March 16, 1988, at 2981, 3022 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161)(Add. 17) at 275, and 316); see also Defendant's Sentencing Exhibits ## 32, 33, 34.

Moreover, the historical information contained in the prison file, including both the previous presentence reports as well as past psychiatric evaluations, is the exact type of evidence that a probation officer would have relied on had a presentence report been prepared in this case.[70] As a result, this Court finds petitioner has failed to establish that the Utah Supreme Court's determination regarding admission of the prison file was based upon an unreasonable application of clearly established federal law. Accordingly, claim 18 is denied.

### 2. Admission of additional psychiatric evaluations

In claim 19, petitioner argues that admission of three additional psychiatric evaluations (State's Exhibit 1D) at the penalty phase of his trial violated his rights to be free from self-incrimination under the Fifth Amendment, to confrontation under the Sixth Amendment,[71] to a fair and reliable capital sentencing under the Sixth Amendment, to a fair and reliable capital sentencing proceeding under the Eighth Amendment, and to due process of law under the Fourteenth Amendment. The petitioner's own expert relied on the three psychiatric evaluations contained in state's exhibit 1D in reaching his conclusions about petitioner's mental health. As a result, the sentencing court was entitled to review and consider reports relied upon by the petitioner's expert, whether or not they contained incriminating statements. Accordingly, this Court finds no merit to the portion of claim 19 that alleges a violation of petitioner's rights against self-incrimination, or his right to a fair and reliable capital sentencing proceeding and/or to due process of law. Therefore, claim 19 is denied in its entirety.

---

[70]     J.T. Tr. of March 17, 1988, at 3146-47, 3163 ((ROA 1162) (Add. 18) at 75-76, and 92).

[71]     For the reasons discussed in subparagraph A. above, no confrontation violation occurred by admission of these psychiatric evaluations.

**Claim 20: Admission of Expert Testimony by State**

In claim 20, petitioner argues that admission of the testimony of a licensed clinical psychologist, Patricia Smith, Ph. D., regarding his risk of future dangerousness, violated his rights to due process under the Fourteenth Amendment and to a reliable capital sentencing proceeding under the Eighth Amendment. Petitioner states that this claim is related to the prison file admitted as Penalty Phase Exhibit 8 and to the psychiatric and psychological evaluations admitted as Penalty Phase Exhibit 1D. According to petitioner, despite having never met him, Dr. Smith made conclusions about the defendant's future dangerousness based upon her review of the files and records of petitioner, thereby violating his constitutional rights. This issue was raised on direct appeal. The Utah Supreme Court summarily dismissed the claim finding it had no merit. Menzies II, 889 P.2d at 406.

Dr. Smith was called by the state to rebut the testimony of petitioner's experts, Michael DeCaria, Ph. D., and Douglas Wingleman, Ph. D. Dr. Smith testified she was asked to review a psychological report completed by Dr. DeCaria, the prison records of the petitioner, and a psychological report by Dr. Wingleman. J.T. Tr. of March 17, 1988, at 3144 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1162) (Add. 18) at 73). Dr. Smith also indicated that she looked at the portion of the prison file that included three psychological reports, one psychiatric evaluation, and a presentence report. Id. at 3145 (74). Dr. Smith was also provided petitioner's juvenile court record and his adult criminal record, and she read the preliminary hearing transcript from the trial court record in this case. Id. at 3148 (77). Dr. Smith testified the information in the documentation she reviewed were the kinds of things that would normally be relied upon by experts in the field. Id. at 3149 (78). Dr. Smith pointed out her perceived deficiencies in the methods utilized by Dr. DeCaria.

While Dr. Smith testified that she was not able to give a diagnosis of a patient she hadn't evaluated, id. at 3160 (89), she stated that Dr. DeCaria's report did not contain a "differential diagnosis or final diagnosis," id. at 3158-59 (87-88), and she felt his report should have included more background information on the petitioner such as a reference to all past psychological and psychiatric evaluations that had been completed of him, as well as an assessment of intelligence. Id. at 3151 (80). Moreover, Dr. Smith was extremely concerned with petitioner's response to Dr. DeCaria's question regarding what petitioner's goals in life would be; i.e., petitioner stated it would be "to get the son of a bitch who put me here in jail." Id. at 3157 (86). Finally, Dr. Smith testified that an individual with a long-term antisocial personality disorder would not be a suitable "candidate for treatment, even within an institution that was residential." Id. at 3164 (93).

Petitioner's argument regarding Dr. Smith's testimony, both during the trial and in this proceeding, is really that Dr. Smith could not give any opinion on the issue of his future dangerousness or susceptibility to the type of treatment suggested by Dr. DeCaria (that petitioner should receive individual therapy) and Dr. Wingleman (that petitioner could be retaught or retreated to function adequately and to overcome his learning dysfunctions) because she had not personally conducted an examination of petitioner. This argument was specifically rejected in Barefoot v. Estelle, 463 U.S. 880 (1983) (superseded by statute on other grounds, as recognized in Slack v. McDaniel, 529 U.S. 473 (2000)). In rejecting Barefoot's argument that psychiatric testimony must be based on personal examination of the defendant and could not be given in response to hypothetical questions, the Supreme Court stated: "Expert testimony, whether in the form of an opinion based upon hypothetical questions or otherwise, is commonly admitted as evidence where it might help the factfinder do its assigned job." Id. at 903.

In his reply, petitioner attempts to distinguish his case from  Barefoot by arguing that Dr. Smith's opinions "were not 'deduced from facts that are not disputed' or 'the statement of facts proved in the case.'" Dkt. # 127, at 72.  The record does not support that argument.  Rather, as recognized by the trial court, based upon the evidence in the case, "[i]n 1976, [petitioner] was diagnosed with antisocial personality disorder severe type.  In 1986, ten years later, he was diagnosed, again, antisocial personality disorder."  J.T. Tr. of March 17, 1988, at 3163 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1162) (Add. 18) at 92).  Clearly, Dr. Smith relied on these past psychological evaluations and other evidence that had been admitted at trial, including statements petitioner made to his own experts, in forming her opinions about the petitioner's susceptibility to treatment and rehabilitation.  In light of the evidence at trial, this Court finds that petitioner has failed to establish that the state court's decision was based upon an unreasonable determination of the facts or was an unreasonable application of clearly established federal law.  Accordingly, claim 20 is denied.

**Claims 21 and 22:  Withdrawn** (see Dkt. # 109, at 186).

**Claim 24:  Victim Impact Evidence**

Petitioner asserts, in claim 24, that he was deprived of his Eighth Amendment right to a reliable sentencing hearing by admission of victim impact evidence during the penalty phase of his trial. Petitioner states this claim is exhausted.  Dkt. # 109, at 189.  Respondent contends the specific claim raised herein has not been exhausted.  Dkt. # 123, at 151.  In his reply, petitioner states that his "appellate brief shows that the basis for the appeal issue was founded squarely on the application of the Eighth Amendment of the federal constitution to the issue and relies primarily on United States Supreme Court case law." Dkt. # 127, at 74.  Further, petitioner claims when "trial counsel

objected to the victim impact testimony during the penalty phase, the objection was explicitly that the testimony was in violation of law as dictated by <u>Booth v. Maryland</u>, 482 U.S. 496 (1987)." <u>Id.</u>

"Exhaustion requires that the claim be 'fairly presented' to the state court, which 'means that the petitioner has raised the "substance" of the federal claim in state court.'" <u>Fairchild v. Workman</u>, 579 F.3d 1134, 1151 (10th Cir. 2009) (quoting <u>Bland v. Sirmons</u>, 459 F.3d 999, 1011 (10th Cir. 2006)). "[T]he crucial inquiry is whether the 'substance' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim." <u>Prendergast v. Clements</u>, 699 F.3d 1182, 1184 (10th Cir. 2012) (citing <u>Picard v. Connor</u>, 404 U.S. 270, 278 (1971)).

> [I]n order to be fairly presented, the state court claim must be the "substantial equivalent" of its federal habeas counterpart. There is no such substantial equivalency where the claim raised in habeas proceedings is "in a significantly different and stronger posture than it was when the state courts considered it." To satisfy exhaustion, then, the habeas petition's focus—as well as the alleged error that it identifies—cannot depart significantly from what the petitioner had presented to the state court.

<u>Grant v. Royal</u>, 886 F.3d 874, 891 (10th Cir. 2018) (internal citations omitted).

After careful review of the arguments presented to the Utah Supreme Court, this Court finds that petitioner did not submit the federal constitutional claim in his direct appeal that he now raises in this proceeding. The focus of petitioner's direct appeal briefing was, as stated in the heading of his proposition, that "the admission of the victim impact evidence violated the Utah constitution." <u>See</u> Brief of Appellant filed on September 14, 1992 at 184 (Dkt. # 110, Disk # 1, Related Appeals/ Direct Appeal, Dkt. # 100, at 209). In fact, petitioner's direct appeal brief recognized that <u>Booth v. Maryland</u>, 482 U.S. 496 (1987), applied at the time of petitioner's trial and that, after the trial, the Supreme Court issued its decision in <u>South Carolina v. Gathers</u>, 490 U.S. 805 (1989). The brief

advised the Utah Supreme Court that <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991), had reversed both

<u>Booth</u> and <u>Gathers</u>, but requested that the Utah Supreme Court find that the victim impact evidence

introduced in his case offended Article I, § 9 of the Utah constitution.  Brief of Appellant, at 186

(211).  Finally, the petitioner concluded his argument to the Utah Supreme Court by stating:

> Despite the holding in <u>Payne</u>, Utah Code Ann. § 76-3-207 and Article I, § 9
> of the Utah constitution preclude the use of the victim impact evidence in this case.
> This Court should adhere to the rationale and holding in <u>Booth</u>, which was in place
> at the time of this trial, and find that reversible error occurred.

<u>Id.</u> at 188 (213).

Clearly, petitioner did not argue to the Utah Supreme Court that he was deprived of his

Eighth Amendment right to a reliable sentencing by admission of the victim impact evidence during

the penalty phase of his trial, as he now requests this Court to do.[72]  Petitioner's argument that the

rationale of <u>Booth</u> should be applied in Utah is not the "substantial equivalent" of his current claim

based upon the Eighth Amendment.  As a result, this Court finds petitioner did not fairly present this

claim to the Utah Supreme Court and, therefore, has failed to exhaust this claim.

This claim is, however, subject to an anticipatory procedural bar.  "A petitioner is

'procedurally barred' from relief under the [Utah Post-Conviction Remedies Act] if an issue 'could

have been raised at trial or on appeal' unless the petitioner can demonstrate that 'the failure to raise

that ground was due to ineffective assistance of counsel.'"  <u>Benvenuto v. State</u>, 165 P.3d 1195, 1200

(Utah 2007) (internal citations omitted).  Furthermore, the statute of limitations precludes

---

[72]    In his reply, petitioner claims "the state supreme court erred in its determination that an
objection was not preserved at trial." Dkt. # 127, at 74.  Petitioner then states "[t]his failure
to accurately read the record entirely taints the Utah Supreme Court decision." <u>Id.</u> at 75.  The
problem with this argument is that it still has nothing to do with petitioner's current federal
constitutional claim.

postconviction relief unless the petitioner files his petition "within one year after the cause of action has accrued." See Utah Code Ann. § 78B-9-107(1) (West 2012). Petitioner does not make any argument relating to the adequacy of Utah's procedural default rule. Because petitioner does not challenge the adequacy of Utah's procedural rules, this Court concludes that Utah's procedural bar is adequate to preclude this Court from considering petitioner's Eighth Amendment claim regarding the victim impact evidence introduced at his trial.[73] Claim 24 is denied.

**Claims 25 (incorporating Claim 27) and 28: Prosecutorial Misconduct**

Petitioner alleges, in claim 25, that the prosecutor committed misconduct by improperly referring to items not in evidence and arguing improper factors in aggravation, thereby depriving petitioner of his right to due process and a fair and reliable sentencing hearing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Petitioner asserts this claim is exhausted, having been raised on direct appeal. Dkt. # 109, at 192. Respondent admits the petitioner "did raise some of the claims of prosecutorial misconduct in his direct appeal," but states he did not raise all of the claims of prosecutorial misconduct that he now asserts. Dkt. # 123, at 154. Respondent advises, however, that "the State has decided not to raise an exhaustion issue because although certain parts of this claim were not specifically raised as claims of prosecutorial misconduct, [petitioner] did assert that the Judge erred by relying on the prosecutor's arguments." Id. at 154-55 (citations omitted).

---

[73]  Even if this claim had been properly raised, based on Payne, petitioner would not be entitled to relief.

While a state prisoner's federal habeas petition should be dismissed if he has not exhausted available state remedies as to any of his federal claims,[74] the state can waive the exhaustion requirement through an express statement by counsel.  28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."); see also Gonzales v. McKune, 279 F.3d 922, 926 & n.8 (10th Cir. 2002) (en banc) (applying § 2254(b)(3) and holding state expressly waived certain issues).  Based upon respondent's express waiver of exhaustion as to this claim, the Court will treat this claim as though it has been exhausted.

A.  Standard for reviewing claims of prosecutorial misconduct

Inflammatory statements, under federal law, pass muster unless the comments were so severe as to have rendered the entire trial fundamentally unfair.

> The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power."  Id., at 642, 94 S.Ct. at 1871.

Darden v. Wainwright, 477 U.S. 168, 181 (1968).  Remarks that would cause reversal of a direct appeal of a federal criminal conviction are not necessarily grounds for reversal when spoken in a state court.  Breechen v. Reynolds, 41 F.3d 1343, 1355 (10th Cir. 1994).  The inquiry into the fundamental fairness of a trial can be made only after examining the entire proceedings.  Donnelly, 416 U.S. at 643; Boyd v. Ward, 179 F.3d 904, 919 (10th Cir. 1999).

---

[74]    Coleman, 501 U.S. at 731.

Relying on Donnelly, petitioner argues that improper closing argument, during the penalty phase of trial, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. Petitioner then sets out three general areas that he believes involved prosecutorial misconduct.

B. Improper argument regarding statutory aggravating factor

First, petitioner claims the prosecutor improperly argued for application of a statutory aggravator that had not been presented to or found by the jury,[75] stating that "the State asked the trial court to admit two photographs of the victim's wounds,[76] 'for the purpose of showing the heinousness of the homicide.'" Dkt. # 109, at 193. When arguing for admission of the photographs, however, the prosecutor stated the "court is entitled to see just how brutal those stab wounds to her throat were, . . . the brutal nature of the murder itself." J.T. Tr. of March 15, 1988, at 2834-36 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 128-30). On direct appeal, petitioner argued, as he does in claim 26 of his second amended petition, that "the judge improperly considered heinousness as an aggravating circumstance and, therefore, he is entitled to a new penalty phase." Menzies II, 889 P.2d at 404. In considering this issue, the Utah Supreme Court held:

> In its closing argument, the State listed the aggravating factors it wanted the court to consider and stated that one such factor was "the brutal and heinous nature of the murder." The prosecutor, however, did not refer the court to the "heinous" provision in section 76-5-202(1)(q) of the Code. When the trial court enumerated the aggravating and mitigating factors at the time of sentencing, it noted subpart (q). While we think that it would have been error for the court to consider subpart (q) satisfied by the facts of this case and to use that finding as an aggravating factor, we are not convinced that such an error occurred. The trial judge was certainly aware

---

[75]    As mentioned elsewhere in this Opinion and Order, the jury was not presented with this evidence because the penalty phase was tried to the judge.

[76]    These are the two photographs that were discussed in claim 23, above.

of our previous decisions limiting capital murder deemed ruthless and brutal to those "involving an aggravated battery or torture." State v. Wood, 648 P.2d 71, 86 (Utah 1981). While we are uncomfortable with the trial judge's referenced to subpart (q), we have no solid reason to believe that the judge thought this was an appropriate situation for reliance on the heinousness factor listed in 76-5-202(1)(q).

Furthermore, we note that the judge could have properly considered the nature and circumstances of the crime, including its brutality and what the prosecutor apparently referred to colloquially as heinousness, as an aggravating factor under section 76-3-207(2). In this guise, the various facts of the crime that [petitioner] says do not rise to the level of constitutional and statutory heinousness could still have been considered. Therefore, even if we were to assume that the court erred in considering heinousness, we think that the error was harmless because we "can still confidently conclude beyond a reasonable doubt that the remaining aggravating circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate." State v. Archuleta, 850 P.2d 1232, 1248 (Utah), cert. denied, 510 U.S. 979, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993).

Menzies II, 889 P.2d at 405.

Because the prosecutor was free to argue that the nature and circumstances of the crime justified the death penalty, see Utah Code Ann. § 76-3-207(2) (West 1988), this Court finds the prosecutor's comments were not improper. Moreover, the judge, as sentencer, was free to consider any matter which was "relevant to the sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty." Id.; see also Williams, 923 F.2d 982 (10th Cir. 1972); State v. Young, 853 P.2d 327 (Utah 1993) ("[statutorily defined aggravating] factors not presented in guilt phase may be presented during the penalty phase"); State v. Maestas, 299 P.3d 892, 967-68 (Utah 2012). Regardless, in light of the Utah Supreme Court's willingness to assume an error had occurred, the petitioner has failed to establish that the Utah Supreme Court's reweighing of the aggravating and mitigating factors resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

C. Arguments not supported by evidence

Next, petitioner argues that parts of the prosecutor's closing contained arguments unsupported by facts. Specifically, petitioner challenges the prosecutor's argument that

> the only thing that [petitioner] learned in prison from 1976 until 1984 is that the next time he was going to commit a robbery, he was going to eliminate his victim. And that's exactly what he did when he killed Maureen [sic] Hunsaker.[77]

Dkt. # 109, at 193. Thereafter, the prosecutor stated that "the reason for her murder [was] in order to keep her from testifying or identifying [petitioner]."[78] Id. Based upon the evidence, however, this Court finds these statements were either directly supported by,[79] and/or were reasonable inferences to be drawn from, the evidence.

Petitioner also complains that the prosecutor improperly relied on unsupported speculation to create fear that petitioner might escape or be paroled if he received a life sentence. According to petitioner, there was no evidence to support the prosecutor's assertions and the comments were "baseless speculation to instill fear in the court." Dkt. # 109, at 195.[80] Again, however, the prosecutor's comments were supported by the testimony of defense witness Paul Sheffield, administrator for the Utah State Board of Pardons ("the Board"), who testified about Utah's parole system. Defense called Sheffield to advise the court of the kind of circumstances the Board

---

[77] J.T. Tr. of March 18, 1988, at 3202 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1162) (Add. 18) at 132).

[78] Id. at 3209 (139).

[79] See J.T. Tr. of March 2, 1988, at 2085 ((ROA 1158) (Add. 14) at 187), where Britton (the jailhouse informant) was asked: "At any time in either of the two conversations that you had with [the defendant], did you give - - did he give you a specific reason as to why he had killed the woman?" and he answered: "To keep her from testifying against him and identifying him."

[80] Petitioner also complains that the evidence regarding his escape risk was "unreliable hearsay." As addressed above, the hearsay rule does not apply at sentencing.

116

considers in determining the life sentence of a defendant. J.T. Tr. of March 17, 1988, at 3111 (Dkt. # 110, disk # 1, Trial/Transcripts (ROA 1162) (Add. 18) at 40). Sheffield testified that twenty-five capital homicide inmates had appeared before the Board: of those, six were given natural life sentences and eight received parole dates, id. at 3117, 3123 (46, and 52); the average term served by those receiving parole dates was 20 years, id.; and the shortest term given by the Board was thirteen years, id.

Further, Sheffield testified: that it was possible that the defendant could be released from prison in thirteen years if he got a life term, id. at 3124 (53); that he was aware the defendant had been sent to prison on an aggravated robbery, had escaped, and then was convicted of another aggravated robbery and was sent back to the Utah State Prison, id.; and that despite receiving a sentence of one to fifteen years for the escape charge and five years to life on the aggravated robbery charge, he was recommended for parole after serving less than six years on those convictions, id. at 3125 (54).

Based on this testimony, the prosecutor made the following argument:

> I suppose this court could say, 'I'm going to impose a life term for you, [petitioner], and I would recommend to the Board of Pardons that you spend the rest of your life in prison, and you never, never be released.'
> But, your Honor, you heard Mr. Sheffield testify there are no guarantees that that will happen. This court will always wonder what happens if he escapes from the Utah State Prison as he did in 1978 or as he tried to at the State Hospital in 1986. What if the Board of Pardons decides to parole him, and they ignore the court's and the prosecution's recommendation.
> According to Mr. Sheffield, the average term is 20 years. That means that [petitioner] could be back on the street when he is 49 years old. Keep in mind, your Honor, that Judge Baldwin imposed five to life in 1978, and the [petitioner] was out in less than six years.

Id. at 3110-11 (39-40). Since this argument was directly supported by the evidence at trial, this Court finds no prosecutorial misconduct.

Additionally, in claim 28, petitioner argues that his right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the state court's reliance on speculation, that petitioner might escape or be paroled, as a basis for imposing death. Again, this claim was raised on direct appeal, but was denied as lacking merit. Menzies II, 889 P.2d at 406. In Simmons v. South Carolina, 512 U.S. 154 (1994), the Supreme Court made it clear that "[i]n assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant." Id. at 163. While complaining that the trial court speculated about parole and escape, petitioner's own witness testified there was no guarantee he would not be paroled or escape. Further, as discussed above, the evidence established that petitioner had previously escaped from prison. Accordingly, this Court finds it was not error for the trial court to consider these matters in imposing his sentence.

D. References to petitioner as a "psychopath"

Finally, petitioner claims that the prosecutor's reference to him as a "psychopath," after reading from a book about psychopaths that was not in evidence, and by comparing him to the Yorkshire Ripper, Charles Manson, and the Son of Sam were unprofessional and should not have been tolerated by the court. Trial counsel did not object to any of the statements that petitioner now claims were improper.

Evidence at trial established that a prior judge had characterized petitioner as "psychopathic" based upon a psychological evaluation the prior judge had ordered.[81] To the extent the penalty phase was tried to the court, as opposed to a jury, this Court finds petitioner has failed to establish that any of the comments, individually or cumulatively, rendered his sentencing hearing fundamentally unfair.

---

[81] See State's Sentencing Exhibit 1A, Order of Certification for Criminal Proceedings, at 2, ¶ 3. (Dkt. # 110, Disk # 1, Trial/Exhibits/1988.03.15 Sentencing, Exh. 1A ST, Order of Certification for Criminal Proceedings, at 2, ¶ 3).

Moreover, petitioner has not established that actual prejudice resulted from any of the prosecutor's remarks about which he complains. To do so, petitioner would have to show more than that the remarks "created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982). In this case, the trial court meticulously reviewed petitioner's criminal history and the attempts to rehabilitate him, including citing to a report dated February 26, 1976 in which Lewis L. Boone, Murray Jordan Mental Hygiene Center, indicated petitioner was "psychopathic." See J.T. Tr. of March 18, 1988, at 3248-70 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1162) (Add. 18) at 178-200). The evidence in this case negates any alleged prejudice caused by any of the prosecutor's comments. Furthermore, trial counsel's failure to object to the comments at trial, while not dispositive, is relevant in this Court's assessment of fundamental fairness. See Trice v. Ward, 196 F.3d 1151, 1167 (10th Cir. 1999). Based upon a review of the entire proceedings, this Court finds that petitioner has failed to establish that the state court decision, finding his claims of prosecutorial comments to be without merit, was an unreasonable application of clearly established federal law. Accordingly, claims 25 (incorporating claim 27) and 28 are denied.

**Claims 26 (incorporating Claim 30) and 29: Reliance on Uncharged Aggravating Circumstances**

Petitioner argues in claim 26 that his rights to due process under the Fourteenth Amendment and to a reliable and fair capital sentencing proceeding under the Eighth Amendment were denied because the state court relied on uncharged aggravating circumstances. According to petitioner, the state argued for the application of the "heinousness" aggravator and the "preventing a witness from testifying" aggravator, and the trial court found those two aggravators and sua sponte applied the

"pecuniary gain" aggravator as well. Since none of these aggravators was charged or found as a fact by the jury, petitioner claims a violation of his constitutional rights. According to petitioner, he did not have "effective notice that the prosecution would argue for application of uncharged statutory aggravators during sentencing," nor was he aware that the trial court would consider these aggravators in imposing a sentence. Dkt. # 109, at 200. Additionally, in claim 29, petitioner argues the "heinousness" aggravator is unconstitutionally broad.[82] Finally, in claim 29, petitioner argues that the trial court's application of the "pecuniary gain" aggravator "double-counted" the robbery, thereby failing to narrow the class of defendants eligible for the death penalty as required by Zant v. Stephens, 462 U.S. 862, 877 (1983). Petitioner raised these arguments in his direct appeal. The Utah Supreme Court denied each of these claims as being without merit. Menzies II, 889 P.2d at 406.

In Andrews v. Shulsen, 802 F.2d 1256 (10th Cir. 1986), the Tenth Circuit stated that "statutory notice of aggravating circumstances satisfies constitutional requirements under the Due Process Clause." Id. at 1263 n.4 (citing Spinkelink v. Wainwright, 578 F.2d 582, 609-10 (5th Cir. 1978)). Further, in Andrews, the Tenth Circuit found that the Utah death penalty statute met the narrowing requirements of Zant. Id. at 1261. While the language in the statute under which petitioner was convicted was expanded to list seventeen aggravating factors,[83] instead of the eight considered in Andrews, this Court sees no difference in the way these two statutes operate. The statute restricts capital homicides to intentional or knowing murders committed under one of

---

[82]    This Court previously addressed petitioner's arguments considering the "heinousness" aggravator in Claim 25 above, and does not believe that any further comment on this aggravator is required.

[83]    See Utah Code Ann. § 76-5-202 (West 1985).

seventeen enumerated circumstances. Since these circumstances are elements of the crime of first degree murder, one or more must be proven beyond a reasonable doubt in the guilt phase of a capital case.

Under Utah law, murder in the first degree was, at the time of petitioner's conviction, punishable by death or life imprisonment. See Utah Code Ann. § 76-2-206(1) (West 1977). Following conviction, a separate hearing was required to determine the defendant's sentence. Id. § 76-3-207 (West 1982). During the sentencing hearing, the parties were allowed to present evidence "as to any matter the court [deemed] relevant" to the sentence. Id. § 76-3-207(2). These matters can include, but are not limited to, "the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty." Id. Additionally, the statute enumerated six mitigating circumstances but authorized consideration of any other mitigating factors. Id. In State v. Wood, 648 P.2d 71 (Utah 1982), the Utah Supreme Court held that a

> sentencing body must compare the totality of the mitigating against the totality of the aggravating factors, not in terms of the relative numbers of the aggravating and the mitigating factors, but in terms of their respective substantiality and persuasiveness. Basically, what the sentencing authority must decide is how compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factors. The sentencing body, in making the judgment that aggravating factors "outweigh," or are more compelling than, the mitigating factors, must have no reasonable doubt as to that conclusion, and as to the conclusion that the death penalty is justified and appropriate after considering all the circumstances. This means that upon consideration of all of the circumstances relating to this defendant and this crime the sentencing authority must be convinced beyond a reasonable doubt that the death penalty should be imposed.

Id. at 84.

There is no question that the statute, under which petitioner was convicted, narrowed the class of persons convicted of murder who are eligible for the death penalty as required by Zant. As

in <u>Andrews</u>, the Utah statutes, which were in effect at the time of petitioner's trial, limited the class of defendants subject to execution by requiring that a jury find at least one statutory aggravating factor beyond a reasonable doubt in the guilt phase of a first degree murder trial. Moreover, at the sentencing phase, the Utah statutes required the sentencer to be convinced beyond a reasonable doubt that the death penalty was appropriate in this particular case. The U.S. Constitution requires no more of a death penalty scheme than a narrowing of the class of death-eligible murderers and consideration of mitigating circumstances with the exercise of discretion during the sentencing phase. <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 246 (1988). As a result, this Court finds petitioner has failed to establish that the Utah Supreme Court decision was an unreasonable application of clearly established federal law. Accordingly, claims 26 (incorporating claim 30) and 29 are denied.

**Claim 31: Ineffective Assistance of Counsel during the Penalty Phase**

In claim 31, petitioner argues that he was denied effective assistance of counsel during the penalty phase of his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Petitioner indicates this claim was raised "in part in his state post-conviction petition." Dkt. # 109, at 214. Then, petitioner states, "To the extent any aspect of this claim was not exhausted, that failure is attributable to the ineffective assistance of [his] post-conviction counsel." <u>Id.</u> This Court will address only the ineffective assistance of counsel claims that were exhausted in state court. <u>See Davila</u>, 137 S.Ct. 2058 (2017).

Specifically, petitioner argues that the state court made numerous errors in applying clearly established federal law to the evidence. According to petitioner, the Utah Supreme Court's conclusion that counsel's investigation was adequate was based on an objectively unreasonable interpretation of clearly established federal law. Additionally, petitioner claims the state court also

unreasonably applied <u>Strickland</u> in its deficient performance analysis when it concluded "that defense counsel may have strategically decided not to present some mitigating evidence, including evidence of organic brain damage, because the information could have hurt [petitioner's] case." Dkt. # 109, at 221.  Further, petitioner asserts that the state court's findings were unreasonable because the court failed to assess the sufficiency of the mitigation evidence, as a whole, weighed against the aggravating factors.  Respondent counters these claims by stating petitioner "has failed to establish that the State court decision unreasonably applied <u>Strickland</u>." Dkt. # 123, at 175.

1. <u>Procedural bar</u>

While the respondent concedes the overall claim of denial of effective assistance of counsel during the penalty phase of trial was exhausted, respondent states in a footnote that "[s]ome facts and arguments were not specifically raised in state court." <u>Id.</u> at n.27.  As a result, respondent states those specific claims are procedurally defaulted.  <u>Id.</u>

According to the Utah Supreme Court, petitioner raised numerous failure to investigate claims on appeal.  A number of those claims, however, were raised for the first time on appeal from the denial of petitioner's postconviction petition and were, therefore, disregarded as procedurally barred.  <u>Menzies IV</u>, 344 P.3d at 626 n.173.  The arguments that were preserved include claims that "counsel failed to investigate: (1) details of sexual molestation; (2) school records evincing psychological troubles; (3) early mental illness; (4) fetal alcohol syndrome (FAS); (5) neglect and abuse by his stepfather, his father, and mother; (6) the amounts and kinds of drugs and alcohol he ingested prior to the murder; and (7) the effect of his parent's divorce." <u>Id.</u> at 626.  "Although state court prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." <u>Pinholster</u>, 563 U.S. at 186.  Accordingly,

in considering this claim, this Court will consider only these seven enumerated failures to investigate that were presented to the state court. Failure to raise other allegations of failure to investigate are deemed procedurally barred.

2. Legal principles applicable

Just as in the guilt phase of trial, counsel's performance at the sentencing stage of a capital trial is governed by the principles enunciated in Strickland. Thus, in order to prevail on this claim, a defendant must establish both deficient performance and prejudice. Strickland, 466 U.S. at 687. In a capital sentencing proceeding, counsel's role is "to ensure that the adversarial testing process works to produce a just result under the standards governing the decision." Id. at 686. Moreover, the Strickland Court acknowledged that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id. at 689.

Further, in deciding what was reasonable, a federal court must base its decision on the "prevailing professional norms" at the time of the trial. Bobby v. Van Hook, 558 U.S. 4, 7 (2009) (holding that it is inappropriate to rely on American Bar Association Guidelines for the Appointment and Performance for Defense Counsel in Death Penalty Cases, which was announced eighteen years after the petitioner's trial). The Supreme Court has emphasized that

> review under § 2254(d)(1) focuses on what a state court knew and did. State-court decisions are measured against this Court's precedents as of "the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision "applies a rule that contradicts [such] law" and how the decision "confronts [the] set of facts" that were before the state court. Williams v. Taylor, 529 U.S. 362, 405, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Terry Williams). If the state-court decision "identifies the correct governing legal principle" in existence at the time, a federal court must assess whether the decision "unreasonably applies that principle to the facts of the

prisoner's case." Id. at 413, 120 S.Ct. 1495. It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.

Pinholster, 563 U.S. at 182-83 (footnote omitted). This Court may not issue the writ where the state court decision applied clearly established federal law erroneously or incorrectly; rather, the application must also be unreasonable. Thomas v. Gibson, 218 F.3d 1213, 1220 (10th Cir. 2000) (citing Williams, 529 U.S. at 411).

Petitioner has not provided any evidence to establish what the prevailing professional norms were in Salt Lake City in 1988 other than to cite to Standard 4-4.1 of the ABA Standards for the Defense Function (1979), which is entitled "Duty to Investigate." That standard provided:

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

Id.[84] In articulating the standard, the commentary provided, in pertinent part:

The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotions or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions.

Id. (commentary).

---

[84]     While the ABA standards concerning death penalty cases have changed considerably since petitioner's trial, these are the standards which were in effect at the time of petitioner's trial.

At the time of petitioner's trial, the term "mitigation specialist" was not routinely mentioned in the case law[85] and counsel would not, in 1988, have had access to the same research capabilities that exist today to locate cases mentioning the term.[86] In 1985, however, the National Legal Aid and Defender Association Standards (NLADA) utilized the term in its "Counsel Standards." At that time, Standard 11.4.1, titled "Investigation," provided that

> Counsel should attempt to conduct interviews of potential witnesses in the presence of a third person who will be available, if necessary, to testify as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist to conduct the interviews.

NLADA Standard 11.4.1(d)(3)(C). No authority, however, required counsel to hire a "mitigation specialist" to gather mitigating evidence in order to be effective. Rather, as the Supreme Court has stated:

> counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 691.

3.  Merits of claim

---

[85]   See also Ruling and Order dated March 23, 2012, in which the state court postconviction judge found that "mitigation studies were not the norm in 1988 . . ." and mitigation specialists were not required in 1988 when this trial occurred. PC ROA at 0015454 (Dkt. # 110, Disk # 3, Vol. 40 at 436). Additionally, the case law discussing mitigation studies post-dates petitioner's trial. PC ROA at 0015453 (id. at 435).

[86]   No Supreme Court cases utilized the term between January 1, 1970 and January 1, 1989. However, the Ohio Public Defender's Office apparently employed a mitigation specialist as early as 1986. See State v. Landrum, No. 1330, 1989 WL 4244 (Ohio Ct. App. January 12, 1989) (unpublished).

On appeal from his state postconviction proceeding, petitioner raised three categories of claims regarding trial counsel's penalty-phase representation: "(1) inadequate qualifications and preparation, (2) failure to investigate, and (3) failure to present adequate mitigating evidence." Menzies IV, 344 P.3d at 622. Before considering the merits of these claims, the Utah Supreme Court made the following additional findings of fact that are relevant to trial counsel's penalty-phase representation:

> During the penalty phase, the State highlighted [petitioner's] extensive criminal background. His prior crimes included three robberies. The first occurred on December 21, 1975. On that occasion, [petitioner] stole a truck from a dealership and picked up a partner. The two intended to rob someone and steal the person's marijuana. Instead, [petitioner] and his partner robbed a 7-11 convenience store. [Petitioner] threatened the store clerk with a gun, ordered him to a back room, and ran away with money from the cash register. The second robbery occurred five days later. After [petitioner] and his partner stole another truck from a different dealership, the two proceeded to rob the same 7-11 store and the same store clerk. But this time, [petitioner] insisted the clerk leave the store with him and his partner. Once out of town, the robbers dropped the clerk off, told him to get into a nearby ditch, and said that if he stuck his head out they would blow it off. The third robbery happened after [petitioner] escaped from jail in 1978 while serving time for the first two robberies. After escaping, he robbed a cab driver. During that robbery, he pointed a shotgun at the cab driver's head. He took $76 in cab fares and $1 from the cab driver's wallet. When the cab driver attempted to reach for a gun, [petitioner] shot him in the right arm. Five surgeries and ten years later at sentencing proceedings, the cab driver still could not write with his right hand.
>
> The State also pointed to acts by [petitioner] before trial to show that he could not be rehabilitated. For instance, while [petitioner] underwent evaluation by the Utah State Hospital, Ms. Arnold sneaked him a screw driver. The State's brief suggests [petitioner] intended to unscrew blocks securing the hospital windows. Additionally, [petitioner] kept a sharpened metal dust pan handle under his mattress. During his time in Salt Lake County Jail, [petitioner] told a jail officer that the officer did not know the problems [petitioner] could cause. [Petitioner] threatened to take out a guard or another inmate. Eventually, the jail transferred him to the behavior modification unit. The State argued that [petitioner's] criminal history, combined with the circumstances of Mrs. Hunsaker's murder, showed that he posed a continuing threat of violence and could not be rehabilitated.
>
> Ms. Wells and Ms. Palacios called several witnesses to rebut the State's case and argued that [petitioner] should not receive the death penalty. [Petitioner's] aunt and sister testified regarding his family history and circumstances. Their testimonies

127

detailed various abuses [petitioner] endured as a child. For instance, they testified that his stepfathers abused him daily, raped his mother, belittled him for failing to kill a rabbit, burned the family car to prevent his mother from leaving home, and beat his pregnant mother so severely that her child died shortly after birth. [Petitioner's] mother often left the family for extended periods of time. She died when he was only fourteen. After his mother's death, [petitioner's] stepfathers took everything the mother had and did not provide for [petitioner]. [Petitioner's] family characterized him as giving and compassionate. They stated that they hoped he would receive only a life sentence. [Petitioner's] sister noted she would feel a tremendous void if the court sentenced [petitioner] to death.

[Petitioner's] family also provided a certificate from Alcoholics Anonymous and poems and letters from [petitioner]. [Petitioner] explained in one letter that he committed the previous robberies because he felt rejected and that he blamed only himself for those prior crimes.

Douglas Wingleman, an educational psychologist, testified regarding [petitioner's] mental state. Dr. Wingleman said [petitioner] suffered from mental deficits that prevented him from responding appropriately to his surroundings. He noted, however, that with proper treatment [petitioner] might be able to function normally.

Michael DeCaria, a clinical psychologist, also testified. Dr. DeCaria emphasized the turbulent childhood [petitioner] was forced to endure and the detrimental effects it had on him. Dr. DeCaria noted that [petitioner's] stepfathers hit him, forced him to sleep in a very small room with his sister for three years, denied him dinner, and kept him home from school. Dr. DeCaria further noted that [petitioner's] problem with substance abuse resulted from his desire to alter his consciousness and make his world better. Dr. DeCaria stated that [petitioner] had no real caretaker growing up because of his stepfathers' abuse, his mother's early death, and his sister's obligation to help care for his sickly younger brother. Dr. DeCaria opined that people raised like [petitioner] often do not develop a normal conscience. In Dr. DeCaria's opinion, [petitioner] suffered from three distinct personality disorders. Dr. DeCaria testified, however, that [petitioner] may still have time to change. He noted that antisocial behavior tends to decline around age thirty, and [petitioner] was twenty-nine at the time. He also suggested that [petitioner] had a desire to change his behavior. Finally, he said the [petitioner] had the potential to function near a college-student level.

Trial counsel called Laddy Pruett, a prison social worker, to testify. Mr. Pruett testified that, based on [petitioner's] criminal history and jail experience, he would be placed on twenty-three hour lockdown. He would be entitled to limited supervised recreation, no work release, and would never be left alone on prison grounds. On the other hand, Mr. Pruett stated that [petitioner] took pride as a janitor during a prior prison stint and took pride in his family. Mr. Pruett indicated, that during the time he worked with him, [petitioner] did not try to escape or fight with others. In fact, [petitioner] had no disciplinary action against him for twenty-two months before being released from prison.

Trial counsel also called Paul Sheffield, the Utah Board of Pardons Administrator, to testify regarding the likelihood of parole in a similar case. Mr. Sheffield outlined the factors the Board of Pardons would consider and concluded that [petitioner] would likely serve his entire sentence in prison.

Judge Uno balanced the mitigating and aggravating evidence. In the end, he concluded that the aggravating circumstances outweighed any mitigating evidence and sentenced [petitioner] to death.

Menzies IV, 344 P.3d at 622-23.

Thereafter, in considering petitioner's claim that counsel's investigation was inadequate, the Utah court considered each of the issues that petitioner argued counsel failed to investigate and held that the actions of counsel during the penalty phase did not constitute ineffective assistance of counsel. In so concluding, the court stated:

Counsel began penalty-phase preparations in sufficient time, conducted a sufficient mitigation investigation, and presented a reasonable and complete mitigation defense. And even if we were to accept any of [petitioner's] arguments that penalty-phase counsel provided ineffective assistance, he fails to demonstrate how counsel's decisions or failures prejudiced his mitigation defense.

Id. at 630. As a result, the Utah Supreme Court affirmed the postconviction court's grant of summary judgment on each of petitioner's penalty-phase ineffective assistance of counsel claims.

Id.

A. Unreasonable application of federal law

In challenging the state court's legal conclusions, petitioner challenges the individual comments that the Utah Supreme Court made in rendering its ultimate conclusion. Petitioner first claims the "state court's conclusion that counsel's investigation was adequate because counsel 'hired no less [sic] than three mental health professionals,' was based on an unreasonable application of clearly established federal law." Dkt. # 109, at 217 (citations omitted); see also id. at 219 ("The Utah Supreme Court's conclusion that the investigation was adequate was based on an objectively

unreasonable interpretation of clearly established federal law."). While there can be no question that Strickland requires a "reasonable" investigation as opposed to an "adequate" investigation, this Court does not conclude that the terminology utilized by the state court shows that it based its decision on an unreasonable application of Strickland. Rather, in looking at the Utah Supreme Court's decision overall, it is clear that the court considered the actual investigation counsel undertook, as well as the allegations of what counsel could have done, in deciding whether petitioner had established that counsel's penalty stage investigation was constitutionally unreasonable. Moreover, the state court did not stop with the first prong of Strickland; it continued to the second prong, finding that, even if the investigation was lacking, petitioner failed to establish prejudice. Additionally, the terminology utilized by the Utah Supreme Court appears to be in response to the argument appellant counsel raised, to-wit: "the American common law is replete with cases which found Strickland prejudice, when counsel failed to adequately present mitigation evidence prior to 1988." Dkt. # 136-1, at 100-01 (citations omitted and emphasis added).

While the state court utilized the term "adequate"[87] throughout its opinion, the only part of the investigation that the court actually termed "adequate" related to petitioner's third, fourth, and fifth failure to investigate claims, i.e., claims that counsel failed to investigate fetal alcohol syndrome; neglect and abuse by his stepfather, his father, and mother; and the amounts and kinds of drugs and alcohol petitioner ingested prior to the murder. Menzies IV, 344 P.3d at 626. After discussing the heavy burden on a defendant to establish a violation of the Sixth Amendment for failure to investigate, the court stated that

---

[87]     Petitioner's counsel utilizes this same term in discussing counsel's duty of investigation for purposes of the second stage of trial. See Dkt. # 109, at 229.

counsel's investigation of [petitioner's] mental health issues and his background for purposes of mitigation was sufficiently comprehensive and thus did not constitute deficient performance. [Petitioner's] counsel used three different mental health professionals to evaluate any potential psychological issues. His counsel interviewed his sister and aunt to understand his childhood and background. They investigated the prison conditions and potential for rehabilitation if [petitioner] were given life in prison.

Id. A more detailed look at the state court's treatment of these specific claims reveals the court found counsel had hired fewer than three mental health professionals to assess him as to any current **and** prior mental health problems; that, as conceded by petitioner's own brief, there was nothing material to suggest that petitioner suffered from fetal alcohol syndrome; and the fact that some of petitioner's relatives were alcoholics or that his mother was a bar maid did not sustain a conclusion that counsel's performance was deficient for failing to investigate the possibility of fetal alcohol syndrome. Id. Finally, the court recognized that there was a host of evidence presented at trial concerning petitioner's abuse as a child, offered through mental health experts as well as through his sister and aunt. Id.

Petitioner does not contest any of these factual findings. Rather, petitioner contends that counsel's "inadequate" investigation meant that their experts were ill-prepared to address his history of abuse, neglect, and trauma. Petitioner admits that the sentencing judge "heard a truncated version of [his] traumatic childhood,"[88] but claims counsel should have presented more evidence of his childhood and hired an additional mental health expert to perform a neuropsychological evaluation. With the advantage of hindsight, perhaps counsel could have done more. However, this Court is not allowed to rely on the benefit of hindsight, but must assess this case based upon the information

---

[88]     Dkt. # 109, at 220.

known at the time of counsel's decisions.  <u>Strickland</u>, 466 U.S. at 680.  While the Utah Supreme

Court erroneously considered a 1989 ABA guideline that was not in effect at the time of petitioner's

trial in considering whether counsel presented appropriate mitigating evidence,[89] petitioner's counsel

did, in fact, conduct an investigation into all of the areas suggested by the earlier commentary to

Standard 4-4.1 of the ABA Standards for the Defense Function (1979).  Specifically, the Utah

Supreme Court found, as the record reflects, that counsel provided the sentencing court with

> (1) extensive evidence of [petitioner's] social history and mental health, including
> physical, emotional and psychological abuse, as well as substance abuse; (2) evidence
> of [petitioner's] educational background in elementary and middle school; (3)
> evidence of [petitioner's] prior employment and prior incarcerations, including
> employment in prison; and (4) [petitioner's] rehabilitative potential, that he would
> likely never be released, and that he would be held under very restrictive conditions.
> Moreover, counsel presented evidence of how this background affected his mental
> health and psychological condition through multiple witnesses, including two mental
> health professionals - Dr. DeCaria and Dr. Wingleman.  Counsel also called
> [petitioner's] sister and aunt to provide graphic descriptions of [petitioner's] home
> and social life and abuse.

<u>Menzies IV</u>, 344 P.3d at 628; <u>see also</u> J.T. Tr. of March 16, 1988, at 2905-3070 (Dkt. # 110, Disk

# 1, Trial/Transcripts (ROA 1161) (Add. 17) at 199-364);  J.T. Tr. of March 17, 1988, at 3076-188

((ROA 1162) (Add. 18) at 5-118); J.T. Tr. of March 18, 1988, at 3188-92 (118-122).[90]

To support his allegations that defense counsel did not do a proper investigation, petitioner

submitted, during his postconviction proceeding and this proceeding, an affidavit of Marissa Sandall-

Barrus, a capital mitigation specialist.  <u>See</u> Exhibit 38 herein and PC ROA at 0012247, Exhibit S to

the Fifth Amended [Postconviction] Petition (Dkt. # 110, Disk # 3, Vol. 33, at 131).  This specialist

---

[89]     <u>See</u> <u>Van Hook</u>, 558 U.S. at 7-8.

[90]     The jury trial transcript for both March 17, 1988 and March 18, 1988 contain a page number
         3188.

admits that the records of trial counsel contained education records, but states that the records were not complete.  Id. ¶ 4.  However, the specialist had no way to tell if a more complete record existed for 1986-88.  Id.   In reviewing this claim, the Utah Supreme Court said:

> Even if counsel performed deficiently in failing to search for the missing records (years 1986 to 1988), [petitioner] has made no showing of prejudice based on what the included education records demonstrated.  In fact, the school records that were in the record give evidence only of a very poor track record of attendance – nothing else sustains a conclusion that the un-investigated records, if included, would have impacted the case in any way.

Menzies IV, 344 P.3d at 626.  Thus, most of the information contained in this specialist's affidavit is nothing more than speculation, i.e., what could have been testified to if they had found more records[91] and/or reflects an alternative way to present the information that counsel, in fact, possessed.  For instance, the specialist admits that information concerning petitioner's biological child was contained in Dr. DeCaria's report; however, she adds "it may have been beneficial and the judge may have shown mercy if they [sic] had known that [petitioner] has a child."  Id. ¶ 6.  To the extent trial counsel was aware of this information, but chose not to introduce it, a tactical decision was made by counsel that is presumed correct, Strickland, 466 U.S. at 689, unless it was "completely unreasonable, not merely wrong."  Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000).  Where counsel relies upon the evidence generated by his or her investigation, this Court finds that a decision

---

[91]    With the exception of hearsay evidence from petitioner's former stepmother that indicates that petitioner was very protective of his younger half-sister or that petitioner was badly beaten by an older child, the specialist's affidavit adds very little to the evidence that was actually presented during the sentencing proceeding.  Rather, it contains only hearsay and/or conclusory allegations of what might have been found if further investigation had been conducted or that further investigation "**may** have provided more details."  Dkt. # 109-9, at 41-45.

to omit certain facts is not completely unreasonable. Moreover, in this case, if this evidence had been admitted, it could have opened the door for the state to emphasize that petitioner's child was conceived while petitioner was an escapee from prison in 1978, and that petitioner had no further contact with either this woman or his daughter. See PC ROA at 0012487, Report of Psychological Assessment by Michael D. DeCaria, Ph.D., Clinical Psychologist, Exhibit Y to Fifth Amended [Postconviction] Petition (Dkt. # 110, Disk # 4, PCR Sealed Pleadings, Sealed Vol. 4, at 179). As a result, this Court finds it was not unreasonable for counsel not to introduce this evidence at trial.

Additionally, while the mitigation specialist's affidavit contains hearsay information that claims petitioner's sister "only met with [petitioner's] attorney, Brooke Wells, for a short period of time the day before she was scheduled to testify" and "she was not interviewed by his defense team prior to the penalty phase," Dkt. # 109-9, at 45, ¶ 8, the sister does not make this statement in her declaration. Rather, the sister's declaration states only that if counsel "had spent the time with me," they could have learned more about petitioner's childhood. Dkt. # 109-5, at 84, ¶ 29. Based upon the information that petitioner's sister presented at trial, however, it is clear that either counsel or an investigator had to have spent time interviewing this witness for the sister to know and have an opportunity to retrieve photos of petitioner as a child and bring them with her to trial, as well as a folder of information that petitioner sent to her while he was in prison. See J.T. Tr. of March 16, 1988, at 2905-46 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 199-240).

While claiming counsel "failed to present any evidence that [petitioner] was sexually abused as a child," petitioner submits absolutely no evidence to substantiate that he was sexually abused as a child. Rather, the mitigation specialist claims that, during her investigation, "there was some information provided that indicated [petitioner] may have been molested by his step-mother." Dkt.

# 109-9, at 43, ¶ 5 (emphasis added). There is no indication of who provided this information and/or when this possible incident occurred. The Utah Supreme Court recognized this, stating: "other than this brief reference, there is nothing to indicate where this 'some information' came from or that a reasonable investigation would have uncovered such evidence." Menzies IV, 344 P.3d at 626.[92] Similarly, petitioner faults counsel for failing to present evidence "that his biological father taught him to steal and asked him to kill a man." Dkt. # 109, at 220. Again, however, the mitigation specialist claims to have been told this, but she does not indicate who the source of this information was and she admits she was not able to verify the information. Dkt. # 109-9, at 43, ¶ 5. Petitioner also argues that counsel failed to present evidence that a petition was filed against his parents for failure to care for him when he was seven years old. Dkt. # 109, at 220. This evidence was, however, presented to the sentencing court as it was contained in the presentence investigation report dated September 10, 1976. See State's Sentencing Exhibit 8 (Dkt. # 110, Disk # 1 Trial/Exhibits/1988.03.15 Sentencing at 83). Petitioner also complains because counsel did not obtain a neuropsychological evaluation.

After detailing all of these alleged deficiencies in the mitigation investigation, petitioner argues "[t]he Utah Supreme Court also unreasonably applied Strickland in its deficient performance

---

[92]    In this proceeding, petitioner also submits a declaration of Victoria Reynolds, Ph. D., that was never submitted to the state courts. Dkt. # 109-13. Dr. Reynolds admits petitioner "denied sexual abuse when asked by mental health professionals in the past." According to Dr. Reynolds, however, "this should not be taken as indicative of the truth without further assessment." Dr. Reynolds, however, supplies no additional evidence that petitioner was ever sexually abused. While recognizing this Court's review is limited to the record before the state courts, Pinholster, 563 U.S. at 186, the Court references this declaration simply to show the conclusory nature of the allegations made in an attempt to overturn the state court's factual findings.

analysis when it concluded that counsel may have strategically decided not to present some mitigating evidence, including evidence of organic brain damage, because the information could have hurt [petitioner's] case." Dkt. # 109, at 221. Since counsel did not conduct any neurological testing, petitioner claims that a conclusion that failure to present the evidence was strategic is unreasonable. This Court would agree that counsel can not make a strategic decision to omit mitigating evidence without conducting an investigation into such evidence. Petitioner has not, however, presented any evidence to establish that counsel was on notice, either from their interactions with petitioner or the experts that they hired, that they should obtain such an evaluation.[93] Therefore, this Court finds that petitioner has failed to establish deficient performance.

Petitioner also claims the state court's findings were unreasonable because "the court failed to assess the sufficiency of the mitigation evidence, as a whole, weighed against the aggravating factors." Dkt. # 109, at 221. This Court disagrees. The state trial court considered a motion for summary judgment as to each of the issues raised by petitioner's fifth amended postconviction petition, finding petitioner had failed to establish deficient performance on some issues and had failed to establish prejudice on others. The Utah Supreme Court agreed, holding:

> . . . penalty-phase counsel's actions did not constitute ineffective assistance of counsel. Counsel began penalty-phase preparations in sufficient time, conducted a sufficient mitigation investigation, and presented a reasonable and complete mitigation defense. Even if we were to accept any of [petitioner's] arguments that penalty-phase counsel provided ineffective assistance, he fails to demonstrate how counsel's decisions or failures prejudiced his mitigation defense.

---

[93] See Menzies IV, 344 P.3d at 629, which is quoted in detail in sub-paragraph (B) below.

Menzies IV, 344 P.3d at 630. To the extent the state court addressed both prongs of Strickland, this Court finds that petitioner has failed to establish how this decision was contrary to or involved an unreasonable application of clearly established federal law.

B. Unreasonable determination of facts

After delineating all of the areas in which petitioner claims the state court unreasonably applied federal law, petitioner repeats most of the arguments that this Court has just addressed. Therefore, this Court will address only those arguments not previously discussed. First, petitioner claims counsel was ineffective because they did not initiate a timely investigation, including waiting "until after [penalty phase of] trial to interview on[e] [of] a few mitigation witnesses." Dkt. # 109, at 223 (citation omitted). In considering this allegation, the Utah Supreme Court rejected this claim because petitioner failed to establish prejudice. Moreover, the state court found that "the evidence actually suggests that counsel *did* initiate the mitigation investigation before the guilt phase began, since Dr. DeCaria interviewed [petitioner] over fourteen months before trial." Menzies IV, 344 P.3d at 625. Petitioner has not cited to, and this Court is not aware of, any Supreme Court decisions that require counsel to interview all witnesses and complete all discovery prior to the second stage of trial. In many instances, that may be physically impossible. Rather, counsel is required to conduct a reasonable investigation, and whether such an investigation is reasonable depends upon what counsel did or did not do. In this case, as set forth above, counsel's penalty phase investigation included information concerning the defendant's background, education, employment record, mental health issues, and family relationships. As noted by the postconviction court,

> Beyond question there were actions taken and actions omitted and many things could have been done differently. . . . That is, however, supremely irrelevant. The law does not require that every defendant be found not guilty or receive a life sentence if

convicted of aggravated murder. The law requires only imperfect but reasonable counsel.

PC ROA, Ruling and Order dated March 23, 2012, at 0015506. Similarly, in <u>Brown v. United States</u>, 411 U.S. 223 (1973), the Supreme Court acknowledged that a defendant is entitled to a fair trial but not a perfect one, because there are no perfect trials. <u>Id.</u> at 230; <u>see</u> <u>also</u> <u>United States v. Hastings</u>, 461 U.S. 499, 508-09 (1983).

Next, petitioner claims that the state court's conclusion regarding the mitigation investigation was based on an unreasonable finding "that [petitioner's] biological father, Clifford Menzies, was 'inaccessible' because he had not been seen for 12 years." Dkt. # 109, at 226. Petitioner adds that "[t]he mere fact that Clifford was not in touch with his children does not indicate that he was in any way 'inaccessible.'" <u>Id.</u> Similarly, petitioner argues that there was no evidence in the record that petitioner's stepfather, Clint Stevens, was unavailable. In considering petitioner's claim that there was additional evidence that should have been raised, the Utah Supreme Court affirmed the postconviction court's determination that the additional evidence and witnesses were unnecessary, finding:

> Petitioner claims that there was *additional* evidence under most of these factors that should have been raised . . . . For example, he claims that counsel should have called multiple additional witnesses to testify, including his biological father, his step-fathers and step-mother, and his teachers. But as the PCC recognized, each of these witnesses was either inaccessible or would have been unhelpful, if not damaging, to [petitioner's] mitigation defense. For instance, his biological father was inaccessible because he had not been seen for twelve years. Furthermore, [petitioner] failed to show that his stepfathers were available, and [petitioner's] sister and aunt provided information about them in any event.

<u>Menzies IV</u>, 344 P.3d at 628 (italics in original).

There is no evidence in the record to establish that either petitioner's father or stepfathers were actually available or willing to testify about their bad acts against petitioner at the time of trial. Rather, at trial, petitioner's sister testified that she had not seen their father for twelve years and did not know whether he was alive. J.T. Tr. of March 16, 1988, at 2907-08 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 201-02). Moreover, petitioner has not provided any evidence suggesting he knew where his father or his stepfathers were at the time of trial or how to contact them. Even so, the Utah Supreme Court did not rest its decision on their unavailability. Rather, it found that petitioner's sister and aunt provided information about them, and that testimony was not rebutted. As a result, this Court finds that petitioner has failed to establish that the Utah Supreme Court's finding of fact was unreasonable.

Petitioner also complains that there was no evidence in the record to support the conclusion that evidence of organic brain damage would have hurt his case. In considering this claim, the Utah Supreme Court did not rest its decision solely on how this evidence would have impacted petitioner's case. Rather, the court considered the claim as it had been presented in the postconviction court, stating:

> [Petitioner's] final penalty-phase ineffective assistance claim is that counsel failed to introduce evidence of organic brain damage (OBD)–that [petitioner's] brain was physically impaired in such a way that it impacted his judgment or constituted a mental disease. [Petitioner] claims that Utah common law and Utah statutes *required* presentation of OBD and that failure to present such evidence constitutes prejudice. We reject these claims because [petitioner] misunderstands what is required of counsel under the law, and because introducing evidence of OBD would likely have hurt, rather than helped, [petitioner's] case.
>
> First, although Utah statutes do suggest that counsel raise evidence of mental impairment or disease, including the impact of drugs and alcohol, they do not *specifically* require counsel to introduce evidence of OBD. As a preliminary matter, we note that [petitioner's] arguments concerning Utah common law and the sentencing statute are unpreserved–they were raised for the first time on appeal. And

139

[petitioner's] common-law argument is unsupported by the cases he cites. Though both cases do refer to OBD, neither establishes in any way that trial counsel must present OBD evidence as a matter of effective assistance of counsel. Nor does Utah's sentencing statute require OBD evidence. Counsel need only raise mental illness/mental health concerns that are appropriate under a reasonable mitigation strategy. That was done here.

At the penalty phase, counsel elicited testimony from two separate mental health experts, both of whom testified that [petitioner's] propensity for violence was likely to abate in prison. They also testified to [petitioner's] substance abuse and the possibility that it directly affected him at the time of the murder. Although counsel also commissioned a psychiatrist, they did not call the psychiatrist to testify because the testimony would have hurt the mitigation defense–the psychiatrist's report focused on [petitioner's] violent nature and that he was unlikely to change. Although [petitioner] claims that counsel should have hired an additional neuropsychological examination to explore OBD and FAS, he makes no showing that counsel was required as a matter of constitutional effectiveness of counsel to explore these additional possibilities.

In fact, the evidence suggests that counsel was unaware of the possibility that [petitioner] had OBD or FAS and the experts counsel hired to investigate any such possibility found no supporting evidence in their inquiries. Given that "it is reasonable for counsel to rely on the judgment and recommendations of qualified experts" in developing a mitigating strategy, it was reasonable for counsel not to have explored the possibility of these additional conditions, since the three commissioned mental health experts provided no evidence suggesting to counsel that those conditions were likely to have affected [petitioner's] psychological condition. And as the PCC recognized, there was also no direct evidence of OBD.

Finally, introducing evidence of OBD would have hurt [petitioner's] mitigation defense, rather than helped. Because "impulse control [would be] forever and always impaired as a result of that OBD," this would have undercut the mitigation strategy of showing that [petitioner] was capable of rehabilitation. Had OBD evidence been introduced, it would have supported the State's position that [petitioner] would continue to be violent.

In sum, [petitioner's] failure to investigate an OBD evidence claim fails because he has not established that counsel's performance was deficient and that counsel's performance prejudiced his case.

Menzies IV, 344 P.3d at 628-9 (italics in original).

After challenging the legal conclusions and findings of fact, petitioner spends approximately twenty-five additional pages trying to convince this Court that defense counsel were "prejudicially deficient in failing to conduct an effective mitigation investigation and present key witnesses related

to his abusive and neglectful childhood." Dkt. # 109, at 228-53. In an attempt to provide additional support to his claim, petitioner submits a declaration of Victoria Reynolds, Ph. D., who reviewed juvenile and family records of petitioner and states: "In my opinion, an adequate and detailed trauma assessment with [petitioner] was never conducted at any point in [petitioner's] life." Dkt. # 109-13, at 258, ¶ 8. According to this doctor, such an assessment would "<u>possibly</u> put in context some of the reasons for his increasingly alienated, self-destructive, and violent trajectory that led to his current criminal case." <u>Id.</u> (emphasis added). This declaration was prepared on August 13, 2015, and was, therefore, never submitted to or considered by the state courts. Thereafter, petitioner spends approximately eighteen (18) additional pages to convince this Court that counsel was ineffective in failing to prepare and present "appropriate expert witnesses" during the penalty phase of trial. Again, this argument is premised upon Dr. Reynolds's declaration, as well as Dr. Kockler's neuropsychological evaluation, neither of which was before the state court. As previously stated, this Court's review is limited to the record that was before the state court. <u>Pinholster</u>, 563 U.S. at 186.

Based upon the record before the state court as discussed herein, including the fact that counsel conducted an investigation into all of the areas suggested by the commentary to Standard 4-4.1 of the ABA Standards for the Defense Function (1979), <u>i.e.</u>, defendant's background, education, employment records, mental and emotional stability, and family relationships, this Court finds "fairminded jurists could disagree" on the correctness of the state court's decision that counsel's performance was not deficient. <u>See Richter</u>, 562 U.S. at 786. Therefore, this Court finds that petitioner simply has not shown that the Utah Supreme Court's decision regarding counsel's performance was unreasonable or that trial counsel's representation amounted to incompetence under

the "prevailing professional norms" at the time of petitioner's trial. Petitioner has also not shown that the decision was based upon an unreasonable determination of the facts. Therefore, federal habeas relief is not appropriate on claim 31.

**Claim 32: Withdrawn** (see Dkt. # 109, at 265)

**Claim 34:  Denial of Due Process Regarding Change in State Law**

In claim 34, petitioner asserts that he was deprived of his rights of due process under the Fourteenth Amendment when the state court overruled prior state law during his direct appeal. Petitioner admits this claim has not been exhausted in state court; however, he argues ineffective assistance of postconviction counsel as cause to excuse his procedural default.

In Davila, 137 S. Ct. 2058 (2017), the Supreme Court refused to extend the holding in Martinez to allow federal courts to hear a substantial, but procedurally defaulted, claim of ineffective assistance of postconviction counsel.  Therefore, this Court finds that any errors by state postconviction counsel do not provide cause to overcome petitioner's procedural default of this claim.  Accordingly, claim 34 is denied.

**Claim 35:  Change in State Law Allowing Sentence of Life Without Possibility of Parole**

Petitioner alleges, in claim 35, that a change in state law to include a new sentence of life without the possibility of parole for a defendant convicted of murder renders his death sentence cruel and unusual.  Petitioner raised this claim on direct appeal, but the Utah Supreme Court denied the claim without specifically addressing it.  Menzies II, 889 P.2d at 406.  Petitioner now claims that this was an unreasonable application of clearly established federal law.

While petitioner's direct appeal was pending, the Utah legislature modified the penalty options for capital cases, adding a third option of life without the possibility of parole.  See Utah

Code Ann. § 76-3-207.5 (West 1992) (effective April 27, 1992). Moreover, the amended statute expressly stated that the new sentencing option "has no effect on sentences imposed in capital cases prior to April 27, 1992." Id.; see also State v. Andrews, 843 P.2d 1027, 1028-29 (Utah 1992) (new sentencing option has no retroactive application to a defendant whose sentence occurred prior to effective date of statute).

Petitioner does not cite to any Supreme Court decisions that holds that a sentence of death becomes "cruel and unusual" if a state subsequently changes its death penalty scheme to allow for a third sentencing option in all future capital cases. Rather, petitioner relies on the oft-quoted phrase that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Gregg v. Georgia, 428 U.S. 153, 173 (1976) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)). He argues that the legislative change in sentencing options emphasizes the undue severity of the sentence imposed in this case based upon an unfounded fear that petitioner might one day be paroled. This does not, however, establish that the Utah Supreme Court's decision was an unreasonable application of clearly established federal law. Accordingly, claim 35 is denied.

**Claim 36: Error in Application of Sentencing Standard**

In claim 36, petitioner asserts that the Utah Supreme Court's conclusion, that the trial judge appropriately applied the sentencing standard set forth in State v. Wood, 648 P.2d 71 (Utah 1982), was an objectively unreasonable finding of fact that violated his rights to due process under the Fourteenth Amendment and a reliable sentence under the Eighth Amendment. Additionally, petitioner argues that the trial judge failed to make any written findings as required by State v. Lafferty, 749 P.2d 1239 (Utah 1998). According to petitioner, because the trial judge did not

"thoroughly understand and assess the mitigating evidence," the trial judge's decision did not comport with the individualized sentencing requirements of <u>Zant</u>, <u>Woodson v. North Carolina</u>, 428 U.S. 280 (1976), and <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989). Since the sentencing court specifically stated that it had weighed and evaluated the mitigating evidence, respondent urges this Court to find that petitioner has not established that the state-court decision was based on an unreasonable determination of facts.

Petitioner raised these issues on direct appeal and the Utah Supreme Court addressed the issue on the merits, holding:

> Finally, [petitioner] argues that the trial court failed to apply the standard set forth in <u>Wood</u>, 648 P.2d at 83-84, in imposing the death penalty. There, we held that in order to impose the death peanlty, the sentencing body must find beyond a reasonable doubt that the substantiality or persuasiveness of the aggravating factors outweighs that of the mitigating factors, and must then conclude, also beyond a reasonable doubt, that the death penalty is appropriate. <u>Id.</u>
>
> [Petitioner] asserts that the trial court failed to properly weigh the aggravating and mitigating factors and then incorrectly concluded that the death penalty was appropriate. We do not agree. The first prong of <u>Wood</u> requires that the sentencing body find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. 648 P.2d at 83-84. While we realize that the trial judge recited a number of factors during the sentencing proceeding, the record indicates that he weighed those factors in the manner required by <u>Wood</u>:

>> The court has, to the best of the court's ability, weighed and evaluated the mitigating circumstances and aggravating circumstances. And the conclusion the court has reached is that based on the aggravating and mitigating circumstances, the court concludes that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.

> In addition, <u>Wood</u> requires that the sentencing body find that the death penalty is the appropriate penalty beyond a reasonable doubt. 648 P.2d at 84. Again, the record indicates that the trial judge properly applied the law:

>> Consequently, this court, with the heaviest of hearts, makes the more difficult and trying decision that under the circumstances and beyond

a reasonable doubt, the death penalty is the appropriate penalty, and the court so orders.

We therefore find no merit to [petitioner's] claim that the trial judge applied an inappropriate standard when he sentenced [petitioner] to death.

[Petitioner] also points out that the trial judge did not make written findings that the prior bad acts evidenced by material found in his prison file had been proven beyond a reasonable doubt, as required by our decision in State v. Lafferty, 749 P.2d 1239 (Utah 1988), *habeas corpus granted on other grounds*, Lafferty v. Cook, 949 F.2d 1546 (10th Cir. 1992). While we have required written findings regarding unadjudicated bad acts if the sentence is determined by a judge, we have not said that such findings are constitutionally required and that a failure to make such findings mandates reversal. Id. at 1260 n. 16. Rather, we can look to the other evidence before the trial court to be certain that the death sentence would have been imposed even without the improper evidence. Id. Reviewing the record before us, we think that the error was harmless. The prior bad acts referred to are quite minor when compared to the other evidence of aggravating circumstances. We conclude that the facts indicate "beyond a reasonable doubt that the remaining aggravating circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate," despite the trial court's consideration of the prison file. See Archuleta, 850 P.2d at 1248. Therefore, any error was harmless. See Lafferty, 749 P.2d at 1261 (citing State v. Hackford, 737 P.2d 200, 204-05 and n. 3 (Utah 1987)).

Menzies II, 889 P.2d at 406.

In this case, petitioner asserts that the sentencing decision was not reliable and, therefore, it resulted in an arbitrary sentencing proceeding. The basis for petitioner's assertion is that, while the sentencing judge stated that he would address the mitigating evidence he considered, his subsequent statements gave very little attention to the mitigating evidence. Dkt. # 109, at 276. Petitioner also complains that, in recounting the extensive aggravating evidence, the trial judge considered numerous unadjudicated prior bad acts contained in the prison file, as well as inapplicable and

uncharged aggravating circumstances.[94]   Finally, petitioner argues that the Utah Supreme Court's conclusion, that the sentencing judge appropriately applied Wood, is an objectively unreasonable finding of fact because the sentencing judge failed to thoroughly understand and assess the mitigating evidence.

A review of the evidence in this case, however, does not support petitioner's arguments. While the Utah Supreme Court did take issue with the trial court's failure to make written findings regarding the prior unadjudicated bad acts contained in the prison file, it made it clear that those acts were "quite minor when compared to the other evidence of aggravating circumstances." Menzies II, 889 P.2d at 406.  Petitioner is not actually contesting any of the factual findings made by the Utah Supreme Court; rather, he contests the moral judgment made by both the trial court and the Utah Supreme Court.   In Saffle v. Parks, 494 U.S. 484 (1990), the Supreme Court stated that "[t]he decision whether to impose the death penalty represents a moral judgment about the defendant's culpability, not a factual finding." Id. at 506.   As a result, this Court finds that petitioner has failed to establish that the state-court decision was based on an unreasonable determination of facts. Further, this Court finds that the sentencing decision in this case met the due process requirements outlined in Zant.   Therefore, claim 36 is denied.

**Claim 37:  Ineffective Assistance of Appellate Counsel**

Petitioner argues in claim 37 that he received ineffective assistance of appellate counsel for failing to raise meritorious claims on appeal, which include:  (1) petitioner's right to due process was violated when he was forcibly shackled in front of the jurors (claims 9 and 14(G)); (2) petitioner's

---

[94]   See Claims 26 and 29 above for discussion of petitioner's claim that court relied on uncharged aggravating factors.

right to due process, to an adequate and effective appeal, and to a public trial were violated by the court's failure to record significant proceedings in petitioner's case (claims 33 and 14(H)); and (3) petitioner's rights were violated when he was convicted by a biased jury (claims 38.E.2 and 14.C). To the extent these claims lack merit, appellate counsel was not ineffective for failing to raise them on appeal. Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999). Further, as discussed above, where claims were raised in petitioner's state postconviction proceeding but were not raised in his appeal from that proceeding, he is barred from raising those claims herein. Accordingly, claim 37 is denied.

**Claim 38: Ineffective Assistance of Postconviction Counsel**

Petitioner argues in claim 38 that he received ineffective assistance of counsel during his postconviction proceedings. Petitioner does not have a constitutional right to counsel in a postconviction proceeding. As a result, attorney error committed during the course of state postconviction proceedings cannot supply cause to excuse a procedural default that occurs in those proceedings. Davila, 137 S. Ct. at 2065 (citing Murray v. Giarratano, 492 U.S. 1 (1989)). Accordingly, claim 38 is denied.

**Claims 39 and 40: Constitutionality of Utah Death Penalty Scheme**

In claim 39, petitioner argues that he was sentenced to death under a death penalty scheme that fails to adequately channel the application of the death penalty in violation of the Eighth Amendment. As pointed out by respondent, petitioner does not attempt to explain how the Utah death penalty statute that was in effect at time of his sentencing fails to narrow the class of persons eligible for the death penalty.

Additionally, in claim 40, petitioner asserts that the Utah death penalty statute violates the Fifth and Fourteenth Amendments because it imposes a burden on a defendant to overcome the evidence of conviction and creates a presumption of death in sentencing. Although petitioner claims this issue was not raised in his state court proceedings, a review of petitioner's direct appeal brief contradicts this to some extent. Petitioner's appellate brief states:

> [Petitioner] maintains that the Utah death penalty scheme violates the eighth amendment to the United States constitution and Article I, § 9 of the Utah constitution because (1) the lengthy list of aggravating factors in Utah Code Ann. § 76-5-202 allows almost any homicide to result in a death penalty, thereby failing to narrow the class, (2) the unlimited aggravation language of § 76-3-207 fails to channel the discretion of the sentencer, <u>(3) the statute impermissibly creates a presumption of death in the penalty phase, (4) the Utah death penalty scheme unacceptably reduces evidentiary burdens in the penalty phase</u>, and (5) . . . .

Brief of Appellant filed on September 24, 1986, at 196 (Dkt. # 110, Disk #1, Related Appeals/Direct Appeal, Dkt. # 100, at 221) (emphasis added). In presenting this claim to the Utah Supreme Court, however, petitioner did not articulate any arguments with respect to these two statements. Rather, petitioner attempted to "adopt and incorporate" arguments made by a different person in a completely different appeal brief. <u>Id.</u> at 196-97 (221-22). Petitioner then concludes:

> Both the federal and Utah constitutions require that the class of murderers eligible for the death penalty be significantly narrowed. The current statutory scheme, with its seventeen statutory aggravating circumstances and allowance for almost unlimited aggravating evidence in the penalty phase, violates both constitutions.

<u>Id.</u> at 198 (223).

Regardless of petitioner's failure to articulate any legal arguments to support these two statements, this Court finds that the claim was raised in his direct appeal brief and, therefore, has been exhausted. The Utah Supreme Court did not, however, specifically address this issue. Rather,

it was denied with the statement, "We find [petitioner's] other claims to be without merit." <u>Menzies II</u>, 889 P.2d at 406.

To be valid, a capital punishment statute must prescribe aggravating circumstances or their equivalent that "genuinely narrow the class of persons eligible for the death penalty." <u>Zant</u>, 462 U.S. at 877; <u>see</u> <u>also</u> <u>Andrews</u>, 802 F.2d 1256 (10th Cir. 1986) (upholding the constitutionality of an earlier version of the Utah death penalty scheme), and cases cited therein. Utah's capital sentencing statutes were revised following <u>Furman v. Georgia</u>, 408 U.S. 238 (1972), and resemble the Texas system upheld in <u>Jurek v. Texas</u>, 428 U.S. 262 (1976). <u>Andrews v. Shulsen</u>, 600 F. Supp. 408 (D. Utah 1984). The initial revision of these statutes limited capital homicides to intentional and knowing murders committed in eight enumerated circumstances. <u>See</u> Utah Code Ann. § 76-5-202 (West 1973). In 1985, the legislature amended the statute to expand capital homicides to the intentional and knowing murders committed in seventeen enumerated circumstances. <u>See</u> Utah Code Ann. § 76-5-202 (West 1985). This amended statute was the one in effect at the time the homicide was committed in this case. This Court is not aware of, and petitioner does not cite to, any Supreme Court case holding that a state death penalty statutory scheme is unconstitutional if it contains seventeen enumerated circumstances as opposed to eight. Even with seventeen enumerated circumstances, a review of the statute leaves no doubt that this statute has substantially narrowed the class of persons who are eligible for the death penalty. Moreover, the portion of the enumerated circumstance applied to petitioner herein was substantially similar to an enumerated circumstance

contained in the 1973 statute.[95]  As a result, this Court finds petitioner has failed to show that the

decision of the Utah Supreme Court denying claim 39 was an unreasonable application of clearly

established federal law.

Additionally, the standards that guide a sentencing body must focus on the circumstances of

the crime, as well as the background and personal characteristics of the defendant.  Woodson, 428

U.S. at 304 (citing  Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 55 (1937)).   While

petitioner's argument appears to be that, by allowing the sentencer to consider as aggravating factors

the evidence that established the crime in the guilt phase, the Utah statute[96] impermissibly creates

a presumption of death or somehow reduces the burden of proof in the penalty phase.  The Supreme

Court has held, however, that consideration of aggravating circumstances in both the guilt and

penalty phases of a capital trial does not de facto shift the burden of proof to the defendant or render

the sentencing scheme unconstitutional.  See Lowenfield, 484 U.S. at 246.  Accordingly, this Court

finds that petitioner has failed to establish that the decision of the Utah Supreme Court denying claim

---

95      Compare Utah Code Ann. § 76-5-202(1)(d) (West 1973) ("(1) Criminal homicide constitutes
        murder in the first degree if under circumstances not constituting manslaughter, the actor
        intentionally or knowingly causes the death of another under any of the following
        circumstances: . . . . . . (d) The homicide was committed while the actor was engaged in the
        commission of, or an attempt to commit, or flight after committing or attempting to commit,
        robbery, rape, forcible sodomy, or aggravated sexual assault or arson, burglary or
        kidnapping."), with Utah Code Ann. § 76-5-202(1)(d) (West 1985) ("(1) Criminal homicide
        constitutes murder in the first degree if the actor intentionally or knowingly causes the death
        of another under any of the following circumstances: . . . . . . (d) The homicide was
        committed while the actor was engaged in the commission of, or an attempt to commit, or
        flight after committing or attempting to commit, aggravated robbery, robbery, rape, rape of
        a child, object rape, object rape of a child, forcible sodomy, sodomy upon a child, sexual
        abuse of a child, child abuse of a child under the age of 14 years, as otherwise defined in
        subsection 76-5-109(2)(a), or aggravated sexual assault, aggravated arson, arson, aggravated
        burglary, burglary, aggravated kidnaping, kidnaping, or child kidnaping.").

96      Utah Code Ann. § 76-3-207(2) (West 1982).

40 was an unreasonable application of clearly established federal law. For the reasons stated, claims 39 and 40 are hereby denied.

**Claims 41 and 42: Cruel and Unusual Punishment**

In claim 41, petitioner argues that, because he has spent twenty-seven (27) years on death row, it would violate his Eighth Amendment right to be free from cruel and unusual punishment for the state to execute him. Petitioner's claim, commonly referred to as a Lackey claim,[97] is premised on two notions—execution of one who has spent so many years on death row does not meaningfully advance the goals of retribution or deterrence and, as it relates to death-row inmates, the severe limitations placed upon these inmates compounds the anxieties normally associated with incarceration, including living with the uncertainty of an upcoming execution for a substantially long period of time. Further, in claim 42, petitioner asserts that the death penalty is categorically cruel and unusual punishment, in violation of the Eighth Amendment. Petitioner admits that neither of these issues have been exhausted.

The Supreme Court has never held that execution of a person who has been held on death row for a substantial number of years prior to the execution violates the Constitution. "Although two Supreme court justices have expressed the view that lower federal courts should grapple with this issue, those views do not constitute an endorsement of the legal theory, which has never commanded an affirmative statement by any justice, let alone a majority of the Court." Stafford v. Ward, 59 F.3d 1025, 1028 (10th Cir. 1995). This Court is not aware of any reported federal case that has adopted the position advocated by petitioner. See also Gardner v. State, 234 P.3d 1115, 1142-44 (Utah

---

[97]    See Lackey v. Texas, 514 U.S. 1045 (1995) (Stevens, J., statement respecting denial of certiorari).

2010); State v. Lafferty, 20 P.3d 342 (Utah 2001); State v. Andrews, 843 P.2d 1027, 1030-31 (Utah 1992). Further, the Supreme Court has "time and again reaffirmed that capital punishment is not per se unconstitutional." Glossip v. Gross, 135 S. Ct. 2726, 2739 (2015), and cases cited therein. Accordingly, this Court hereby denies claims 41 and 42.

**Claim 43: Cumulative Error**

In claim 43, petitioner asserts that he was denied a fair trial as a result of the cumulative effect of all errors during his trial, appeal, and postconviction proceedings, thereby depriving him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. Petitioner argues that, if this Court does not find any of his individual claims persuasive, it should grant relief based upon the cumulative effect of all of his alleged constitutional violations. Respondent asserts that this claim has not been exhausted.

As previously stated, before exhaustion will have occurred a habeas petitioner must have "fairly presented" to the state courts the "substance" of his federal habeas corpus claim. Picard, 404 U.S. at 275-76. While petitioner raised a claim of cumulative error in his direct appeal, that claim included only the individual errors that he claimed on direct appeal. It did not include all of the claims raised in this habeas proceeding. Petitioner did not raise any claim of cumulative error in his appeal from the denial of his postconviction petition. Because petitioner did not fairly present to the state courts that the cumulative effect of "errors" denied him due process and a fundamentally fair trial, this Court finds he failed to exhaust this claim. Gonzales v. McKune, 279 F.3d 922, 925 (10th Cir. 2002) (en banc) (rejecting petitioner's argument that exhaustion requires only that the substance of the claim be presented and concluding that the cumulative error argument was unexhausted and procedurally barred because cumulative error claim was never presented to the state court); see also

<u>Nickleson v. Stephens</u>, 803 F.3d 748 (5th Cir. 2015) (no circuit court has held that cumulative error claims against state convictions may be reviewed in federal proceedings without exhaustion). Therefore, claims 43 is denied.

## IV.
## CONCLUSION

After a thorough review of the second amended petition for writ of habeas corpus (Dkt. # 109), respondent's response (Dkt. # 123), petitioner's reply (Dkt. # 127), and all of the state court records filed herein, this Court finds that petitioner has failed to establish that he is currently in custody in violation of the Constitution or laws or treaties of the United States, as required by 28 U.S.C. § 2254(a). Accordingly, the second amended petition for writ of habeas corpus (Dkt. # 109) is **denied**.

Additionally, this Court finds that petitioner failed to develop the factual basis for many of his claims in the state court proceedings, despite having been allowed five opportunities to amend his state postconviction petition, and he has not established by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense. As a result, petitioner's request for an evidentiary hearing and/or for leave to conduct additional discovery is **denied**. 28 U.S.C. § 2254(2); Rule 6, <u>Rules Governing Section 2254 Cases in the United States District Courts</u>. A separate judgment is entered herewith.

## V.
## CERTIFICATE OF APPEALABILITY

Rule 11, <u>Rules Governing Section 2254 Cases in the United States District Courts</u>, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." The Court recognizes that "review of a death sentence is among the most

serious examinations any court of law ever undertakes." Brecheen v. Reynolds. 41 F.3d 1343, 1370 (10th Cir. 1994). To be granted a certificate of appealability, however, petitioner must demonstrate a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists of reason or that the questions deserve further proceedings. Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). "Obviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor." Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983) (citations omitted).

The Court reviewed each of petitioner's propositions of error, and found none of the claims merited or warranted habeas relief. However, the Court recognizes that some of petitioner's stated issues relate to the alleged deprivation of one of his constitutional rights, which, if substantiated, could entitle him to habeas relief. In order to ensure that these issues receive the type of review on appeal which should be accorded such serious matters, the Court has carefully considered each issue and finds that the following enumerated issues could be debated among jurists or could be resolved differently by another court:

Claim 13: improper jury instructions (due to a dissenting opinion in Menzies II, 889 P.2d at 407 (dissenting opinion));

Claim 14: ineffective assistance of counsel during the guilt stage, i.e., failure to investigate the accounts of Tim Larrabee and Beth Brown and present inconsistencies at trial, and failure to investigate and present evidence undermining the account of Walter Britton;

Claims 15 and 18: admission of the prison file (due to a dissenting opinion in Menzies II, 889 P.2d at 408 (dissenting opinion)); and

Claim 31: ineffective assistance of counsel during the penalty stage.

154

Additionally, this Court finds that these same issues are adequate to deserve encouragement to proceed further.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot, 463 U.S. at 893).

A certificate of appealability is **granted** as to the claims enumerated above.

**IT IS SO ORDERED** on this 11th day of January, 2019.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE